Michael R. Mushkin, Esq.
Nevada Bar No. 2421
L. Joe Coppedge, Esq.
Nevada Bar No. 4954
MUSHKIN & COPPEDGE
6070 South Eastern Ave Ste 270
Las Vegas, NV 89119
Telephone: 702-454-3333
Facsimile: 702-386-4979
E: michael@mccnvlaw.com
E: jcoppedge@mccnvlaw.com

Illyssa I. Fogel
Nevada Bar No. 213
ILLYSSA I. FOGEL & ASSOCIATES
512 W. Goldfield Ave., Ste 54
Yerington, NV 89447
V/F: 888.570.7220
E: ifogel@iiflaw.com

*Attorneys for Plaintiff Curtis C. Magleby*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| CURTIS C. MAGLEBY, an individual,<br><br>          Plaintiff,<br><br>     vs.<br><br>CITIZENS BANK, N.A., a Rhode Island banking corporation, CITIZENS FINANCIAL GROUP, INC., a publicly traded financial corporation, CITIZENS CAPITAL MARKETS, INC., a Massachusetts corporation, THEODORE C. SWIMMER, an individual, and DONALD H. MCCREE, an individual,<br><br>          Defendants. | Case No.:<br><br><br><br>**COMPLAINT**<br><br><br>**JURY DEMAND** |

Plaintiff Curtis C. Magleby ("Plaintiff" or "Mr. Magleby"), as and for his Complaint ("Complaint") against Defendants Citizens Bank, N.A., ("CBNA"), Citizens Financial Group Inc. ("CFG"), Citizens Capital Markets, Inc. (CCM), Theodore C. Swimmer ("Swimmer") and Donald H. McCree ("McCree") (collectively "Defendants"), alleges as follows:

### JURISDICTION

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. The Plaintiff, Mr. Magleby, is a resident of Nevada, while the Defendants, CFG, CBNA, and CCM, are entities with principal places of business outside Nevada.

2.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this district. Specifically, Mr. Magleby currently resides in Nevada, and the impact of the Defendants' actions, including wrongful termination and breach of contract, is felt in Nevada.

3.      The Defendants are subject to personal jurisdiction in this district as the Defendants have engaged in activities that have a substantial connection with Nevada. This includes employing Mr. Magleby, who resides in Nevada, and conducting business that affects Nevada residents.

### NATURE OF THE ACTION

4.      This action arises out of:

      a)      Wrongful termination;

      b)      Breach of contract;

      c)      Certain extortionate practices (detailed below);

      d)      Defendants' tortious interference with the at-will employment contracts at issue;

      e)      Defendants' tortious interference with the Restricted Stock Unit Award Agreement (the "RSU Agreement" or "Award Agreement"), which could only be terminated for cause, at issue here;

      f)      Defendants' connected torts of (i) intentional infliction of economic distress, and (ii) tortious interference with business, business relationships and future business opportunities;

      g)      Defendants' defamatory reporting on Mr. Magleby's Form U-5, reflecting

Defendants' multiple breaches of FINRA Rule 2010,[1] along with other rules and principles of common law; and

h)    Erroneous rulings by an Arbitrator in California exhibiting manifest disregard of the law.

5.    Defendants' collective conduct directly caused, and continues to cause, identifiable financial harm to Plaintiff, also detailed below.

**PARTIES**

6.    From approximately March 15, 2015, Plaintiff Magleby, CRD[2] No. 2259115, was a securities industry registered representative, first with Citizens Securities, Inc. ("CSI") for one year, and then with a related entity, Defendant CCM, until he was terminated in mid-December 2021.

7.    During his employment with Defendants, Mr. Magleby, a native of Las Vegas, Nevada, was living and working in California, where he had begun his employment with Defendants and where he continued to work until he moved back to Las Vegas in October 2020, for approximately the last year his employment. The COVID-19 pandemic had made living in California inordinately difficult for Mr. Magleby. Mr. Magleby currently resides in Las Vegas, Clark County, Nevada.

8.    Defendant CBNA, is, and was at all relevant times, a Rhode Island banking corporation, with a principal place of business at Providence, Providence County, Rhode Island. Defendant CBNA is the wholly owned banking subsidiary of CFG, below. Defendant CBNA was the payor on Mr. Magleby's compensation, both salary and bonus.

9.    Defendant CBNA is regulated by the United States Office of the Comptroller of the Currency ("OCC"). CBNA holds itself out as the 13th largest bank in the United States. Where appropriate, CFG, CBNA, and CCM are collectively referred to in this Complaint as "Citizens."

---

[1] Plaintiff acknowledges that there is no private cause of action for violation of FINRA rules, but notes that such violations may be used as evidence of various acts of malfeasance.

[2] Central Registration Depository (CRD®) program, supports the licensing and registration filing requirements of the U.S. securities industry and its regulators. The CRD program covers the registration records of broker-dealer firms, branch offices and their associated individuals, including their qualification, employment and disclosure histories; it also directs the processing of form filings, fingerprint submissions, collection and disbursement of registration-related fees, qualification exams and continuing education sessions.

10.     Defendant CFG is a publicly traded company (NYSE:CFG), whose stock closed at $47.08 on December 14, 2021. Defendant CFG is the parent of all other corporate Defendants.

11.     Defendant CCM, CRD #277073, was, at all relevant times, a licensed broker-dealer, registered with the Financial Industry Regulatory Authority ("FINRA")[3] and the United States Securities and Exchange Commission ("SEC"), with a principal place of business Boston, Suffolk County, Massachusetts. Defendant CCM is a wholly owned subsidiary of Defendant CFG.

12.     Defendant Theodore C. Swimmer ("Swimmer"), CRD No. 2661662, is an individual with a place of business in Charlotte, Mecklenburg County, North Carolina. At all relevant times, Swimmer was the head of Corporate Finance and Capital Markets at CCM, and, as holder of a Series 24 license, was Plaintiff's direct supervisor.

13.     Defendant Donald H. McCree ("McCree"), CRD No. 2316064, is an individual with a place of business in Boston, Suffolk County, Massachusetts. At all relevant times, McCree was the vice-chairman and head of commercial banking at CBNA, and the CEO of CCM.

### FACTUAL ALLEGATIONS RELATED TO ALL CLAIMS

14.     In connection with his employment, Mr. Magleby was presented with two material documents: (i) a written offer of employment as "Managing Director" of "Cap Mkts" (*i.e.*, CCM) dated February 26, 2015, from parent company CFG purportedly "on behalf of" its banking subsidiary, CBNA, but nevertheless expressly referring to "CFG" as the employer throughout the offer letter, attached as **Exhibit 1**, and (ii) a document titled "Mutual Agreement to Arbitrate Employment-Related Disputes," not developed and made effective until 2018, on the letterhead of CBNA but textually identifying it as being between Mr. Magleby and CFG, together with "any of its subsidiaries, affiliated, related or successor entities, ('Citizens') and each individual employee of Citizens," attached as **Exhibit 2**.

15.     Taken together, Exhibits 1 and 2 demonstrate an interconnectedness of the Citizens entities and personnel. CFG provided the offer on behalf of its banking subsidiary, CBNA; CBNA, in turn, was ostensibly hiring Mr. Magleby to work at CCM. CBNA provided an

---

[3] FINRA is responsible for the CRD program. FINRA is a self-regulatory organization for member broker-dealers that is responsible under federal law for supervising member firms.

arbitration agreement between its parent, CFG, and Mr. Magleby, covering Citizens employees and personnel, which applies to the dispute between the parties. This inter-operability suggests that any protections offered by the corporate veil should be pierced, certainly with respect to the claims asserted in this Complaint.[4]

16.    Exhibits 1 and 2 reflect that Defendants CFG, CBNA, and CCM were acting variously as principals and agents of each other. For example, while Defendant CFG is the parent of both CBNA and CCM, it functioned as an agent of CBNA and CCM by offering a job at CCM "on behalf of" CBNA. It is well established that principals are liable for the torts of their agents, pursuant to longstanding principles of the laws of agency, and also pursuant to the ancient, but still operative, doctrine of *respondeat superior*. See, e.g., *Patterson v. Domino's Pizza, LLC*, 177 Cal.Rptr.3d 539, 333 P. 3d 723 (2014); *Davis v. Beling*, 128 Nev. 301, 278 P. 3d 501 (2012.)

17.    Citizens' employment offer, to Mr. Magleby, included a bonus structure consisting of (i) 20% of financing revenue, plus (ii) 30% of M&A revenue, plus (iii) certain Restrictive Stock Units, also pegged to production. This bonus structure was negotiated by Mr. Magleby and Defendant Swimmer.

18.    Mr. Magleby's bonus compensation was the subject of an annual Restricted Stock Unit Award Agreement (the "RSU Award Agreement"), part of the Citizens Omnibus Incentive Plan, that set forth the annual stock components of Mr. Magleby's compensation. A copy of one of the annual Omnibus Incentive Plan RSU Award Agreements, for 2014, but granted in 2019, is attached as **Exhibit 3.**

19.    Defendant CFG's offer letter on behalf of CBNA for Mr. Magleby to work at CCM specifies that Mr. Magleby will be based in the State of California, and also specifies that the law applicable to his relationship with Citizens is the law of the state in which Mr. Magleby is based.

20.    The Arbitration agreement from CBNA also specifies that it is subject to the law of the state in which Mr. Magleby is based "without regard to its conflict of laws provisions."

---

[4] It is noteworthy that when Mr. Magleby was hired via the CFG offer letter, the organizations did not have a Broker-Dealer qualified to underwrite securities, so Citizens had to use a joint venture arrangement with Oppenheimer, to whom Citizens paid 20% (twenty percent) of the fees.

# BACKGROUND FACTS

21. Until the events described in this Complaint, Mr. Magleby had an unblemished record in the securities industry, ever since Mr. Magleby first obtained his Series 7 License in 1995, when he was registered with Smith Barney, Inc.

22. Throughout his distinguished career, Mr. Magleby has been associated with highly esteemed and leading firms in the financial sector, including Smith Barney (which merged with Salomon Brothers and subsequently became Citigroup), Lehman Brothers (which he departed in 2005), Wells Fargo Securities,[5] and Cushman & Wakefield Securities.

23. Mr. Magleby was subsequently asked to start a gaming, lodging and leisure corporate finance business at Citizens Securities, Inc.,[6] via employment first at CBNA which led to his employment at Defendant CCM.

24. Mr. Magleby advanced in his investment banking career by concentrating on institutional investment banking clients. Throughout his career, Mr. Magleby assumed increasing responsibilities as he transitioned through various firms; he consistently worked on significant, high-value transactions, including several multi-billion-dollar deals. This trajectory continued, culminating in Mr. Magleby's involvement in the majority of the largest transactions at Citizens.

25. Mr. Magleby's professional skill and transactional success led to various promotions within the firms where he was registered.

26. In 1992, Mr. Magleby had moved to New York. However, during the summer of 2000, Mr. Magleby moved from New York to California to (i) provide a better environment for his family, particularly his three sons, and (ii) to have proximity to his Las Vegas customers.

27. As detailed in ¶ 7, Mr. Magleby eventually moved to Las Vegas, Nevada.

28. By the time Mr. Magleby started working for Citizens in 2015, he had 20 years of success in the finance industry and was recruited by Swimmer for Citizens.

---

[5] Mr. Magleby was registered with Wachovia Securities, which was acquired by Wells Fargo, and thus Mr. Magleby's BrokerCheck® report lists Wells Fargo.

[6] Mr. Magleby's initial employment within the Citizens universe was with CFG's banking subsidiary, CBNA, in or around March 2015. BrokerCheck® reports that such employment continued through the termination at issue in this matter.

## THE FACTS UNDERLYING THE CLAIMS

29.    For various reasons, Mr. Magleby, despite his ongoing success in the industry, took a break from the financial industry starting in 2009, during which time he opened a few restaurants and functioned as CEO of a food industry entity named CJ Burger.

30.    In 2011 Mr. Magleby re-entered the financial industry at Cushman & Wakefield as a Senior Managing Director responsible for its Western United States Investment Bank, among other things. After a few years, Mr. Magleby was recruited by a former client at Lehman Brothers and Wells Fargo and took a position as a senior vice president at GLPI, Inc., a gaming and leisure property operation, headquartered in Pennsylvania.

31.    In or around October 2014, Mr. Magleby was approached by Jason Miller ("Miller") and Swimmer, both of whom were part of the interconnected Citizens management universe, specifically, Defendant CCM.

32.    Swimmer was the head of CCM, and Miller was the head of CCM's debt department.

33.    Swimmer's approach of Mr. Magleby evolved into an interview process, facilitated by the fact that Mr. Magleby, Swimmer, and Miller had previously worked together.

34.    Swimmer, in sum and substance, told Mr. Magleby that because of their prior connection, Swimmer had no questions. Swimmer even expressed concern to Mr. Magleby regarding whether Citizens was sophisticated enough for Mr. Magleby. Swimmer also expressed confidence that Mr. Magleby would do "an excellent job."

35.    After Swimmer's interview, CFG sent a written offer of employment dated February 26, 2015, to Mr. Magleby, **Exhibit 1**.

36.    Accordingly, Mr. Magleby entered into the employ of CBNA in or around March 2015, and shortly thereafter became registered at Citizens Securities, Inc., in or around May 2015.

37.    Of particular relevance here, at the pleading stage, is that Citizens' employment offer reflected a compensation agreement negotiated between Swimmer and Mr. Magleby (*see,* n.7, *infra*), which included a bonus structure capping at (i) 20% of financing revenue, plus (ii) 30% of M&A revenue, plus (iii) certain Restrictive Stock Units, also pegged to production.

38.     Bonus compensation was in addition to a salary.

39.     After accepting the offer, Mr. Magleby set about the business of building (from scratch) a gaming, lodging and leisure group, which was non-existent at Citizens, and thus Mr. Magleby's "baby" from inception.

40.     Sometime in late 2016, Mr. Magleby and Swimmer had some discussions about Mr. Magleby's compensation, and the compensation formula in place. Swimmer told Mr. Magleby that the company had hired a new head of commercial banking, Defendant McCree, and told Mr. Magleby to forward the compensation agreement to McCree and discuss Mr. Magleby's year-end bonus with him.

41.     Accordingly, Mr. Magleby and McCree spoke by telephone in December 2016 for approximately forty-five minutes.

42.     In that conversation, McCree was effusively complimentary to Mr. Magleby. McCree unambiguously expressed satisfaction with Mr. Magleby and called him a "real investment banker." McCree also seemed impressed with a deal sheet presented by Mr. Magleby. McCree told Mr. Magleby that McCree had not seen one before from any employee of CCM.

43.     McCree promised Mr. Magleby that McCree would consider the compensation issues raised by Mr. Magleby, which issues were basically related to getting assurance that Citizens would adhere to the compensation formula negotiated by Mr. Magleby and Swimmer. [7]

44.     Despite his promise, McCree never got back to Mr. Magleby. Consequently, Mr. Magleby sought out Swimmer.

45.     Swimmer told Mr. Magleby that although McCree was favorably impressed with Mr. Magleby's client list and production, McCree was intending to renege on the compensation agreement.

46.     Between 2016 and 2021, Mr. Magleby generated significant monies to the benefit of Defendants and was entitled to concomitant compensation in accordance with his negotiated agreement, as demonstrated by the following chart:

---

[7] Plaintiff recollects that certain emails by Swimmer, carried on a server owned by Defendant, and to which Plaintiff had no access, do confirm the compensation negotiations and thus, when taken together with other documents, form an enforceable contract, which was breached by Defendants. Prior to the filing of a prior claim in arbitration, discussed below, Plaintiff's then counsel sent a non-spoliation letter to counsel for Defendants.

| Year | Est. Fees to Citizens Gen. by Magleby | Magleby's Est. Bonus Per Agmt.* | Magleby's Actual Bonus | Bonus Shorted |
|---|---|---|---|---|
| 2016 | $18.3 million | $3.66 million | $1 million | **$2.6 million** |
| 2017 | $16.1 million | $3.22 million | $1.1 million | **$2.12 million** |
| 2018 | $17.1 million | $3.5 million | $1.4 million | **$2.1 million** |
| 2019 | $22.5 million | $4.5 million | $1.225 million | **$3.275 million** |
| 2020 | $30 million | $6 million | $850,000 ** | **$5.150 million** |
| 2021 | $34.7 million (est.) | $8.1 million | **$00** | **$8.1 million** |
| **Totals** | **$138.7 million** | **$29.98 million** | **$5.575 million** | **$23.345 million** |

\* *See* footnote 4, *supra*.
\*\*   Due to 60% compensation reduction forced on Magleby after Citizens threatened to fire him and file a false form U5, as detailed below.

47.     As the foregoing chart reveals, while Mr. Magleby was denied his negotiated bonus, he did receive bonuses for his ever-increasing annual production, though there was no consistency to the calculations.

48.     The inconsistencies can be seen from the percentages: 2016 - 5.46%; 2017 – 6.8%; 2018 – 7.8%; 2019 – 5.44%; 2020 – 2.8%. It is noteworthy that, pursuant to an old SEC Report of the Committee on Compensation Practices, dated April 10,1995, typical payouts at large firms for registered representatives ran between 33% to 45% of gross production. In that context, the percentage mentioned in ¶ 37, *supra*, was reasonable. (*See also*, n. 4, *supra*.)

49.     In addition to bonus compensation, Mr. Magleby was also receiving an annual salary of $300,000.00, pursuant to the original employment offer.

50.     In connection with Mr. Magleby's salary, and despite his rather significant generation of profits for Citizens, Mr. Magleby was denied a promised raise, a raise that was nevertheless paid to all other managing directors in June 2021. He was told he would receive the raise in his bonus.

51.     That promise of a raise, upon which Mr. Magleby relied, was ultimately untruthful.

52.     As the foregoing chart further reveals, from total gross production for the years 2016 through 2021 of $138,700,000.00 (one hundred thirty-eight million seven hundred thousand

dollars), Mr. Magleby was entitled to, by virtue of his negotiated bonus agreement (*see* n.6, *supra*), bonuses aggregating more than $29 million dollars. Instead, he received $5.575 million dollars, a fraction over 4% of the negotiated bonuses.

53.    Accordingly, CCM now owes (and the Defendants collectively are liable to pay) Mr. Magleby a little over $23.4 million dollars.[8]

54.    Mr. Magleby, faced with the choices of (i) making a stand to fight for his negotiated bonus, which would have likely resulted in his termination, and (ii) accepting what was remitted to him at the fluctuating whims of Citizens, opted for the latter, but did so without waiving his rights.

55.    Mr. Magleby here seeks to enforce his non-waived rights[9] and obtain equitable and legal justice, in the form of the money earned by and due to, him and other relief, to be precisely demonstrated and fully evidenced at the trial of this matter.

**RELEVANT EVENTS LEADING UP TO THE TERMINATION**

56.    In or around December 2019, Mr. Magleby spoke with Swimmer about Mr. Magleby's work to get a sense of where Swimmer, to whom Mr. Magleby directly reported, wanted Mr. Magleby to focus his efforts.

57.    To Mr. Magleby's dismay, Swimmer berated Mr. Magleby over Mr. Magleby's discussion with Rob Allen, the Chief Credit Officer, about the potential size of gaming commitments. This reaction was particularly surprising to Mr. Magleby, as it was Swimmer who had initially encouraged him to engage in that discussion with Rob Allen.

58.    In February 2020, at least three people – Swimmer, Miller, and Scott Reeds ("Reeds") (another of Mr. Magleby's managers) – directly informed Mr. Magleby that CFG's Chairman and CEO, Bruce Van Saun, had significantly increased Mr. Magleby's bonus above the bonus amount recommended by Swimmer. This significant increase apparently did not sit well with Swimmer.

---

[8] Figures are rounded estimates and precise numbers will be presented at the trial of this matter, but the deviation from these estimates will be *de minimis*.

[9] Mr. Magleby was told on several occasions that his remuneration would increase as long as his production did not decline. Mr. Magleby's production steadily increased. Mr. Magleby relied on Defendants' representations, which representations, when combined with his already high work ethic, further incentivized him to strive to become the largest producer in the Citizens universe.

59.     Nevertheless, in October 2021, Swimmer informed Mr. Magleby that Mr. Magleby had generated "all-time record" revenue.

60.     Mr. Magleby understood that, by generating all-time record revenue, he was the largest producer in his category in Citizen's universe.

61.     In October, 2021 (two months before termination) Swimmer told Mr. Magleby to expect a bonus in excess of what he would have received against the $30 million that Mr. Magleby generated in 2020 (*i.e.,* $6 million, or 20%), had it not been reduced.

62.     Mr. Magleby here asserts that such reduction in 2020 – a bonus of only 2.8% against production of $30,000,000.00 - was wrongful and dishonest, not just because it reflected a broken promise, but because it was unjustly vindictive and done with the intent of harming Mr. Magleby. This figurative picking of Mr. Magleby's pocket was a violation of CCM's obligation, under applicable FINRA rules, to observe just and honorable principles of trade, per FINRA Rule 2010

63.     Mr. Magleby detrimentally relied on Swimmer's assurances, meaning that Mr. Magleby's misplaced belief in the honesty of Swimmer incentivized Mr. Magleby to work even harder than anyone else in an ambitious effort to be and remain the top producer in the Citizens universe.

64.     To be clear, Mr. Magleby always gave more than 100%, but the promise, misleadingly and fraudulently presented to him, was especially motivating, and the discovery that it was illusory was concomitantly demoralizing.

65.     Despite repeated representations and assurances, made by Swimmer and others, Defendants, nominally and actually, acting in concert, were looking to find an excuse to relieve Citizens of the obligation to pay Mr. Magleby his bonus compensation.

**THE FABRICATED EXCUSE**

66.     Mr. Magleby engaged in the purchase and sale of publicly traded securities for his personal account and at his own risk, fully disclosing these activities to Citizens' compliance department and adhering to all FINRA regulations. The Compliance Department and Control Room not only approved, but also monitored Mr. Magleby's trading.

67.    Applicable FINRA rules permit such conduct.

68.    Notwithstanding a fairly pedestrian pattern of personal securities transactions, in 2019, Mr. Magleby was sent, after years of such activity, a written warning of a supposed "violation" of a newly implemented trade approval system. The system "kicked out" the violation warning in connection with an order valued at $195.00 (one hundred ninety-five dollars) to sell three put option contracts for Novocore, Ltd.

69.    This written warning led to a back and forth, with CCM incorrectly insisting that Mr. Magleby had violated a policy. Mr. Magleby provided a detailed demonstration that the issue reflected a defect in the system, but he was inexplicably (or intentionally) ignored.

70.    Without investigation, Citizens issued a violation to Mr. Magleby, prompting Mr. Magleby to express his objections.

71.    Reeds, one of Mr. Magleby's managers, responded by warning Mr. Magleby that if he failed to swallow the violation, CCM would *retaliate* (Reeds' exact word) against Mr. Magleby. This despite Mr. Magleby being in a management position.

72.    Mr. Magleby refused, and as Reeds predicted, the Defendants began their course of unlawful retaliatory conduct toward Mr. Magleby.

73.    Mr. Magleby, not having done anything wrong, continued to trade for his own account and risk. For the next eleven months, his personal trading was unremarkable.

74.    In June 2020, after Mr. Magleby had been given clearance to purchase 22 shares of Zoom Video Communications, Inc. ("Zoom"), a transaction valued at $5,301.25, Mr. Magleby pressed the wrong button. Instead of clicking "buy," he clicked "sell."

75.    The Zoom stock was not on any restricted list and the inadvertent sell did not create a short position in Mr. Magleby's account. The accidental sell had no impact on the stock price and did not affect any Citizens customer, or the net capital of any Citizens entity. This was not a FINRA reportable event. Nevertheless, CCM issued a warning letter to Mr. Magleby.

76.    Things deteriorated from there. In June and July 2020, shortly after the initial COVID lockdowns, Mr. Magleby was admitted to a hospital with possible heart issues. Mr.

Magleby had fully disclosed his health situation to Reeds[10] in conversation and to Human Resources.

77.    For reasons relating to Mr. Magleby's health, while he continued to work successfully on Defendant CCM's behalf, his trading for his own account and risk (primarily done at Fidelity)[11] suffered other inadvertent errors, all of which were materially inconsequential, but technically outside the scope of the approvals Mr. Magleby had received. None of the errors affected any clients of Defendant CCM, and none affected Defendant CCM or Citizens at all. None were FINRA reportable events.

78.    Notes created by CCM's personnel solidly evidence that Defendants knew the errors were unintentional, and in any event, immaterial. Mark Ragucci ("Ragucci"), a senior compliance officer, wrote "we do not believe that this is intentional. He is moving too fast. It's careless mistakes," and "Do not see anything related to insider trading or that he is benefitting from this and *there is no material risk to the bank, nor does this need to be reported to regulators.*" (Emphasis added.)

79.    CCM, however, was no longer concerned with reality. Thus, CCM's Human Resources department advocated for a formal written warning, indicating it would support termination of Mr. Magleby's employment.

80.    However, Mr. Magleby was the single largest producer in the firm and upon information and belief, his superiors, including Swimmer and McCree, were receiving an override or other benefits from Mr. Magleby's production. Consequently, Mr. Magleby received an oral warning accompanied by new restrictions on his largely irrelevant personal trading.

81.    Defendants collectively realized they could, to use a common phrase, "have their cake and eat it too," by simply slashing Mr. Magleby's remuneration.

82.    Accordingly, the oral warning was followed by a written warning, along with unreasonable restrictions on Mr. Magleby's ability to trade for his own account and risk, and most insidiously, a reduction in his bonus compensation by 60%.

---

[10] Upon information and belief, Reeds falsely noted in Mr. Magleby's file that Reeds was unaware of Mr. Magleby's health issues.
[11] At some point, due to issues with Fidelity, Mr. Magleby moved his account to Merrill Lynch.

83. The reduction in compensation was disproportionate to the purported "offense", which offense was in fact a sham excuse for Citizens to keep more of the millions Mr. Magleby was generating for them.

84. In other words, Defendants were perpetrating a long-game swindle, to enrich themselves at Mr. Magleby's expense.

## THE EXTORTIONATE THREATS

85. The threats against Mr. Magleby multiplied.

86. Swimmer, along with other senior personnel, including Bridget McAvoy, a senior VP in Human Resources, and Gary Aswad, the head of risk management, violatively extorted Mr. Magleby by telling him that if he chose to voluntarily leave the firm for any reason, Citizens would negatively mark Mr. Magleby's Form U-5[12] to state he had been "terminated."

87. This extortionate threat was particularly pointed because it boxed Mr. Magleby in. A "voluntary departure" notation on a Form U-5 ordinarily has no negative connotation to "the Street." Investment professionals routinely change jobs. But a negatively marked Form U-5 can be crippling to the effort to obtain future employment.

88. Swimmer's (and the others identified in ¶ 86) extortionate threat constituted a guarantee that Mr. Magleby could not leave with his reputation – built up over twenty years – intact. If Mr. Magleby resigned voluntarily, he would be negatively marked. If Mr. Magleby were terminated, he would be negatively marked.

89. The extortion was a violation of FINRA's overarching mandate that brokerage firms observe just and equitable principles of trade.

90. To reiterate, Swimmer, McCree and others all knew that any such fabricated negative "marks" on Mr. Magleby's Form U-5 would interfere with Mr. Magleby's ability to secure employment elsewhere. Indeed, CFG's own original offer letter (ostensibly on behalf of CBNA for Mr. Magleby to work at CCM) was contingent on Mr. Magleby's background check, which included review of his Form U-5. So, with that figurative, but knowing and powerful, gun to his head, Mr. Magleby accepted the restrictions.

---

[12] Formally titled "Uniform Termination Notice for Securities Industry Registration." Form U-5 is a document used to report the termination of a registered representative from a financial firm.

91.     Mr. Magleby's last purported "violation" was November 19, 2020, and the restrictions were imposed for one year, set to expire on November 19, 2021. Mr. Magleby observed the restrictions and did not trade his individual stocks in his individual account for that time. However, with around a week or so left on the restriction period, Defendants, acting in concert and in bad faith, fabricated a "violation" – the one used to later "justify" Mr. Magleby's termination – on November 11, 2021.

92.     Nevertheless, Mr. Magleby was also erroneously cited for a supposed violation in March 2021, for trading in his 401(k) account, which CCM later acknowledged was a "misunderstanding." Despite CCM's acknowledgement, Mr. Magleby was prevented from subsequently trading individual stocks in his own 401(k) account.

93.     CCM, in order to deprive Mr. Magleby of millions of dollars, if not more, and to benefit Citizens and the various entities named in this Complaint, terminated Mr. Magleby without notice on December 14, 2021.

94.     The significance of terminating Mr. Magleby two weeks before Christmas goes beyond the mere Dickensian; high producing financial professionals count on year-end bonus income, which often constitutes up to 90% of their annual compensation.

95.     At CCM, bonus entitlements were calculated in December, for payment in February of the following year.

96.     By terminating Mr. Magleby when they did, Defendants effectively assured that he would be deprived of his well-earned bonus. On November 16, 2021, Mr. Swimmer told Mr. Magleby that senior management was "really happy" with Mr. Magleby's performance, that the bonus pool was looking good and that Mr. Magleby's bonus was looking like it would come in at over $2,000,000.00 (two million dollars). But by terminating him, Mr. Magleby's bonus entitlement would be returned to the bonus pool and redistributed to the benefit of others at Mr. Magleby's expense.

97.     Then, crossing the border into "Outrageous," Citizens falsely asserted, as the only reason Mr. Magleby was given at the time for his termination, that Mr. Magleby "intentionally" tried to mislead Citizens Bank. (*See* ¶ 102, *infra*.)

**OTHER RELEVANT EVENTS**

98.    Tragically, the day before he was terminated, Mr. Magleby's son was hospitalized, placed in intensive care, and placed on a wait list for a liver transplant.

99.    Mr. Magleby went to the office on December 14, 2021, even though his son was hospitalized, and oblivious to CCM's intent to terminate him, only to be confronted by security guards wearing body armor. The locks had been changed, and Mr. Magleby was informed he was no longer welcome.

100.    Citizens' rough treatment of Mr. Magleby was inflicted on him, despite his having generated an aggregated $138,700,000.00 (one hundred thirty-eight million seven hundred thousand dollars) production during his employment with Citizens.

101.    Defendants prevented Mr. Magleby from retrieving or even accessing his personal papers. CCM unlawfully retained some of his personal property for several days and, to this day, nobody from Citizens has returned Mr. Magleby's all-important personal contacts list, calendar records, or medical records, among other things, intentionally converting his property, to the detriment of Mr. Magleby.

102.    Mr. Magleby spoke with Gary Aswad (as head of risk management, an authorized agent of Citizens) and Bridget McAvoy (as a representative of Human Resources). Mr. Aswad told Mr. Magleby directly and unequivocally that Mr. Magleby was being terminated for "intentionally trying to mislead Citizens Bank." In other words, Citizens was not terminating him for "no reason" but rather for a false reason. No description was ever provided as to just how Mr. Magleby could possibly have misled CBNA.

103.    Mr. Magleby is unaware of any document generated by him that could have possibly misled the 13th largest retail bank in the United States.

104.    Mr. Magleby never misled CBNA or anyone else.

105.    Mr. Magleby pressed for answers and was directed to CCM's lawyer, who refused to provide Mr. Magleby with any information as to how Mr. Magleby misled anyone in the Citizens universe.

106.    On that same date, December 14, 2021, CCM sent Mr. Magleby a proposed

termination agreement, which, in exchange for paying Mr. Magleby several million dollars (*see*, n.15, *infra*) that he was entitled to, required Mr. Magleby to be silent about his treatment at Citizens, and sought to press a non-competition requirement (unenforceable in either Nevada or California) among other requirements that Mr. Magleby felt were oppressive.

107.    In an effort to come to an amicable departure, and preserve his reputation, Mr. Magleby retained counsel to negotiate the terms of the separation, but those negotiations proved fruitless. This was particularly frustrating as it appeared an agreement had been reached, but then Citizens moved the goalposts, seeking to apply Delaware law to prevent Mr. Magleby from working in Nevada and changing the dates when payments would be made to Mr. Magleby. Mr. Magleby remonstrated against signing an agreement that was effectively violative of the laws of the state in which he lived.

**THE FALSE FORM U-5**

108.    While those negotiations were ongoing, CCM nevertheless initially filed a false Form U-5, in violation of FINRA rules, containing the otherwise desirable designation that Mr. Magleby, despite being locked out, being met with guards, and having his personal property converted, "voluntarily resigned." He would have earlier voluntarily resigned, but for the extortion described in ¶¶ 86-90.

109.    Form U-5 provides space to designate four categories for termination: (i) Voluntary (ii) Permitted to Resign (iii) Discharged and (iv) Other. With the exception of "Voluntary," the other three choices require an explanation.

110.    CCM falsely placed a "Voluntary" designation on the original Form U-5 it filed, while in the midst of negotiations, hoping that Mr. Magleby would accept a few million dollars,[13] representing only a fraction of his entitlement, and would agree to burdensome and unenforceable post-employment restrictions. Hence, the designation "Voluntary," otherwise desirable, was not only false but a manipulation, a fraudulent gambit to press Mr. Magleby.

111.    Once the negotiations failed, however, CCM filed an amended Form U-5 stating that Mr. Magleby was "Discharged," the most negative designation.

---

[13] Specifically, $900,000.00 in cash and $1,800,000.00, at then market prices, in CFG free trading stock, for a total package of $2,700,000.00.

112.   CCM was then required to provide two explanations, one for the reason for termination and the other for the reason for amending the originally filed Form U-5.

113.   CCM wrote that the reason for termination was "Failure to follow internal policies as it pertains to personal trading activities. No customer/client impact." This notation – implying an intentional act of wrongdoing on Mr. Magleby's part - was in rather stark contrast to compliance officer Ragucci's notations. (*See, ¶¶ 76-77, supra.*)

114.   In providing an explanation for amending the reason for termination from "Voluntary" to "Discharged," CCM stated: "Upon review of the circumstances surrounding Mr. Magleby's termination, the Firm determined that the Reason for Termination is more accurately classified as 'Discharged.'" This notation on the Amended Form U-5, completed 45 days after his termination when it was due 30 days thereafter, is inaccurate as no circumstances had changed to warrant the amendment.

115.   CCM falsely stated that overlooked "circumstances" caused the amendment, when these "circumstances" were present during the negotiations. The only new fact was that Defendants refused to negotiate the separation in good faith.

116.   This "Discharged" designation, coupled with a "failure to follow policies" notation, has prevented Mr. Magleby from obtaining subsequent employment, a consequence foreseeable by Defendants, and for which Defendants should be held liable.

117.   CCM needed to replace Mr. Magleby in order to finalize / monetize several billion dollars in commitments developed and obtained by Mr. Magleby for the benefit of Citizens. CCM did so by hiring back Chris Lynch, Mr. Magleby's subordinate, trained by Mr. Magleby, at a significantly lower compensation level than CCM had been paying Mr. Magleby.

118.   The evidence will show that CCM, through Swimmer and McCree, and others, trumped up a host of violations against Mr. Magleby over insignificant and immaterial "errors" that had no effect on Citizens, no effect on customers, and no effect on CCM's ability to pass FINRA audits, all in a bad faith, rule-violative, effort to deprive Mr. Magleby of millions of dollars in earned compensation.

119.   Defendant CCM has threatened to "enforce" a non-competition clause in the

1   original Citizens offer letter, which, upon information and belief, is unenforceable in the State of
2   Nevada, where Mr. Magleby currently resides, or in California. *See, e.g., Reeves v. Hanlon*, 17
3   Cal. Rptr.3d 289, 295, 95 P.3d 513 (2004). (*See* ¶ 106, *supra*.)

4       120.    Defendants, individually and collectively, engaged in an intentional course of
5   conduct, in violation of securities industry standards, not to mention the common law duty of
6   good faith and fair dealing, to benefit themselves financially at Mr. Magleby's expense, in
7   substantial sums which cannot be precisely calculated at this time, but which will be detailed for
8   the Court during evidentiary hearings. The sums are significant.

9                                   **THE ARBITRATION**

10      121.    On December 14, 2022, just two weeks before Mr. Magleby would have been
11  entitled to another annual bonus, Mr. Magleby was fired by Citizens for bogus reasons. Mr.
12  Magleby sought and engaged counsel.

13      122.    In or around May, 2022, Mr. Magleby retained counsel. After fruitless efforts to
14  amicably resolve the dispute, counsel demanded that the matter be arbitrated pursuant to the
15  Mutual Agreement of the parties. In September, 2022, the matter was formally submitted to the
16  American Arbitration Association. Arbitrator selections were filed, and a Statement of Claim was
17  filed and served.

18      123.    The AAA, on November 21, 2022, notified counsel that Hon. Amy D. Hogue,
19  retired, one of the least favored by Mr. Magleby because of her frequent reversals as a California
20  Superior Court Judge, was selected as the sole arbitrator. The Arbitrator conducted the proceeding
21  and ultimately issued her ruling in Los Angeles, County of Los Angeles, California.

22      124.    Upon exchanges of the initial documents, the proceedings began.

23      125.    In early December 2022, Defendants filed a motion to dismiss, which was opposed
24  by Mr. Magleby.

25      126.    In February 2023, the Arbitrator granted parts of the motion to dismiss, denied
26  others, and allowed Mr. Magleby to amend. He then filed an amended Statement of Claim, which
27  was corrected around April 12, 2023, to correct some inadvertent omissions. The pleading was
28  designated the First Amended Statement of Claim and Demand for Arbitration (Corrected), and

1  referred to as "FASOC," attached as **Exhibit 4.**

2  127.    On or about May 8, 2024, Respondents filed a Motion for Summary Judgment,

3  together with supporting documents such as a statement of undisputed facts, a declaration and

4  exhibits. Mr. Magleby filed an opposition to the motion, which included a statement of undisputed

5  facts, a declaration and exhibits.

6  128.    On June 14, 2024, the Arbitrator delivered her Arbitration Award (the "Award")

7  Granting Summary Judgment in Favor of Respondents, attached as **Exhibit 5**.

8  129.    The Award contained several significant errors amounting to a violation of Section

9  10 of the Federal Arbitration Act, 9 U.S.C. § 11, and a manifest disregard of the law, including,

10 but not limited to:

11          a)      the failure of the Arbitrator to enforce demands for the intentionally

12 withheld document production served by Mr. Magleby during the arbitration, some of which

13 documents were, specifically, the annual restricted stock unit (RSU) agreements delineating how

14 much he was to receive in annual bonuses. These failures to produce the documents and to enforce

15 the demands therefore, alone, are sufficient to reverse the Award;

16          b)      the incorrect dismissal of the Wrongful Termination claim;

17          c)      the failure of the Arbitrator to consider the positions of the parties on the

18 issue of whether Mr. Magleby's compensation package included both the salary and his bonus

19 components that were the subjects of the RSU agreements; and

20          d)      the inconsistent indications of the Arbitrator throughout Section V., pages

21 17 – 20, of the Award that she had no jurisdiction over the dispute regarding the payment of

22 bonuses pursuant to the annual RSU Award Agreements, which were actually before her, and that

23 a separate action to recover the same must be brought.

24 130.    "As part of his annual compensation, Magleby received restricted share units

25 (RSU's)." *See* Section V. of the Award, line 19. However, the Arbitrator then inexplicably held

26 that the claim for the RSU's was not before Arbiter, stating that the Offer Letter Agreement was

27 Separate and Distinct from the OIP's, the Omnibus Incentive Plan, which contained contractual

28 provisions that entitled Mr. Magleby to his compensation, even in the circumstances alleged by

1    Defendants. The Arbitrator stated, "[t]he OIP's are separate agreements dictating a separate and

2    distinct dispute resolution process." *See* **Exhibit 5**, Award, Section VI., C., page 20.

3    131.    On October 23, 2024, Plaintiff demanded arbitration in Nevada, through Nevada

4    counsel, of the dispute with Defendants regarding the Omnibus Incentive Plan and the failure to

5    pay him his entitled bonuses. *See* **Exhibit 6.** However, Defendants have failed to respond to

6    Plaintiff's demand, and he now believes the matter can be litigated.

7    132.    On June 25, 2024, Defendants, as Respondents, filed their Petition to Confirm

8    Arbitration Award pursuant to Section 9 of the Federal Arbitration Act in the United States

9    District Court for the Second District of New York. *See Citizens, et al., vs Magleby*, USDC,

10    SDNY, Case No. 1:24-cv-04827-AKH.

11    133.    Defendants' filing of the Petition to Confirm Arbitration Award in New York was

12    in direct contravention of the Mutual Agreement, **Exhibit 2**, which provides that the arbitration

13    is to be held "within fifty (50) miles of the [employee's] primary work location," and Section 9

14    of the Federal Arbitration Act ("FAA"), which provides that the court for confirmation of an

15    award is the "district within which such award was made." In this case, this would have been

16    California, where Mr. Magleby lived for the larger portion of when he worked for Respondents,

17    beginning in March of 2015, until he moved back to Nevada full time in 2020. Thus, venue for

18    the Motion to Confirm Arbitration Award was proper in California or Nevada – but certainly

19    NOT in New York.

20    134.    Defendants' filing of the Petition to Confirm Award in New York was made in

21    direct violation of the express terms of the operative agreements, and on false allegations of venue.

22    These are clearly set forth in Mr. Magleby's (Respondent's) Notice of Motion and Motion to

23    Dismiss for Lack of Venue, filed on October 29, 2024. *See Citizens v. Magleby,* cited above, Dkt

24    No. 13.

25    135.    On January 6, 2025, the United States District Court for the Southern District of

26    New York, referenced above, granted Respondent's Motion to Dismiss for Lack of Venue or

27    Transfer and transferred the matter to the United States District Court for the District of Nevada.

28    *See Citizens v. Magleby,* cited above, Dkt No. 20.

**FIRST CLAIM FOR RELIEF**

**(Wrongful, Retaliatory Termination)**

136.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 135 of this Complaint as though fully set forth herein.

137.    As set forth above, Defendants, individually and collectively, were engaged in a transparent effort to force Mr. Magleby out, by imposing a series of "violations" over insignificant matters that had no negative effect on any client or the firm itself.

138.    While employment agreements may be "at will," they may not be terminated for bad faith reasons, such as to benefit the employer by intentionally harming the employee, as Defendants did here.

139.    The conduct of Defendants, and each of them, as alleged herein, was willful, wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

140.    As a direct result of Defendants' wrongful, retaliatory termination, Plaintiff was economically harmed in an amount to be determined at the trial of this matter.

**SECOND CLAIM FOR REIEF**

**(Breach of Contract)**

141.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 140 of this Complaint as though fully set forth herein.

142.    As detailed above, Mr. Magleby and Citizens were in a contractual relationship,[14] which required Mr. Magleby to perform certain tasks and responsibilities. Not only did Mr. Magleby perform under his contract, but he also was, upon information and belief, Defendants' largest producer (*see*, ¶¶ 58, 59, and n.9, *supra*). Mr. Magleby's performance was outstanding,

---

[14] Prior to commencing the Arbitration, counsel for Magleby demanded a copy of all documents forming the contract between Mr. Magleby and Defendants. That demand was ignored and Defendants failed to provide the RSU agreements, whose contractual clauses operated to Mr. Magleby's benefit and Defendants' detriment.  Arbitrator Hogue, in ignoring those provisions, essentially violated her oath and failed to resolve the entire controversy between the parties.

and that performance inured to the benefit of all Defendants.

143.    To state a breach of contract claim, under Nevada or California law, a plaintiff must allege four elements: (1) formation of a contract; (2) performance or excuse of performance by the plaintiff; (3) material breach of contract by the defendant; and (4) damages." *Laguerre v. Nev. Sys. Of Higher Educ.*, 837 F.Supp.2d 1176, 1180 (D. Nev. 2011), *cited with approval by Trice v. Liberty Mut. Ins. Co.,* 2021 Nev. App. Unpub. LEXIS 26, *5 (Jan. 22, 2021) *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (Cal. Sup. Ct. 2011).

144.    Despite Mr. Magleby's exemplary performance of his contractual obligations, as previously stated, the Defendants collectively did not fulfill their obligations. The Defendants failed to provide the promised earned bonuses, failed to implement the promised salary increases, and made unfounded allegations against Mr. Magleby, among other breaches. In their numerous collective failures, the Defendants, based on their specific connection to the contract and their contractual obligations and duties, either directly breached the contract or induced its breach, to the benefit of all Defendants and to Mr. Magleby's substantial economic detriment and damage, as detailed above.

145.    As a direct and proximate result of the breach, Plaintiff was economically harmed in an amount to be determined at the trial of this matter.

**THIRD CLAIM FOR RELIEF**

**(Breach of Duty of Good Faith and Fair Dealing)**

146.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 145 of this Complaint as though fully set forth herein.

147.    It is well established that contracts contain implied covenants of good faith and fair dealing. The laws of each of California and Nevada recognize the covenant.

148.    "It is well settled in Nevada that 'every contract imposes upon the contracting parties a duty of good faith and fair dealing." *State, University and Community College System v. Sutton*, 120 Nev. 972, 989, 103 P.3d 8, 19 (2004).

149.    "[W]hen one party performs a contract in a manner that is unfaithful to the purposes of the contract and the justified expectations of the other party are thus denied, damages

may be awarded against the party who does not act in good faith." *Hilton Hotels Corp v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 808 P2d 919, 923 (1991).

150. "In *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883], we stated, 'There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 765 P.2d 373, 254 Cal. Rptr. 211 (1988).

151. As noted in the foregoing jurisprudence, as well as in the relevant cases cited in the Arbitrator's ruling of March 1, 2023, the covenant generally means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

152. The Defendants, in engaging in nefarious, bad faith tactics, acting through CCM, Swimmer and McCree, and others, to squeeze Mr. Magleby out and deprive him of his earned remuneration, of the fruits of his work, thereby breached Defendants' collective duties of good faith and fair dealing. FINRA deems this breach a violation of "just and equitable principles of trade."

153. As a direct result of the breach of Defendants' duty of good faith and fair dealing, Plaintiff was economically harmed in an amount to be determined at the trial of this matter.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

154. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 153 of this Complaint as though fully set forth herein.

155. Citizens retained bonus monies and related funds earned by and due to Plaintiff, without the consent and authorization of Plaintiff.

156. Citizens and the individual Defendants thereby obtained money at Mr. Magleby's expense to which they should not otherwise have been entitled, and, accordingly, they enriched themselves at Plaintiff's expense and to Plaintiff's financial detriment.

157. In that way, Defendants were unjustly enriched.

158.    The conduct of Defendants, and each of them, as alleged herein, was willful, wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

159.    As a direct result of Defendants' unjust enrichment, Plaintiff was economically harmed in an amount to be determined at the trial of this matter.

### FIFTH CLAIM FOR RELIEF

### (Conversion)

160.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 159 of this Complaint as though fully set forth herein.

161.    Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights", *Vigilant Insurance Co. of America v. Housing Authority of the City of El Paso*, 87 N.Y.2d 36, 637 N.Y.S.2d 342 (1995) [citations omitted].

162.    In California, conversion has three elements: ownership or right to possession of property, wrongful disposition of the property right and damages. *Tyrone Pacific Int'l, Inc. v. MV Eurychili,* 658 F.2d 664, 666 (9th Cir.1981). Nevada is the same.

163.    In "California, conversion is a 'strict liability tort.'" *Moore v. Regents of University of California* 51 Cal.3d 120, 144, 793 P.2d 479, 271 Cal. Rptr. 146 (1990) (*Moore*); *Id.* at p. 144, fn. 38 ["conversion rests neither in the knowledge nor the intent of the defendant]; accord, *Poggi v. Scott* (1914) 167 Cal. 372, 375 [139 P. 815]". *Voris v. Lampert*, 7 Cal. 5th 1131, 1150 (Sup. Ct. Cal. 2019). Conversion is a strict liability tort in Nevada, as well. *Wynn Las Vegas, LLC v. Tofani,* 2017 Nev. App. Unpub. LEXIS 930.

164.    Here, even though Plaintiff had an ownership interest, an immediate superior right of possession to items of personal property, including his all-important contact list and medical records, Defendants, and especially Defendant CCM, nevertheless exercised "unauthorized interference with plaintiff's ownership or possession of such property." *Republic of Liberia v.*

*Bickford*, 787 F. Supp. 397, 402 (S.D.N.Y. 1992).

165.    In that way, Defendants unlawfully converted Plaintiff's property.

166.    The conduct of Defendants, and each of them, as alleged herein, was willful, wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

167.    As a direct result of Defendants' conversion, Plaintiff was economically harmed in an amount to be determined at the trial of this matter.

## SIXTH CLAIM FOR RELIEF

### (Defamation)

168.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 167 of this Complaint as though fully set forth herein.

169.    The details underlying the defamation with respect to the Form U-5 are set forth at ¶¶ 108-120, *supra*.

170.    CCM filed a false Form U-5 against Mr. Magleby.

171.    CCM then filed a false, defamatory Amended Form U-5 against Mr. Magleby.

172.    CCM, and Swimmer and McCree, knew that the statements in both the Form U-5 and the Amended Form U-5 were false when made, or else they recklessly disregarded the truth, in violation of Mr. Magleby's right to an honest termination notice.

173.    Defendants' collective falsehoods went directly to Mr. Magleby's "trade or business," with actual malice[15] and thus constituted defamation *per se*.

174.    Defendants' collective falsehoods have marred Mr. Magleby's otherwise unblemished reputation and operated to prevent Mr. Magleby, despite his long history of success in the industry, from obtaining subsequent employment, despite efforts to do so, to his significant economic harm.

175.    The harm caused by Defendants' collective defamation of Mr. Magleby is

---

[15] "Actual malice" is used here in both its legal sense and its vernacular sense.

1   ongoing.

2   176.   Upon information and belief, Defendants' collective defamation of Mr. Magleby

3   was intentional and done with actual malice. An honest notation on the Form U-5 would have

4   been "Other," with an explanation that Citizens decided it did not want to pay Mr. Magleby, and

5   thus elected to sever their relationship by exercising its "at-will" option.

6   177.   The conduct of Defendants, and each of them, as alleged herein, was willful,

7   wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of

8   the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive

9   damages in an amount to be established according to proof, sufficient to punish and deter and

10  make examples of Defendants, and each of them.

11  178.   As a direct result of Defendants' collective defamation of Plaintiff, Plaintiff was

12  (and continues to be) economically harmed in an amount to be determined at the trial of this

13  matter.

14  **SEVENTH CLAIM FOR RELIEF**

15  **(Intentional Interference with Contractual Relations)**

16  179.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 178

17  of this Complaint as though fully set forth herein.

18  180.   There are two prongs to this claim for relief. The first relates to interference with

19  the future continuation of existing contractual relations between Mr. Magleby and his book of

20  clients. The second prong relates to interference, by the individuals named herein as nominal

21  defendants, with an at-will employment agreement between Mr. Magleby and Citizens.

22  181.   In general, the following elements comprise a claim for tortious interference with

23  contractual relations: (i) a prospective contractual relationship between a plaintiff and a third party

24  (ii) knowledge by a defendant of the prospective relationship (iii) intent to harm the plaintiff by

25  preventing the relationship (iv) the absence of privilege or justification by the defendant, and (v)

26  actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports, Inc*.,

27  103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987), cited by *Wichinsky v. Mosa,* 109 Nev. 84, 87-88

28  (1993). *But see, Korea Supply Co. v. Lockheed Martin Corp*., 63 P. 3d 937 (2003 Cal. Sup. Ct)

1  (same, but no need to plead intent).

2  182.   In addition, a third party's "interference with an at-will contract is actionable

3  interference with the contractual relationship" ***because the contractual relationship is at the will***

4  ***of the parties, not at the will of outsiders***. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,

5  supra, 50 Cal.3d 1118, 1127, 270 Cal.Rptr. 1, 791 P.2d 587; *Speegle v. Board of Fire*

6  *Underwriters* (1946) 29 Cal.2d 34, 39, 172 P.2d 867.) And, more specifically, such tort may be

7  based on interference with an at-will employment relationship. (*E.g., Savage v. Pacific Gas &*

8  *Electric Co.* (1993) 21 Cal.App.4th 434, 448, 26 Cal.Rptr.2d 305 [tort of interference with

9  contractual relations may be based on an at-will employment contract]; *Kozlowsky v. Westminster*

10  *Nat. Bank* (1970) 6 Cal.App.3d 593, 598, 86 Cal.Rptr. 52 ["the fact that the Bank was privileged

11  to discharge plaintiff at any time does not necessarily privilege a third party unjustifiably to induce

12  the termination"].) *Reeves v. Hanlon*, 95 P. 3d 513 (2004 Cal. Sup. Ct.).

13  183.   As detailed above, Mr. Magleby had a highly respectable portfolio of business,

14  which was substantial enough to enable him to generate over $138 million in gross revenue during

15  his tenure.

16  184.   Interactions with clients in the securities industry are contractual in nature,

17  particularly at the level at which Mr. Magleby's business operates.

18  185.   By (a) failing to return Mr. Magleby's contact list and (b) fabricating a thin

19  narrative to justify termination, a narrative which admitted to no customer harm, no firm harm

20  and no violation of laws and regulations governing the securities industry, Defendants knowingly

21  and intentionally prevented Mr. Magleby from entering into profitable agreements with his own

22  client base.

23  186.   Further, by engaging in the specific machinations detailed in the body of this

24  Complaint, the Defendants tortiously interfered with not only Mr. Magleby's at-will employment

25  agreement but also his "termination for cause" employment agreement.

26  187.   The conduct of Defendants, and each of them, as alleged herein, was willful,

27  wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of

28  the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive

damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

188.    As a direct result of Defendants' intentional interference with Mr. Magleby's various contractual relations he was (and continues to be) economically harmed in an amount to be determined at the trial of this matter.

**EIGHTH CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Advantage)**

189.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 188 of this Complaint as though fully set forth herein.

190.    The tort of intentional interference with prospective economic advantage is comprised of the following elements: (i) a prospective contractual relationship between the plaintiff and a third party (ii) knowledge by the defendant of the prospective relationship (iii) intent to harm the plaintiff by preventing the relationship (iv) the absence of privilege or justification by the defendant and (v) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt, supra; Wichinskyh, supra. Reeves v. Hanlon*, 95 P. 3d 513 (2004 Cal. Sup. Ct.).

191.    For the reasons detailed in the Seventh Claim for Relief, and throughout this Complaint, Mr. Magleby has stated a *prima facie* claim for tortious interference with prospective economic advantage.

192.    The conduct of Defendants, and each of them, as alleged herein, was willful, wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

193.    As a direct result of Defendants' intentional interference with Mr. Magleby's prospective economic advantage Mr. Magleby was (and continues to be) economically harmed in an amount to be determined at the trial of this matter.

///

## NINTH CLAIM FOR RELIEF

### (Conspiracy to Interfere with Contract and

### Current and Prospective Business Relationships)

194.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 193 of this Complaint as though fully set forth herein.

195.    An actionable civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Hilton Hotels v. Butch Lewis Productions,* 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993) (citing *Sutherland v. Gross,* 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989)).

196.    As detailed throughout this Complaint, the Defendants acted in concert to unlawfully – through the breaches and torts alleged herein – deprive Mr. Magleby of his earned compensation, and in that process of severing him from Citizens, interfered with his existing contract, future contracts, and existing business relationships.

197.    In short, Defendants, collectively and individually, have intentionally inflicted economic and reputational harm on Mr. Magleby by interfering with his contracts and obstructing his business and economic opportunities, in bad faith, as detailed throughout this Complaint.

198.    Defendants had no legitimate justification for their malfeasance toward Plaintiff, and in fact it can easily be seen that Defendants' purpose was to harm Mr. Magleby by benefitting themselves at his expense.

199.    The conduct of Defendants, and each of them, as alleged herein, was willful, wanton, outrageous, oppressive, fraudulent, despicable, and in conscious or reckless disregard of the rights of Plaintiff, and such conduct by Defendants warrants the imposition of punitive damages in an amount to be established according to proof, sufficient to punish and deter and make examples of Defendants, and each of them.

200.    As a direct result of Defendants' collective, patently tortious, conduct toward Mr. Magleby, he was economically harmed in an amount to be determined at the trial of this matter.

**TENTH CLAIM FOR RELIEF**

**(Injunctive Relief - Expungement of Form U-5)**

201.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 200 of this Complaint as though fully set forth herein.

202.    CCM filed a false Form U-5 against Mr. Magleby.

203.    CCM then filed a false, defamatory Amended Form U-5 against Mr. Magleby.

204.    CCM, and Swimmer and McCree, knew that the statements in both the Form U-5 and the Amended Form U-5 were false when made, or else they recklessly disregarded the truth, in violation of Mr. Magleby's right to an honest termination notice.

205.    Defendants' collective falsehoods went directly to Mr. Magleby's "trade or business," with actual malice[16] and thus constituted defamation *per se*.

206.    Defendants' collective falsehoods have marred Mr. Magleby's otherwise unblemished reputation and operated to prevent Mr. Magleby, despite his long history of success in the industry, from obtaining subsequent employment, despite efforts to do so, to his significant economic harm.

207.    The harm caused by Defendants' collective defamation of Mr. Magleby is ongoing.

208.    Accordingly, on this claim for relief, Plaintiff respectfully requests that the Court hold the appropriate hearing pursuant to **FINRA Rule 12805 (or any other applicable rule)**, issue an order directing CRD to expunge the false statements in Mr. Magleby's Form U-5, and, if reportable, from any reports in which it appears, order that the Form U-5 be re-amended to state that Mr. Magleby was wrongfully terminated, and grant such other and further relief to Mr. Magleby that it deems just and proper.

**ELEVENTH CLAIM FOR RELIEF**

**(Declaratory Relief – Setting Aside Arbitration Award)**

209.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 208 of this Complaint as though fully set forth herein.

---

[16] "Actual malice" is used here in both its legal sense and its vernacular sense.

210.    The Award contained several significant errors amounting to a violation of Section 10 of the Federal Arbitration Act, 9 U.S.C. § 11, and a manifest disregard of the law, including, but not limited to:

a)    the failure of the Arbitrator to enforce demands for the intentionally withheld document production served by Mr. Magleby during the arbitration, some of which documents were, specifically, the annual restricted stock unit (RSU) agreements delineating how much he was to receive in annual bonuses. These failures to produce the documents and to enforce the demands therefore, alone, are sufficient to reverse the Award;

b)    the incorrect dismissal of the Wrongful Termination claim;

c)    the failure of the Arbitrator to consider the positions of the parties on the issue of whether Mr. Magleby's compensation package included both the salary and his bonus components that were the subjects of the RSU agreements; and

d)    the inconsistent indications of the Arbitrator throughout Section V., pages 17 – 20, of the Award that she had no jurisdiction over the dispute regarding the payment of bonuses pursuant to the OIP's, which were actually before her, and that a separate action to recover the same must be brought.

211.    The U.S. Court of Appeals for the Second Circuit has imposed three requirements in order to find that an award was issued in manifest disregard of the law: First, that the governing law that was allegedly ignored was "clear," "well-defined" and "in fact explicitly applicable to the matter before the arbitrators,' as '[a]n arbitrator obviously cannot be said to disregard a law that is unclear or not clearly applicable.'" *T.Co Metals v. Dempsey Pipe & Supply*, 592 F.3d 329, 339 (2d Cir.2010); *Merrill Lynch, Pierce, Fenner & Smith v. Bobker*, 808 F.2d 930, 934 (2d Cir. 1986). Second, that "the arbitrators did in fact err in their application of the law, and that the outcome reached was erroneous." Sotheby's, 588 Fed. Appx. at 65; *T.Co. Metals*, 592 F.3d at 339. Third, "that the arbitrators knew of the law's existence and its applicability to the problem before them." Sotheby's, 588 Fed. Appx. at 66; *T.Co. Metals*, 592 F.3d at 339.

212.    An actual controversy has arisen and now exists between the parties concerning the validity, application, and interpretation of the Award.

213.    Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties with respect to the Award.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff seeks:

1)    An award of compensatory and consequential money damages in an amount to be determined at the trial, plus pre- and post- award interest at the appropriate statutory rate; and

2)    An award of exemplary damages to punish the willful, malicious, and contumacious disregard of Mr. Magleby's rights to fair compensation, and to deter its repetition, in an amount determined by the Court to be just and proper, as well as sufficient to satisfy the policy purposes of exemplary or punitive damage awards in general; and

3)    An award directing expungement pursuant to the Request for Expungement, *supra;* and

4)    An award directing the setting aside of the Arbitration Award; and

5)    An award directing that all costs, fees, and expenses of this litigation be imposed against Defendants; and

6)    An award of such other and further relief as the Court deems just and proper.

DATED this 27th day of February 2025

MUSHKIN & COPPEDGE

*/s/ Michael R. Mushkin*
MICHAEL R. MUSHKIN, ESQ.
Nevada State Bar No. 2421
L. JOE COPPEDGE, ESQ.
Nevada State Bar No. 4954
6070 South Eastern Ave., Ste 270
Las Vegas, NV 89119

ILLYSSA I. FOGEL & ASSOCIATES

*/s/ Illyssa I. Fogel*
ILLYSSA I. FOGEL
Nevada State Bar No. 213
512 W. Goldfield Ave., #54
Yerington, NV  89447

*Attorneys for Plaintiff Curtis C. Magleby*

# Exhibit 1

# Exhibit 1



February 26, 2015

Dear Curtis,

Congratulations!

On behalf of Citizens Bank, N.A. ("CFG" or "the Company"), I am pleased to offer you the position of Managing Director, Managing Dir (I), Cap Mkts beginning on a date to be determined ("Start Date").

**Position and Function**

You will be based in Work at Home, CA.  Your employment may require domestic and international travel appropriate to your duties and responsibilities. CFG reserves the right to transfer your employment to any existing or future parent, subsidiary, affiliate, division, branch of CFG or their respective successors, (collectively "affiliate"), or another location within a 50 mile radius. During your employment, you will devote your full time and best professional efforts to providing services to CFG and its affiliates.

**Compensation**

You will be paid an annualized base salary of $300,000.00, payable in bi-weekly installments that are calculated by taking your base salary and dividing by the number of pay periods in the calendar year. Your salary may be subject to an adjustment at the Company's sole discretion.

You will be eligible to participate in the Company's discretionary award program, as amended from time to time.  Discretionary awards are determined annually based on a mix of factors, including but not limited to individual, team and Company performance as well as external economic considerations and may be awarded in cash, equity-based instruments, or in any other form and may also be deferred in full or in part, as determined by the Company. Employees hired or placed into an eligible role after September 30th will not be eligible to receive an award for the current performance year. The form and the timing of payment of your award, as well as other terms and conditions, will be consistent with awards granted to similarly situated colleagues.  Any award you receive will be subject to applicable tax and other required withholdings.

The cash portion of any award will be paid by March 15th following the determination of awards and any equity-based instruments granted to you as part of your award will be granted as soon as practicable following the determination of awards, in each case, provided that you remain employed by the Company on the payment date or grant date (as applicable) and neither you nor the Company has given notice to terminate your employment prior to the payment date or grant date (as applicable).

Any equity-based instruments granted to you as part of your award will be governed by the applicable equity plan document and award agreement.  In the event of any conflict between information contained in this document and the plan or award agreement provisions, the terms of the plan and award agreement will govern.  Receiving an award under the discretionary award program in certain years does not guarantee payment or level of award in any subsequent year and any award may be forfeited or reduced (i.e. subject to clawback) as determined appropriate by the Company in its sole discretion.  The Company reserves the right to change the rules of any compensation plan or program or to cancel any such plan or program at any time without prior notice in its sole and absolute discretion.

All amounts of compensation paid to you will be paid subject to applicable tax and other required



withholdings.

**Benefits**

You will be eligible for benefits, including paid time off, which will be subject to the plan documents and Human Resources policies applicable to CFG employees as may be amended from time to time. You are also eligible to participate in the CFG employee benefits program, which includes but is not limited to, medical, dental, vision, disability, accident and life insurance coverage, as well as a 401(k) Retirement Savings Plan, in accordance with the terms and conditions of the applicable plan documents and the applicable Human Resources policies as may be amended from time to time. Some of these plans require contributions for coverage that are made through payroll deductions.

**Non-Solicitation**

You agree that during your employment and for 365 days following the termination of employment for any reason, you will not directly or indirectly solicit (through any person, corporation, partnership or other business entity of any kind), hire, recruit, induce, entice, influence, encourage, or assist in soliciting or hiring, any person who is employed during such period by CFG or its affiliates; nor will you directly or indirectly induce any such person to: (a) terminate his or her employment or (b) accept employment with anyone other than CFG or its affiliates.

You also agree that during your employment, including your Notice Period (as more fully defined below), and for 365 days following the termination of employment for any reason, you will not directly or indirectly (through any corporation, partnership or other business entity of any kind) solicit, assist in soliciting for business or entice away or in any manner attempt to persuade any client or customer or prospective client or customer to discontinue or diminish his, her or its relationship or prospective relationship with CFG or its affiliates, or otherwise provide business to any person, corporation, partnership or other business entity of any kind other than CFG or its affiliates.  The restrictions in this paragraph will apply only: (1) to clients, customers or prospective clients or customers introduced to you by CFG or its affiliates; or (2) any customer of CFG or its affiliates (whether introduced to you through CFG or its affiliates, or previously known to you) with whom you had contact during your employment by CFG or any affiliate (including your Notice Period); or (3) any customer or client of CFG or its affiliates whose identity as a client or potential client became known to you as a result of your employment at CFG or its affiliates.

You agree that the provisions of the preceding paragraphs are reasonable and that in the event you violate any of them, you acknowledge that CFG or its affiliates will be subject to irreparable harm entitling it, in addition to statutory or common law remedies, to immediate injunctive or equitable relief. You hereby acknowledge that, but for these provisions, CFG or its affiliates would not agree to the financial commitment contemplated by this letter agreement.

**Notice of Intent to Leave**

Although you are employed at-will, you agree that you will provide CFG with 60 days prior written notice of your intent to leave the employ of CFG for any reason ("Notice Period"). CFG, in its sole discretion, may decide to waive or reduce all or part of your notice period in accordance with business needs.  As such, upon tendering notice of resignation, CFG may elect to terminate the employment relationship effective upon the date that resignation was tendered, or some other date within the notice period.  You are not entitled to be paid for any portion of the notice period that CFG elects to waive or reduce.  During any accepted notice period, you will continue to be an employee and you will continue to be entitled to receive your base salary (but not a bonus). Your fiduciary duties and other obligations as an employee of CFG will continue and you will cooperate in the transition of your responsibilities.



CFG will, however, have the right, in its sole discretion, to direct that you no longer come in to a CFG work location.

**Policies and Procedures**

The Company has adopted a number of employment and business policies and procedures. These exist to ensure the business operates effectively and for the welfare and interests of our staff. You will have access to all applicable policies and procedures including the CFG Code of Business Conduct and Ethics when you join us on the Company's intranet or from your line manager. You must familiarize yourself with them and you agree to be bound by them.

We reserve the right to change existing policies and procedures or introduce new ones from time to time in the Company's sole discretion. Information about new policies and procedures or changes to existing ones will be communicated through the Company's intranet and employee communications, unless otherwise required by applicable law.

**Governing Law and Interpretation**

This offer letter will be governed and conformed in accordance with the laws of the state in which you will be based without regard to its conflict of laws provisions. Should any provision of this offer letter be declared illegal or unenforceable by any court of competent jurisdiction and should the provision be incapable of being modified to be enforceable, such provision will immediately become null and void, leaving the remainder of this offer letter in full force and effect.

**Employee Representation**

In accepting this offer, you represent and warrant to CFG that you are not subject to any agreement or understanding with any current or prior employer or business (or any other entity or person) which would in any manner preclude you from fulfilling any of the duties or obligations you would have with CFG or which would result in any additional payment from CFG and you agree to immediately notify CFG should you become aware of any such agreement or understanding at any time during your employment. You further recognize and agree that, to the extent you possess any confidential, proprietary or trade secret information of a third party, you may not and will not use or disclose such information in performing your duties for CFG.

As instructed, you must complete an Electronic Communications Agreement, Notice and Authorization form and the Personal Information sections of your online application within 24 hours. The Notice and Authorization Form authorizes us to start the background check process.

Please note that this offer is contingent on the results of the background check being satisfactory to CFG, as well as your successful completion of all facets of CFG's pre-employment screening process, which may include, among other things, CFG's receipt of satisfactory references.

This offer is also contingent upon your ability to provide documents which prove your identity and demonstrate your authorization to work in the United States, in compliance with the Immigration Reform Act. A list of acceptable documentation is included in the enclosed materials. Please be prepared to provide this information on your first day of employment. Federal law requires that, if this documentation is not provided within 3 business days of your Start Date, you will be removed from the payroll.



**At Will Employment**

***Your employment with CFG is at-will, meaning that you may be terminated at any time with or without cause, and with or without notice, and nothing in this letter should be construed as creating a contract of employment for a fixed duration.***

**Entire Understanding**

This offer letter, along with its attachments, the documents referenced herein, and any and all policies adopted or enacted by the Company, comprise the entire understanding between you and the Company regarding the terms and conditions of your employment with the Company, and fully supersede any and all prior verbal or written communications regarding those terms and conditions that are not outlined herein including but not limited to any representations related to any discretionary or performance-related award or incentive or other compensation. No verbal promises may be made by any officer or employee of the Company as to eligibility for or the guarantee of any receipt of any discretionary and/or performance-related awards in association with the Discretionary Award Program or any other types of incentive payments or awards.

Please indicate your acceptance of this offer by completing the acknowledgment and acceptance requirements on the Job Offer Page.

Once again, Congratulations. We look forward to your success with the CFG Team!

Kind regards,


Lucia Rause
Human Resources, Recruiting

# Exhibit 2

# Exhibit 2

# Mutual Agreement to Arbitrate Employment-Related Disputes



This Mutual Agreement to Arbitrate Disputes ("Agreement") is freely and voluntarily made and entered into by and between Citizens Financial Group, Inc., together with any of its subsidiaries, affiliated, related or successor entities, ("Citizens") and each individual employee of Citizens (the "Colleague"). The Colleague and Citizens (collectively, the "Parties") intend that this Agreement govern, to the greatest extent permitted by law, the resolution of all covered disputes, claims and any other matters arising out of or relating to their employment relationship or termination of that relationship.

1. <u>Mandatory Arbitration</u>. The Parties agree that any claim, complaint, or dispute related to the Colleague's employment with Citizens and not expressly excluded by this Agreement, regardless of the legal theory, shall be submitted to binding arbitration to be held within fifty (50) miles of the Colleague's primary work location with Citizens and administered by the American Arbitration Association ("AAA") in accordance with AAA's Employment Arbitration Rules ("Rules"), as revised by this Agreement. The Rules are available online at www.adr.org. If the Rules are inconsistent with the terms of this Agreement, the terms of this Agreement shall govern. The Arbitrator, and not any federal, state, or local court, or agency, shall have exclusive authority to resolve any dispute relating to the enforceability or interpretation of this Agreement and the arbitrability of disputes between the Parties. The enforceability of this Agreement shall be governed by the Federal Arbitraton Act. The Arbitrator's decision shall be final and binding. Nothing in this provision shall preclude the Parties from seeking provisional remedies in aid of arbitration from a court of competent jurisdiction.  The Parties further agree that the proceedings, filings and arbitration decisions shall remain closed to any third parties and shall be and shall remain confidential to the greatest extent permitted by law.

2. <u>Covered Claims</u>. With the exceptions identified in Section 3 below, this Agreement to arbitrate covers all grievances, disputes, claims, or causes of action (collectively, "claims") that otherwise could be brought in a federal, state, or local court or agency under applicable federal, state, or local laws, arising out of or relating to the Colleague's employment with Citizens and/or the termination thereof, including claims the Colleague may have against Citizens or against its officers, directors, supervisors, managers, employees/colleagues, or agents in their capacity as such or otherwise, or that Citizens may have against the Colleague. The claims covered by this Agreement include, but are not limited to, claims for breach of any fiduciary duty, breach of contract or covenant (express or implied), tort claims, claims for wages, or other compensation due, claims for overpayment of wages or other compensation, claims for wrongful termination (constructive or actual), claims for discrimination or harassment, claims for violation of any federal, state, local or other governmental law, statute, regulation, or ordinance. Claims are covered by this Agreement regardless of whether they have already accrued or will accrue in the future.

3. <u>Claims Not Covered</u>. Claims of sexual harassment (hostile work environment and/or quid pro quo), and equal pay violations under Title VII of the Civil Rights Act, the Equal Pay Act or any other federal, state or local law(s) are specifically excluded from this Agreement. In cases where the Colleague has multiple claims, some covered and some not covered, Citizens retains the sole discretion to litigate all claims in a court of competent jurisdiction or bifurcate the claims between court and arbitration. In addition, claims for workers' compensation, unemployment compensation

or any other claims that, as a matter of law, the Parties cannot agree to arbitrate or have otherwise agreed to arbitrate through a separate agreement, such as FINRA arbitration matters, are also excluded. Nothing in this Agreement shall preclude the Colleague from filing complaints with the Equal Employment Opportunity Commission, analogous state and local agencies and the National Labor Relations Board. Citizens may, in its sole discretion, file the following claims in a court of competent jurisdiction or pursuant to arbitration under this Agreement (a) claims where the Colleague is a co-defendant with at least one individual or entity not subject to this Agreement, including but not limited to actions seeking injunctive or other equitable or preliminary relief; and (b) claims against the Colleague in a single-plaintiff matter for recoupment of overpayment of compensation and/or claw backs of or offsets to compensation.

4. <u>Waiver of Class Action and Representative Action Claims</u>. Except as otherwise required under applicable law, the Parties expressly intend and agree that: (a) class action and representative action procedures shall not be asserted, nor will they apply, in any arbitration, court claim or any other judicial proceeding pursuant to this Agreement; (b) each will not assert class action or representative action claims against the other in arbitration or otherwise; and (c) the Parties shall only submit their own, individual claims in arbitration or otherwise and will not seek to represent the interests of any other person. Further, the Parties expressly intend and agree that any claims by the Colleague will not be joined, consolidated, or heard together with claims of any other the Colleague, regardless of whether the Parties can agree to arbitrate the claim or must proceed through another venue. Notwithstanding anything to the contrary in the Rules, and the general grant of authority to the arbitrator of the power to determine issues of arbitrability, the arbitrator shall have no jurisdiction or authority to compel any class or collective claim, to consolidate different arbitration proceedings, or to join any other party to an arbitration between the Parties.

5. <u>Waiver of Trial by Jury</u>. The Parties understand and fully agree that by entering into this Agreement to arbitrate; they are giving up their constitutional right to have a trial by jury, and are giving up their normal rights of appeal following the rendering of the arbitrator's award except as applicable law provides for judicial review of arbitration proceedings.

6. <u>Claims Procedure</u>. Arbitration shall be initiated upon the express written notice by the aggrieved party to the other party. The Colleague's notice must be accompanied by a check in the amount of $150.00 made out to the "American Arbitration Association," which shall serve as the Colleague's filing fee. Written notice of the Colleague's claim shall be mailed by certified or registered mail, return receipt requested, or through other trackable delivery service (*e.g.*, FedEx or UPS) to the HR Services Center c/o Citizens Financial Group, Inc., HR Shared Services, One Citizens Bank Way, Mail Code: JCC110, Johnston, RI 02919 ("Notice Address"). Written notice of Citizens' claim will be mailed to the last known address of the Colleague. The written notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based. Written notice of arbitration must be initiated within the same applicable federal and state law time limitations that apply to each claim(s) asserted.

7. <u>Arbitrator Selection</u>. The parties shall select a single Arbitrator to adjudicate the matter through the procedure outlined in the Rules.

8. <u>Bypassing AAA if Adminsitrative Fees Become Excessive</u>. If Citizens concludes that, but for this Agreement, multiple single plaintiff arbitration claims filed could have been brought as a class

and/or collective action in state or federal court, and AAA's combined administrative fees for those cases exceed $50,000, then Citizens shall have the right to forego the use of AAA. In that event, the Parties shall meet and confer to select a mutually agreeable arbitrator. If the Parties are unable to agree upon an arbitrator, then each Party shall select five (5) arbitrators to place on a list. Arbitrators placed on the list must be licensed to practice law in any state (or have previously been licensed and have always been and remain in good standing with their respective bar associations) and who have previously served as a neutral arbitrator for at least one dispute involving an employment matter. Each side shall alternate in striking an arbitrator from the list, with the last remaining arbitrator slected to adjudicate the matter. The parties shall mutual agree or flip a coin to determine which party strikes first. Should the selected arbitrator have a conflict or otherwise refuse or be unable to serve, the arbitrator struck immediately prior shall serve as the arbitrator. The Rules, as amended by this Agreement, shall continue to apply to the greatest extent possible to the arbitration.

9.  <u>Discovery</u>. The Rules shall apply with respect to discovery except as revised by this Agreement. The Arbitrator shall have the authority to set deadlines for completion of discovery and decide all discovery disputes.

10. <u>Substantive Law</u>. The Arbitrator shall apply the substantive state or federal law (and the law of remedies, if applicable) as applicable to the claim(s) asserted.

11. <u>Motions</u>. The Arbitrator shall rule on prehearing disputes and may hold prehearing conferences by telephone or in person at the Arbitrator discretion. The Arbitrator shall set deadlines for motions to dismiss and for summary judgment, and set applicable briefing schedules. Such motions are permitted by either party, notwithstanding anything to the contrary in the Rules. The Arbitrator may adjudicate any cause of action, or the entire claim, pursuant to a motion for summary adjudication and in deciding the motion, shall apply the substantive law applicable to the cause of action.

12. <u>Reasoned Decision</u>. Within thirty (30) days of the close of the hearing, the Arbitrator shall issue a written, reasoned and final and binding decision resolving any and all procedural issues and/or substantive matters necessary to conclude the proceedings. By mutual agreement, the Parties may grant the Arbitrator an extension of this deadline.

13. <u>Compelling Arbitration/Enforcing Award</u>. Either party may ask a court to stay any court proceeding, to compel arbitration under this Agreement and to confirm, vacate, or enforce an arbitration award. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

14. <u>Arbitration Fees and Costs</u>. Citizens shall be responsible for the arbitrator's fees and expenses and AAA's fees, with the exception of the $150 filing fee. Each party shall pay its own costs and attorneys' fees. If any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, the Arbitrator may award reasonable attorneys' fees in accordance with the applicable statute. The Arbitrator shall resolve any dispute as to the reasonableness of any fee or cost that may be awarded under this paragraph.

15. <u>Term of Agreement</u>. This Agreement to arbitrate shall survive the termination of the Colleague's employment. It can only be revoked or modified in writing acknowledge or signed by both Parties.

16. <u>Severability</u>. If any provision of this Agreement to arbitrate is adjudged to be void or otherwise unenforceable, in whole or in part, the void or unenforceable provision shall be severed and such adjudication shall not affect the validity of the remainder of this Agreement to arbitrate.

17. <u>Consideration</u>. The Parties acknowledge and agree that the mutuality of the obligation to arbitrate all claims, as well as the Colleague's employment and/or continued at-will employment with Citizens following acknowledgment of receipt of this Agreement, are independent, good and valuable consideration to which the Parties were not otherwise entitled.

18. <u>Acceptance of Agreement</u>. Unless otherwise specified in writing by Citizens on or before a colleague's initial employment with Citizens, all offers of employment extended by Citizens on or after May 18, 2018 are conditioned on the Colleague's acceptance of this Agreement.  Colleagues hired prior to May 18, 2018, who did not exercise their prior right to opt out, shall accept the terms of this Agreement through their completion of their Business Conduct and Ethics training and the related acknowledgments that reference this Agreement.

19. <u>Employment At-Will</u>. This Agreement is not a guarantee of employment for any period of time and does not change the Colleague's status as an at-will employee/colleague.

# Exhibit 3

# Exhibit 3

**CITIZENS FINANCIAL GROUP, INC.**
**2014 OMNIBUS INCENTIVE PLAN**

**Restricted Stock Unit Award Agreement**
**Terms and Conditions (Annual Grants)**

Name of Participant: CURTIS CONRAD MAGLEBY

Number of Restricted Stock Units: 13,378

Date of Grant: 03/01/2019

Unless defined in this award agreement (this "**Award Agreement**"), capitalized terms shall have the meanings assigned to them in the Citizens Financial Group, Inc. 2014 Omnibus Incentive Plan (the "**Plan**"). In the event of a conflict among the provisions of the Plan and this Award Agreement, the provisions of the Plan shall prevail.

Section 1. *Grant of RSU Award.* Citizens Financial Group, Inc. (together with its Subsidiaries, the "**Company**") has granted to the Participant (the "**Participant**") an award (the "**Award**") of the number of restricted share units ("**RSUs**") specified in the Participant's electronic account, effective on the "**Grant Date**" specified in the Participant's electronic account. The Award is subject to the terms and conditions of the Plan and this Award Agreement. The Award is granted under the Plan, the provisions of which are incorporated herein by reference and made a part of this Award Agreement.

Section 2. *Issuance of RSUs.* Each RSU shall represent the right to receive one Share upon the vesting of such RSU, as determined in accordance with and subject to the terms of this Award Agreement and the Plan.

Section 3. *Rights as a Shareholder; Dividend Equivalents.*

(a) The Participant shall have no voting rights or any other rights as a shareholder of the Company with respect to the RSUs unless and until the Participant becomes the record owner of the Shares underlying such RSUs.

(b) If a dividend is declared on Shares during the period commencing on the Grant Date (including such date) and ending on the date on which the Shares underlying RSUs are distributed to the Participant pursuant to Section 6, the Participant shall be credited with dividend equivalents in the form and in an amount equal to the dividend that the Participant would have received had the Shares underlying the RSUs been distributed to the Participant as of the time at which such dividend is paid. Dividend equivalents will be subject to the same vesting and forfeiture restrictions as the RSUs to which they are attributable and will be paid on the same date that the RSUs to which they are attributable are settled in accordance with Section 6.

Section 4. *Restrictions on Transferability.* The RSUs granted hereunder shall not be assigned, sold, exchanged, pledged, hypothecated, transferred, alienated or otherwise disposed of or hedged, in any manner (including through the use of any cash-settled instrument), whether voluntarily or involuntarily, and whether by operation of law or otherwise, other than by will or by the laws of descent and distribution, by the Participant. Any sale, exchange, transfer, assignment, pledge, hypothecation, or other disposition in violation of the provisions of this Section 4 shall be null and void and any RSU which is hedged in any manner shall immediately be forfeited. All of the terms and conditions of the Plan and this Award Agreement shall be binding upon any permitted successors and assigns.

Section 5. *Vesting; Change of Control; Vesting and Forfeiture Upon a Termination of Employment.*

1

(a)      *Vesting.*  The Award will be subject to the vesting schedule specified in the Participant's electronic account.

(b)      *Change of Control.*  If the Participant is terminated by the Company without Cause, or the Participant resigns from employment with the Company with Good Reason, within 12 months after a Change of Control (a "**Change of Control Termination**"), all unvested RSUs shall fully vest on the Participant's termination date and shall be distributed to the Participant pursuant to Section 6.

(c)      *Vesting and Forfeiture Upon Termination of Employment.*

i.      *Termination Without Cause.*  If the Participant is terminated by the Company without Cause (other than a Change of Control Termination), the Participant's RSUs shall continue to vest in accordance with Section 5(a) as though the Participant was still employed by the Company on each applicable vesting date, *provided, however,* that the Participant does not engage in any Detrimental Activity during the Participant's post-employment vesting period.

ii.      *Retirement; Disability.*  If the Participant's employment is terminated due to Retirement or Disability, the Participant's RSUs shall continue to vest in accordance with Section 5(a) as though the Participant was still employed by the Company on each applicable vesting date, *provided, however,* that the Participant (A) does not engage in any Detrimental Activity and (B) does not become employed by any company in the financial services industry, in each case, during the Participant's post-employment vesting period.

iii.      *Death.*  If the Participant is terminated due to death, the Participant's RSUs shall fully vest on the Participant's date of death and shall be distributed to the Participant's Beneficiary pursuant to Section 6.

iv.      *Forfeiture.*  If the Participant is terminated by the Company with Cause or the Participant resigns for any reason (other than a Change of Control Termination), any unvested RSUs shall be forfeited in their entirety on the Participant's termination date without any payment to the Participant. In addition, if (A) the Participant's employment is terminated by the Company without Cause (other than a Change of Control Termination) and the Participant engages in any Detrimental Activity during the Participant's post-employment vesting period, or (B) the Participant's employment is terminated due to Retirement or Disability and the Participant either (I) engages in any Detrimental Activity, or (II) becomes employed by any company in the financial services industry, in either case, during the Participant's post-employment vesting period, any unvested RSUs shall be forfeited in their entirety on the date that the Participant engages in such Detrimental Activity or becomes employed by any company in the financial services industry, as applicable, without any payment to the Participant.

Section 6.      *Distribution on Vesting.*  Subject to the provisions of this Award Agreement, upon the vesting of any of the RSUs, the Company shall deliver to the Participant (or the Participant's Beneficiary, in the event of the Participant's death prior to distribution), as soon as reasonably practicable after the vesting date (or the Participant's termination date, as applicable), one Share for each RSU, provided that such delivery of Shares shall be made no later than the end of the calendar year in which they vest or, if later, by the 15th day of the third calendar month after the vesting date provided that the Participant shall not be permitted, directly or indirectly, to designate the taxable year of the payment.  Upon such delivery, such Shares shall be fully assignable, saleable and transferable by the Participant, provided that any such assignment, sale, transfer or other alienation with respect to such Shares shall be in accordance with applicable securities laws.

Section 7.      *Notice Prior to the Participant's Voluntary Separation from Employment.* In partial consideration for the Participant's eligibility for and receipt of any award granted under the

2

Plan, the Participant agrees to provide the Company with prior notice of the Participant's voluntary separation from employment, regardless of the reason for such separation. Such notice shall be no less than the greater of (a) the notice period applicable to the Participant's employee level as specified in the Company's Separation from Employment Policy as it exists at the time the Participant provides such notice or (b) the period specified in any other written agreement between the Participant and the Company.

Section 8.     *Restrictive Covenants.*

(a)     *Non-Solicitation of Employees.*  In addition to the Participant's obligations detailed in this Agreement, the Participant agrees and reaffirms that, at any time during the Participant's employment and for twelve (12) months following the date the Participant ceases to be employed by the Company for any reason, or if longer, during the remaining vesting period (the "Restricted Period"), the Participant shall not, directly or indirectly, whether for the Participant's own account or for any person or entity other than the Company or any Company Affiliate hire, employ, solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by the Company or any Company Affiliate during the Restricted Period, nor shall the Participant directly or indirectly induce any such employee to terminate his or her employment or accept employment with anyone other than a Company Affiliate, or otherwise interfere with the relationship between the Company and/or any Company Affiliate and any of their employees during the Restricted Period. Anything to the contrary notwithstanding, the Company agrees that the Participant shall not be deemed in violation of this Section 8(a) if an entity with which the Participant is associated hires or engages any employee of the Company or a Company Affiliate, if the Participant was not, directly or indirectly, involved in hiring or identifying such person as a potential recruit or assisting in the recruitment of such employee.

(b)     *Non-Solicitation of, and Non-Interference with, Customers and Prospective Clients.* The Participant agrees that during the Participant's employment and during the Restricted Period, the Participant shall not, directly or indirectly, for any person or entity other than the Company or any Company Affiliate, solicit, assist in soliciting for or accept business from any customer of the Company or any Company Affiliate, nor will the Participant induce or encourage any such customer to discontinue or diminish his, her or its relationship or prospective relationship with the Company or any Company Affiliate, or divert business away from the Company or any Company Affiliate; provided, however, that general solicitation through advertisement shall not constitute solicitation for purposes of this provision. Anything to the contrary notwithstanding, the Company agrees that the Participant shall not be deemed in violation of this Section 8(b) if an entity with which the Participant is associated accepts business from a customer or client of the Company or a Company Affiliate, if the Participant was not, directly or indirectly, involved in soliciting or identifying such customer or client as a potential customer or client of the competing entity.

(c)     *Representations.*  The Participant agrees that all of the foregoing restrictions are reasonable and necessary to protect the Company's and/or any Company Affiliate's business and their Confidential Information and that the Participant's eligibility for and receipt of any award under the Plan, are independently and together good and valuable consideration to compensate him or her for agreeing to all restrictions contained in this Agreement. The Participant also acknowledges, represents and warrants that the Participant's knowledge, skills and abilities are sufficient to permit the Participant to earn a satisfactory livelihood without violating these provisions. Further, the Participant agrees that the Participant shall not, following the termination of the Participant's employment with the Company, represent or hold the Participant out as being in any way connected with the business of the Company or any Company Affiliate.

(d)     *Blue Pencil.*  It is expressly understood and agreed that although the Participant and the Company consider the restrictions contained in this section to be reasonable, if a final judicial determination is made by an arbitrator or a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against the Participant, the provisions of this Agreement shall not be rendered void but shall be

3

deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if an arbitrator or a court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

Section 9.     *Tax Liability; Withholding Requirements.*  The Participant shall be solely responsible for any applicable taxes (including, without limitation, income and excise taxes) and penalties, and any interest that accrues thereon, that the Participant incurs in connection with the receipt, vesting or settlement of any RSU granted hereunder. The Company shall be authorized to withhold from the Award the amount (in cash or Shares, or any combination thereof) of applicable withholding taxes due in respect of the Award, its settlement or any payment or transfer under the Award and to take such other action (including providing for elective payment of such amounts in cash or other property by the Participant) as may be necessary in the opinion of the Company to satisfy all obligations for the payment of such taxes; provided, however, that no Shares shall be withheld with a value exceeding the maximum statutory tax rates in the applicable tax jurisdictions.

Section 10.     *Recoupment/Clawback.*  The Participant hereby acknowledges and agrees that in order to comply with applicable law (including, without limitation, the Dodd-Frank Wall Street Reform and Consumer Protection Act), regulatory authority, and policies of the Company, the Committee retains the right at all times to decrease or terminate all awards and payments under the Plan, and any and all amounts payable under the Plan, or paid under the Plan, shall be subject to clawback, forfeiture, and reduction to the extent determined necessary to comply with applicable law, regulatory authority, and/or policies of the Company, including as a result of risk-related events.

Section 11.     *No Right to Continued Employment.*  Neither the Plan nor this Award Agreement shall confer upon the Participant any right to continue to be employed by the Company and the receipt of the Award does not confer any rights on the Participant other than those expressly set forth in this Award Agreement or the Plan.

Section 12.     *Section 409A of the Code.*  This Award Agreement is intended to comply with the requirements of Section 409A of the Code and the regulations thereunder, and the provisions of this Award Agreement shall be interpreted in a manner that satisfies the requirements of Section 409A of the Code, and this Award Agreement shall be operated accordingly. If any provision of this Award Agreement or any term or condition of the RSUs would otherwise conflict with this intent, the provision, term or condition shall be interpreted and deemed amended so as to avoid this conflict. Notwithstanding anything else in this Award Agreement, if the Board considers a Participant to be a "specified employee" under Section 409A of the Code at the time of such Participant's "separation from service" (as defined in Section 409A of the Code), and the amount hereunder is "deferred compensation" subject to Section 409A of the Code any distribution that otherwise would be made to such Participant with respect to RSUs as a result of such separation from service shall not be made until the date that is six months after such separation from service, except to the extent that earlier distribution would not result in such Participant's incurring interest or additional tax under Section 409A of the Code. If the Award includes a "series of installment payments" (within the meaning of Section 1.409A-2(b)(2)(iii) of the Treasury Regulations), the Participants' right to the series of installment payments shall be treated as a right to a series of separate payments and not as a right to a single payment. Notwithstanding the foregoing, the tax treatment of the benefits provided under this Award Agreement is not warranted or guaranteed, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Participant on account of non-compliance with Section 409A of the Code.

Section 13.     *Miscellaneous.*

(a)    *Definitions*.  For purposes of this Award Agreement:

    i.    "**Cause**" means:

      (1)    any conviction (including a plea of guilty or of nolo contendere or entry into a pre-trial diversion program) of the Participant for the commission of a felony or any conviction of any criminal offense within the scope of Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. § 1829;

      (2)    the Participant commits an act of gross misconduct, fraud, embezzlement, theft or material dishonesty in connection with the Participant's duties or in the course of the Participant's employment with the Company or any of its affiliates;

      (3)    failure on the part of the Participant to perform his or her employment duties in any material respect, which is not cured to the reasonable satisfaction of the Company within 30 days after the Participant receives written notice of such failure; or

      (4)    the Participant engages in Detrimental Activity.

    ii.    "**Company Affiliate**" means the Company's parents, subsidiaries, affiliates or their respective successors (collectively, the "Company Affiliates" and each a "Company Affiliate").

    iii.    "**Detrimental Activity**" includes the following:

      (1)    The Participant's disclosure to any unauthorized person, firm, or corporation or use or attempt to use for his or her own advantage or to the advantage of any other person, firm or corporation, any confidential information relating to the business affairs or trade secrets of the Company or any of its affiliates, howsoever obtained or provided, during the course of, or as a result of, his or her employment (the "**Confidential Information**").  Confidential Information includes, but is not limited to, information relating to employees, customers and suppliers (former, actual and potential), Company contracts, pricing structures, financial and marketing details, business plans, any technical data, designs, formulae, product lines, intellectual property, research activities and any information which may be deemed to be commercially or price sensitive in nature, whether printed, typed, handwritten, videotaped, transmitted or transcribed on data files or on any other type of media, including but not limited to electronic and digital media, whether or not labeled as "confidential";

      (2)    The Participant violates the obligations set forth in Section 8(a) or 8(b) of this Award Agreement.

      (3)    Making any false or disparaging comments about the Company or any of its subsidiaries, affiliates, employees, officers, or directors; or

      (4)    Engaging in any activity which in the opinion of the Company is not consistent with providing an orderly handover of the Participant's responsibilities.

The Participant agrees that the foregoing restrictions are reasonable and necessary to protect the Company's business and that the grant of this Award, along with the benefits and attributes of the Participant's employment by the Company, is good and valuable consideration to compensate the Participant for agreeing to these restrictions.

    iv.    "**Disability**" means the Participant is entitled to, and has begun to receive, long-term disability benefits under the long-term disability plan of the Company in which the Participant participates.

v.    "**Good Reason**" means any of the following changes, as compared to the Participant's terms of employment prior to a Change of Control:

(1)    a material diminution in the Participant's authority, duties, or responsibilities;

(2)    a material diminution in the Participant's base salary other than a general reduction in base salary that affects all similarly situated employees; or

(3)    a relocation of the Participant's principal place of employment by more than 50 miles from his or her current principal place of employment, unless the new principal place of employment is closer to the Participant's home address.

Provided, however, that the Participant must give written notice to the Company within 30 days of the initial existence of any of the foregoing changes, the Company shall have 30 days upon receipt of such notice to remedy the condition so as to eliminate the Good Reason, and if not remedied, the Participant's employment must terminate no later than 60 days following the expiration of such cure period. Notwithstanding the foregoing, the Participant's continued employment shall not constitute a waiver of the Participant's rights with respect to any circumstance constituting Good Reason under this Award Agreement.

vi.    "**Retirement**" means the Participant's age plus years of service (in each case, including completed months) equals or exceeds 65, with a minimum of at least five years of service with the Company.

(b)    *Notices.* All notices, requests and other communications under this Award Agreement shall be in writing and shall be delivered in person (by courier or otherwise), mailed by certified or registered mail, return receipt requested, or sent by facsimile transmission or by e-mail or any other form of electronic transmission or delivery approved by the Committee, as follows:

if to the Company, to:

Citizens Financial Group, Inc.
600 Washington Blvd.
Stamford, CT 06901
Attention: Corporate Secretary

if to the Participant, to the address that the Participant most recently provided to the Company,

or to such other address, facsimile number, e-mail address or such other form of electronic transmission or delivery as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed received on the next succeeding business day in the place of receipt. Notwithstanding anything to the contrary contained in this Award Agreement or in the Plan, the Company may, in its sole discretion, deliver and, by acceptance of this grant, the Participant hereby explicitly and unambiguously consents and agrees to the receipt and delivery of, any notices permitted or required hereunder, documents related to any Awards granted under the Plan and/or any other information (including, without limitation, information required to be delivered to the Participant pursuant to applicable securities laws) regarding the Company and the Subsidiaries or the Plan by electronic means, including but not limited to through the Participant's electronic account, through another on-line or electronic account system established and maintained by the Company or another third party designated by the Company or via the Company website. Such consent shall remain in effect throughout the Participant's term of employment or service with the

6

Company and thereafter until withdrawn in writing by the Participant. The Participant acknowledges that the Participant may receive from the Company a paper copy of any notices or documents delivered electronically at no cost to the Participant by contacting the Company by telephone or in writing.

(c)     *Entire Agreement*. This Award Agreement and the Plan (including the terms specified in the Participant's electronic account, as noted in Section 1 and Section 5 above) constitute the entire agreement and understanding between the parties in respect of the subject matter hereof and supersede all prior and contemporaneous arrangements, agreements and understandings, both oral and written, whether in term sheets, presentations or otherwise, between the parties with respect to the subject matter hereof.

(d)     *Severability*. If any provision of this Award Agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, or would disqualify the Plan or this Award Agreement under any law deemed applicable by the Board, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Board, materially altering the intent of this Award Agreement, such provision shall be stricken as to such jurisdiction, and the remainder of this Award Agreement shall remain in full force and effect.

(e)     *Amendment; Waiver*. No amendment or modification of any provision of this Award Agreement that has a material adverse effect on the Participant shall be effective unless signed in writing by or on behalf of the Company and the Participant, *provided* that the Company may amend or modify this Award Agreement without the Participant's consent in accordance with the provisions of the Plan or as otherwise set forth in this Award Agreement. No waiver of any breach or condition of this Award Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature. Any amendment or modification of or to any provision of this Award Agreement, or any waiver of any provision of this Award Agreement, shall be effective only in the specific instance and for the specific purpose for which made or given.

(f)     *Assignment*. Neither this Award Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by the Participant.

(g)     *Successors and Assigns; No Third-Party Beneficiaries*. This Award Agreement shall inure to the benefit of and be binding upon the Company and the Participant and their respective heirs, successors, legal representatives and permitted assigns. Nothing in this Award Agreement, express or implied, is intended to confer on any Person other than the Company and the Participant, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Award Agreement.

(h)     *Governing Law; Waiver of Jury Trial.* This Award Agreement shall be governed by the laws of the State of Delaware, without application of the conflicts of law principles thereof. By acknowledging this Award Agreement electronically or signing it manually, as applicable, the Participant waives any right that the Participant may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Award Agreement or the Plan.

(i)     *Discretionary Nature.* The grant of the RSUs does not create any contractual right or other right in the Participant to receive any RSUs or other Awards in the future. Future grants of Awards, if any, shall be at the sole discretion of the Company.

(j)     *Participant Undertaking; Acceptance.* The Participant agrees to take whatever additional action and execute whatever additional documents the Company may deem necessary or advisable to carry out or give effect to any of the obligations or restrictions imposed on either the Participant or the RSUs pursuant to this Award Agreement. The Participant acknowledges

7

receipt of a copy of the Plan and this Award Agreement and understands that material definitions and provisions concerning the RSUs and the Participant's rights and obligations with respect thereto are set forth in the Plan. The Participant has read carefully, and understands, the provisions of this Award Agreement and the Plan.

(k)     *Dispute Resolution.* Except as provided in the last sentence of this paragraph to the fullest extent permitted by law, the Company and the Participant agree to waive their rights to seek remedies in court, including but not limited to rights to a trial by jury.  The Company and each Participant agree that any dispute between or among them and/or their affiliates arising out of, relating to or in connection with this Plan shall be resolved in accordance with a confidential two-step dispute resolution procedure involving: (a) Step One: non-binding mediation, and (b) Step Two: binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, et. seq., or state law, whichever is applicable.  Any such mediation or arbitration hereunder shall be under the auspices of the American Arbitration Association ("**AAA**") pursuant to its then current AAA Commercial Arbitration Rules. No arbitration shall be initiated or take place with respect to a given dispute if the parties have successfully achieved a mutually agreed to resolution of the dispute as a result of the Step One mediation.  The mediation session(s) and, if necessary, the arbitration hearing shall be held in the city/location selected by the Company in its sole discretion.  The arbitration (if the dispute is not resolved by mediation) shall be conducted by a single AAA arbitrator, selected by the Company in its sole discretion.  Any award rendered by the arbitrator, including with respect to responsibility for AAA charges (including the costs of the mediator and arbitrator), shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction.  In the unlikely event the AAA refuses to accept jurisdiction over a dispute, the Company and each Participant agree to submit to JAMS mediation (formerly known as Judicial Arbitration and Mediation Services) and arbitration applying the JAMS equivalent of the AAA Commercial Arbitration Rules.  If AAA and JAMS refuse to accept jurisdiction, the parties may litigate in a court of competent jurisdiction.

(l)     *Captions.*  Captions provided herein are for convenience only and shall not affect the scope, meaning, intent or interpretation of the provisions of this Award Agreement.

(m)     *Nature of Payments.*  Any and all grants or deliveries related to the RSUs hereunder shall constitute special incentive payments to the Participant and shall not be taken into account in computing the amount of salary or compensation of the Participant for the purpose of determining any retirement, death or other benefits under (i) any retirement, bonus, life insurance or other employee benefit plan of the Company, or (ii) any agreement between the Company and the Participant, except as such plan or agreement shall otherwise expressly provide.

(n)     *Data Privacy.*  The Participant understands that the Company and its affiliates and hold certain personal information about the Participant, including but not limited to the Participant's name, home address and telephone number, birthdate, social insurance number or other identification number, compensation, details of all Awards or any other entitlement to Shares for the purpose of administering the Plan (the "Data").  As a condition of receipt of this Award, the Participant explicitly consents to the collection, use, transfer and retention, in electronic or other form, of the Data by and among, as applicable, the Company, its affiliates and any third parties assisting the Company in administration of the Plan (including but not limited to any broker or other third party with whom the Participate may elect to deposit Shares), in each case, for the purpose of administering the Participant's participation in the Plan.

Acceptance Date: 03/22/2019

Electronic Signature: Signed Electronically

J8Y5P5K5

03/22/2019 09:57 AM U.S. Eastern Standard Time

ACCEPTED

# Exhibit 4

# Exhibit 4

**AMERICAN ARBITRATION ASSOCIATION**
SECURITIES INDUSTRY ARBITRATION

In the Matter of the Arbitration Between

CURTIS C. MAGLEBY,

                         Claimant,              AAA No. 01-22-0003-9196

            -and-

CITIZENS BANK, N.A., CITIZENS FINANCIAL

GROUP, INC., CITIZENS CAPITAL MARKETS,

INC.,   THEODORE C. SWIMMER, and DONALD

H. MCCREE,

                     Respondents.

**FIRST AMENDED STATEMENT OF CLAIM and**
**DEMAND FOR ARBITRATION**
**<u>(CORRECTED)</u>[1]**

      Claimant Curtis C. Magleby ("Magleby"), as and for his First Amended Statement of Claim ("FASOC") against: (i) Citizens Bank, N.A., ("CBNA"), Citizens Financial Group Inc. ("CFG") and Citizens Capital Markets, Inc. ("CCM") (collectively "Corporate Respondents") and (ii) Theodore C. Swimmer ("Swimmer") and Donald H. McCree ("McCree") (collectively "Individual Respondents"), alleges as follows:

---

[1]  Claimant is expanding and correcting the recently filed FASOC (a) for clarity as to the roles of each individual and entity; (b) to redress an inadvertent deviation from the Arbitrator's Ruling dated March 1, 2023 (the "Ruling"), in that the FASOC now being corrected did not identify which Respondents were being cited in each cause of action; and (c) to further correct certain facts from the original SOC, e.g., *see* n.2, *infra*.

**PARTIES, JURISDICTION AND VENUE**

1.     Claimant Magleby, CRD No. 2259115, from approximately May 15, 2015, was a registered representative, first with Citizens Securities, Inc. ("CSI") for one year, and then with a related entity, CCM, until he was terminated eleven days before Christmas in December 2021.

2.     During his employment with Corporate Respondents, Mr. Magleby, a native of Las Vegas, Nevada, was living and working in California, where he had begun his employment, and where he continued to work until he moved back to Las Vegas in October 2020, for the last year or so of his employment. The COVID pandemic had made living in California inordinately difficult for Mr. Magleby. Mr. Magleby currently resides at 5537 San Palazzo Court, Las Vegas, Nevada, 89141.

3.     Respondent CCM, CRD# 277073, was, at all relevant times a licensed broker-dealer, registered with FINRA and the United States Securities and Exchange Commission ("SEC"), with a principal place of business at 28 State Street, MS1240, Boston, Massachusetts, 02118.

4.     CCM is a wholly owned subsidiary of CFG. Respondent CFG is a publicly traded company (NYSE:CFG), whose stock closed at $47.08 on December 14, 2021, the date of Mr. Magleby's termination. Respondent CBNA is the banking subsidiary of CFG.[2]

---

[2] The original SOC incorrectly identified CFG as a subsidiary of CB, and thus the Ruling was correct to dismiss CFG on the facts pleaded, taken as true. In fact, CFG is the parent company, which alters the applicable legal analysis, and we ask that in light of the mistake, that the Arbitrator treat this aspect of the FASOC as inclusive of a motion to reconsider that part of the Ruling, *nunc pro tunc*.

5.     CBNA, regulated by the Office of the Controller of the Currency, is headquartered at One Citizen's Plaza, Providence, Rhode Island 02903. CBNA holds itself out as the 13th largest retail bank in the United States. Where appropriate, CFG, CBNA, and CCM are, in addition to the term Corporate Respondents, collectively referred to in this FASOC as "Citizens".

6.     Theodore C. Swimmer ("Swimmer"), CRD No. 2661662, is an individual with a place of business c/o CCM, 4250 Congress Street, Charlotte, North Carolina, 29209. At all relevant times, Swimmer was the head of Corporate Finance and Capital Markets at CCM, and, as holder of a Series 24 license, was Claimant's direct supervisor. Swimmer was dismissed by the Ruling as to the causes of action pertaining to contract, unjust enrichment, conversion, and defamation.

7.     Donald H. McCree ("McCree"), CRD No. 2316064, is an individual with a place of business c/o CCM, 28 State Street, MS1240, Boston, Massachusetts 02109. At all relevant times, Respondent McCree was the vice-chairman and head of commercial banking at CBNA, and the CEO of CCM. McCree was dismissed by the Ruling as to the causes of action pertaining to contract, unjust enrichment, conversion, and defamation.

8.     In connection with his employment, Mr. Magleby was presented with two material documents: (**i**) a written offer of employment as "Managing Director" of "Cap Mkts" (*i.e.*, what would become CCM) dated February 26, 2015, from parent company CFG purportedly "on behalf of" its banking subsidiary, CBNA, but nevertheless expressly referring to "CFG" as Mr. Magleby's employer throughout the offer letter (annexed as **Exhibit A**), and (**ii**) a document titled "Mutual Agreement to Arbitrate Employment-Related Disputes," on the letterhead of CFG subsidiary CBNA but textually identifying it

as being *between Mr. Magleby and CFG*, together with "any of its subsidiaries, affiliated, related or successor entities, ('Citizens') and each individual employee of Citizens." (Annexed as **Exhibit B**).

9.      Taken together, Exhibits A and B demonstrate an interconnectedness of the Citizens entities and personnel. Parent company CFG provided the offer on behalf of its banking subsidiary, CBNA; CBNA, in turn, was ostensibly hiring Mr. Magleby to work at CCM.[3]  CBNA provided an arbitration agreement between its parent, CFG, and Mr. Magleby, covering Citizens' employees and personnel, which applies to the dispute now being arbitrated. This inter-operability suggests that any protections offered by the corporate veil should be pierced, certainly with respect to the claims asserted in this FASOC.[4]

10.      Exhibits A and B reflect that CFG, CBNA and CCM were acting variously as principals and agents of each other. For example, while CFG is the parent of both CBNA and CCM, (and thus the principal liable for its own acts and vicariously liable for the acts of its agents), it functioned as an agent of CBNA and CCM by offering a job at CCM "on behalf of" CBNA.  It is black letter law that principals are liable for the torts of their agents, pursuant to longstanding principles of the laws of agency, and also pursuant to the ancient, still operative, doctrine of *respondeat superior*. (*See, e.g., Patterson v. Domino's Pizza, LLC*, 333 P. 3d 723 (Cal. Sup. Ct. 2014; *Davis v. Beling*, 278 P. 3d 501 (Nev. Sup. Ct. 2012.) Here, not only were the individuals named in this

---

[3] CCM did not come into existence until 2016.

[4]  It is noteworthy that when Mr. Magleby was hired via the CFG offer letter, the organizations did not have a Broker-Dealer qualified to underwrite securities, so Citizens had to use a joint venture arrangement with Oppenheimer, to whom Citizens paid 20% (twenty percent) of the fees.

FASOC as "Individual Respondents" agents of the Corporate Respondents, but the Corporate Respondents themselves were functioning as agents of each other. In other words, in committing the acts set forth in this FASOC, Corporate Respondents and Individual Respondents, and each of them, were acting as the agents, servants, and employees of each other and committed such wrongful acts in the course and scope of their agency, service, and employment, rendering them either directly or vicariously liable as the facts dictate.

11.    CFG's offer letter on behalf of CBNA for Mr. Magleby to work at what would become CCM specifies that Mr. Magleby will be based in the State of California, and also specifies that the law applicable to his relationship with Citizens is the law of the state in which Mr. Magleby is based.

12.    The Arbitration agreement from CBNA that binds CFG and the other Respondents and Individual Respondents, also specifies that it is subject to the law of the state in which Mr. Magleby is based "without regard to its conflict of laws provisions."

13.    Venue for the hearing of this matter is appropriate in either the State of Nevada, where Claimant currently resides, or the State of California where he performed most of his services.

<u>NATURE OF ACTION</u>

14. This action arises out of:

       (i)     certain extortionate practices (detailed below);

       (ii)    tortious interference with the at-will contract at issue;

(iii)    connected torts of (a) intentional infliction of economic distress, and (b) tortious interference with business, business relationships and future business opportunities;

(iv)    common law fraud; and

(v)     defamatory reporting on Mr. Magleby's Form U-5, reflecting multiple breaches of FINRA Rule 2010[5], along with other rules and principles of common law.

15.    Respondents' collective conduct directly caused, and continues to cause, identifiable financial harm to Claimant, also detailed below.

## BACKGROUND FACTS

16.    Mr. Magleby, until the events described in this FASOC, had an unblemished record in the securities industry, ever since he first obtained his series 7 license in 1995, when he was registered with Smith Barney, Inc.

17.    The entire arc of Mr. Magleby's career took him through top echelon, widely respected, "Wall Street" firms: Smith Barney (which merged with Salomon Brothers, which in turn eventually became Citigroup), Lehman Brothers (which he left in 2005), Wells Fargo Securities,[6] and Cushman & Wakefield Securities.

---

[5]  Claimant acknowledges that there is no private cause of action for violation of FINRA rules, but notes that such violations may be used as evidence of various acts of malfeasance.

[6]  Mr. Magleby was registered with Wachovia Securities, which was acquired by Wells Fargo, and thus Mr. Magleby's BrokerCheck® report lists Wells Fargo.

18.    Mr. Magleby was subsequently asked to start a gaming, lodging and leisure corporate finance business at CSI,[7] via employment first at CBNA which led to his employment at CCM.

19.    Mr. Magleby progressed through his investment banking career (his securities industry activity focused on the institutional investment banking side, rather than the retail side), gaining in responsibility as he transitioned through the various firms, regularly working on lucrative, "big money" transactions, including multiple multi-billion-dollar transactions, which trajectory continued, culminating in the vast majority of the largest transactions at Citizens.

20.    Mr. Magleby's professional skill and transactional success led to various promotions within the firms where he was registered.

21.    In 1992, Mr. Magleby had moved to New York. However, at some point during the summer of 2000, Mr. Magleby moved from New York to California to (i) provide a better environment for his family, particularly his three sons, and (ii) to have proximity to his Las Vegas customers.

22.    As detailed in ¶2, *supra*, Mr. Magleby eventually moved to Las Vegas, Nevada.

23.    In short, by the time he got to Citizens in 2015, Mr. Magleby was already a 20-year proven success story, and, based on his success, was recruited by Swimmer on behalf of Citizens.

**THE FACTS UNDERLYING THE CLAIMS**

---

[7]   Mr. Magleby's initial employment within the Citizens universe was with CFG's banking subsidiary, CBNA, in or around March 2015. BrokerCheck® reports that such employment continued through the termination at issue in this matter.

24.     For various reasons, Mr. Magleby, despite his ongoing success in the industry, took a break starting in 2009, during which time he opened a few restaurants and functioned as CEO of a food industry entity named CJ Burger.

25.     In 2011 he re-entered the industry at Cushman & Wakefield as a Senior Managing Director, with responsibility for its western United States Investment Bank among other things. After a few years, Mr. Magleby was lured away by a former client at Lehman Brothers and Wells Fargo and took a position as a senior vice president at GLPI, Inc., a gaming and leisure property operation, headquartered in Pennsylvania.

26.     In or around October 2014, Mr. Magleby was approached by Jason Miller ("Miller") and Swimmer, both of whom were part of the interconnected Citizens management universe, specifically (ultimately) Respondent CCM.

27.     Swimmer would later become the CEO of CCM, and Miller would become the head of CCM's debt department.

28.     Swimmer's approach evolved into an interview process, facilitated by the fact that Mr. Magleby, Swimmer, and Miller had previously worked together.

29.     Swimmer, in sum and substance, told Mr. Magleby that because of their prior connection, Swimmer had no questions.  Swimmer even expressed concern to Mr. Magleby as to whether Citizens was sophisticated enough for Mr. Magleby. Swimmer also expressed confidence that Mr. Magleby would do "an excellent job."

30.     After Swimmer's interview, parent company CFG sent a written offer of employment dated February 26, 2015, to Mr. Magleby, Exhibit A.

31.    Accordingly, as noted, Mr. Magleby entered into the employ of CBNA in or around March 2015, and shortly thereafter became registered at CSI, in or around May 2015.

32.    Of particular relevance here, at the pleading stage, is that Citizens' employment offer reflected a compensation agreement negotiated between Swimmer and Mr. Magleby (*see,* n.8, *infra*), which included a bonus structure capping at (i) 20% of financing revenue, plus (ii) 30% of M&A revenue, plus (iii) certain Restrictive Stock Units, also pegged to production.

33.    Bonus remuneration was in addition to a salary.

34.    After accepting the offer, Mr. Magleby set about the business of building (from scratch) a gaming, lodging, and leisure group, which was non-existent at Citizens, and thus Mr. Magleby's "baby" from inception.

35.    Sometime in late 2016, Mr. Magleby and Swimmer had some discussions about Mr. Magleby's compensation, and the compensation formula in place. Swimmer told Mr. Magleby that the company had hired a new head of commercial banking, McCree, and suggested that Mr. Magleby forward the compensation agreement to McCree and discuss Mr. Magleby's year-end bonus with him.

36.    Accordingly, Mr. Magleby and McCree spoke by telephone in December 2016 for approximately forty-five minutes.

37.    In that conversation, McCree was effusively complimentary to Mr. Magleby. McCree unambiguously expressed satisfaction with Mr. Magleby and called him a "real investment banker." McCree also seemed impressed with a deal sheet presented by Mr.

Magleby. McCree told Mr. Magleby that McCree had not seen one before from any employee of CCM.

38.    McCree promised Mr. Magleby that McCree would consider the compensation issues raised by Mr. Magleby, which issues were basically related to getting assurance that Citizens would adhere to the compensation formula negotiated by Mr. Magleby and Mr. Swimmer[8].

39.    Despite his promise, McCree never got back to Mr. Magleby. So, Mr. Magleby sought out Swimmer.

40.    Swimmer told Mr. Magleby that although McCree was favorably impressed with Mr. Magleby's client list and production, McCree was intending to renege on the compensation agreement. There was nothing Mr. Magleby could do with that news at that time.

41.    Between 2016 and 2021, Mr. Magleby generated significant monies to the benefit of Corporate Respondents and was entitled to concomitant recompense in accordance with his negotiated agreement, as visually demonstrated by the following chart:

| Year | Estimated Fees | Magleby's Estimated Bonus Per Agreement | Magleby's Actual Bonus |
|------|----------------|------------------------------------------|------------------------|
| 2016 | $18.3 million  | $3.66 million                            | $1 million             |
| 2017 | $16.1 million  | $3.22 million                            | $1.1 million           |

---

[8] Claimant recollects that certain emails by Swimmer, carried on a server owned by Respondent, and to which Claimant has no access, do confirm the compensation negotiations and thus, when taken together with other documents in Claimant's possession, form an enforceable contract, which was breached by Respondent. Claimant anticipates those emails will be produced in discovery. Prior to the filing of this claim, Claimant's counsel sent a non-spoliation letter to counsel for Respondents.

| 2018 | $17.1 million | $3.5 million | $1.4 million |
| 2019 | $22.5 million | $4.5 million | $1.225 million |
| 2020 | $30 million | $6 million | $850,000[9] |
| 2021 | $34.7 million (est.) | $8.1 million | *Deprived of* $2 million as measured by the "actual bonus" calculations upon termination. |

42.    As the foregoing chart reveals, while Mr. Magleby was denied his negotiated bonus, he did receive bonuses for his ever-increasing annual production, though there was no consistency in the calculations.

43.    The inconsistencies can be seen from the percentages: 2016 - 5.46%; 2017 – 6.8%; 2018 – 7.8%; 2019 – 5.44%; 2020 – 2.8%.  It is noteworthy that, pursuant to an old SEC Report of the Committee on Compensation Practices, dated April 10,1995, typical payouts at large firms for registered representatives ran between 33% to 45% of gross production. In that context, the percentages mentioned in ¶32, *supra*, seem low. (*See also*, n.4, *supra*.)

44.    In addition to bonus compensation, Mr. Magleby received an annual salary of $300,000.00, pursuant to CFG's original employment offer.

45.    In connection with his salary, and despite his rather significant generation of profits for Citizens, Mr. Magleby was denied a promised raise, a raise that was

---

[9]  Due to 60% compensation reduction agreed to by Magleby after Citizens threatened to file a false form U5, as detailed below.

nevertheless paid to all other managing directors in June 2021. He was told he would receive the promised raise in his bonus.

46.     That promise of a raise, upon which Mr. Magleby relied, proved to be a lie.

47.     As the foregoing chart further reveals, from total gross production for the years 2016 through 2021 of $138,700,000.00 (one hundred thirty-eight million seven hundred thousand dollars), Mr. Magleby was entitled to bonuses aggregating $28.98 million dollars. Instead, he received $5.575 million dollars, a fraction over 4%.

48.     Accordingly, CCM now owes (and the Corporate Respondents collectively are liable to pay) Mr. Magleby a little over $23.4 million dollars in bonus compensation. [10]

49.     Mr. Magleby, faced with the choices of (i) making a stand to fight for his negotiated bonus, which would have likely resulted in his termination, and (ii) accepting what was remitted to him at the fluctuating whims of Citizens, opted for the latter, but did so without waiving his rights.

50.     Mr. Magleby here seeks to enforce his non-waived rights[11] and obtain equitable and legal justice, in the form of the money due to him and other relief, to be precisely demonstrated and fully evidenced at the hearing of this matter.

**RELEVANT EVENTS LEADING UP TO THE TERMINATION**

---

[10]   Figures are rounded estimates and precise numbers will be presented at the hearing of this matter, but the deviation from these estimates will be *de minimis.*

[11] Mr. Magleby was told on several occasions that his remuneration would increase as long as his production did not decline. Mr. Magleby's production steadily increased. Mr. Magleby relied on Corporate Respondents' and Individual Respondents' representations, which representations, when combined with his already high work ethic, further incentivized him to strive to become the largest producer in the Citizens universe.

51.    In or around December 2019, Mr. Magleby spoke with Swimmer about Mr. Magleby's work to get a sense of where Swimmer, to whom Mr. Magleby directly reported, wanted Mr. Magleby to focus his efforts.

52.    To Mr. Magleby's dismay, Swimmer berated Mr. Magleby over Mr. Magleby's discussion with Rob Allen, the Chief Credit Officer, about the potential size of gaming commitments.  Swimmer's reaction was particularly stunning to Mr. Magleby because Swimmer was the one who had encouraged Mr. Magleby to have that very discussion with Rob Allen.

53.    In February 2020, at least three people – Swimmer, Miller, and one Scott Reeds ("Reeds") (another of Mr. Magleby's managers) – directly informed Mr. Magleby that CFG's Chairman and CEO, Bruce Van Saun, had significantly increased Mr. Magleby's bonus above the bonus amount recommended by Swimmer. This significant increase apparently did not sit well with Swimmer.

54.    Nevertheless, in October 2021, Swimmer told Mr. Magleby that Mr. Magleby had generated "all-time record" revenue.

55.    Mr. Magleby understood that, by generating all-time record revenue, he was the largest producer in the Citizens universe.

56.    In October 2021 (two months before termination) Swimmer told Mr. Magleby to expect a bonus in excess of what he would have received against the $30 million that Mr. Magleby generated in 2020 (*i.e.,* $6 million, or 20%), had it not been reduced.

57.    Mr. Magleby here asserts that such reduction in 2020 – a bonus of only 2.8% against production of $30,000,000.00 - was wrongful and dishonest, not just because it reflected a broken promise, but because it was unjustly vindictive and done with the

intent of harming Mr. Magleby. This figurative picking of Mr. Magleby's pocket was not only a breach of the duty of good faith and fair dealing, but it was also a violation of CCM's obligation, under applicable FINRA rules, to observe just and honorable principles of trade.

58.    Mr. Magleby detrimentally relied on Swimmer's assurances, meaning that his misplaced belief in the honesty of Swimmer incentivized Mr. Magleby to work even harder than anyone else in an ambitious effort to be, and remain, the top producer in the Citizens universe.

59.    To be clear, Mr. Magleby always gave more than 100%, but the carrot misleadingly and fraudulently dangled in front of him was particularly energizing, and Mr. Magleby's discovery that it was illusory was concomitantly demoralizing.

60.    Despite repeated representations and assurances made by Swimmer and others, Corporate Respondents and Individual Respondents, acting in concert, were looking to find an excuse to relieve Citizens of the obligation to pay Mr. Magleby his bonus compensation.

## THE FABRICATED EXCUSE

61.    Mr. Magleby purchased and sold publicly traded securities for his own account and risk on a fully disclosed (to Citizens' compliance department) basis, in full compliance with FINRA rules.  The Compliance Department and Control Room not only approved, but also monitored Mr. Magleby's trading.

62.    Applicable FINRA rules permit such conduct.

63.    Notwithstanding a fairly pedestrian pattern of personal securities transactions, in 2019, Mr. Magleby was sent, after years of such activity, a written warning of a

supposed "violation" of a newly implemented trade approval system. The system "kicked out" the violation warning in connection with an order valued at $195.00 (one hundred ninety-five dollars) to sell three put option contracts for Novocore, Ltd.

64.    This written warning led to a back and forth, with CCM incorrectly insisting that Mr. Magleby had violated a policy.  Mr. Magleby provided a detailed demonstration that the issue reflected a defect in the system, but he was inexplicably (or intentionally) ignored.

65.    Without investigation, Citizens issued a violation to Mr. Magleby, and Mr. Magleby remonstrated.

66.    Reeds, another of Mr. Magleby's managers, responded by warning Mr. Magleby that if he failed to swallow the violation, CCM would *retaliate* (Reeds' exact word) against Mr. Magleby. This warning was given despite Mr. Magleby being in a management position.

67.    Mr. Magleby refused.  And, as Reeds predicted, Corporate Respondents, aided by Individual Respondents, began their course of unlawful retaliatory conduct toward Mr. Magleby.

68.    Mr. Magleby, not having done anything wrong, continued to trade for his own account and risk.  For the next ten or eleven months, his personal trading was unremarkable.

69.    In June 2020, after Mr. Magleby had been given clearance to purchase 22 shares of Zoom Video Communications, Inc., (a transaction valued at $5,301.25), Mr. Magleby pressed the wrong button. Instead of clicking "buy", he clicked "sell."

70.    The stock was not on any restricted list and the inadvertent sell did not create a short position in Mr. Magleby's account.  It had no impact on the stock price and did not affect any Citizens customer, or the net capital of any Citizens entity. It was not a FINRA reportable event. Nevertheless, CCM issued a warning letter to Mr. Magleby.

71.    Things deteriorated from there.  In June and July 2020, shortly after the initial COVID lockdowns, Mr. Magleby was admitted to a hospital with possible heart issues. Mr. Magleby had fully disclosed his health situation to Reeds[12] in conversation.

72.    For reasons relating to his health, while Mr. Magleby continued to work successfully on CCM's behalf, his trading for his own account and risk (primarily done at Fidelity[13]) suffered other inadvertent errors, all of which were materially inconsequential, but technically outside the scope of the approvals Mr. Magleby had received. None of the errors affected any clients of CCM, and none affected CCM or the other Corporate Respondents at all. None were FINRA reportable events.

73.    Notes created by CCM's personnel solidly evidence that Corporate Respondents and Individual Respondents knew the errors were unintentional, and in any event, immaterial. Mark Ragucci ("Ragucci"), a senior compliance officer, wrote "we do not believe that this is intentional. He is moving too fast. It's careless mistakes," and "Do not see anything related to insider trading or that he is benefitting from this and *there is no material risk to the bank, nor does this need to be reported to regulators.*" (Emphasis added.)

---

[12]  Upon information and belief, Reeds falsely noted in Mr. Magleby's file that Reeds was unaware of Mr. Magleby's health issues.

[13]  At some point, due to issues with Fidelity, Mr. Magleby moved his account to Merrill Lynch.

74.     CCM, however, was no longer concerned with reality. Thus, CCM's Human Resources Department advocated for a formal written warning, indicating it would support termination of Mr. Magleby's employment.

75.     However, Mr. Magleby was the single largest producer in the firm and his superiors, including Swimmer and McCree, were, upon information and belief receiving an override on, or other benefit from, Mr. Magleby's production. So, Mr. Magleby received an oral warning with new restrictions on his largely irrelevant personal trading.

76.     Corporate Respondents and Individual Respondents collectively realized they could, to use a common phrase, "have their cake and eat it too," by simply slashing Mr. Magleby's remuneration.

77.     Accordingly, the oral warning was followed by a written warning, along with unreasonable restrictions on Mr. Magleby's ability to trade for his own account and risk, and most insidiously, a reduction in his bonus compensation of 60%.

78.     The reduction in compensation was disproportionate to the purported "offense," which offense was in fact a sham excuse for Corporate Respondents to keep more of the millions Mr. Magleby was generating for them.

79.     In other words, Corporate Respondents, acting through and aided by the Individual Respondents, were perpetrating a long-game swindle, to enrich themselves at Mr. Magleby's expense.

**THE EXTORTIONATE THREATS**

80.     The threats against Mr. Magleby multiplied.

81.     Swimmer, along with other senior personnel, including Bridget McAvoy, a senior VP in human resources and Gary Aswad, the head of risk management, violatively

extorted Mr. Magleby by telling Mr. Magleby that if he chose to voluntarily leave the firm for any reason, Citizens would negatively mark Mr. Magleby's Form U-5.[14]

82.    This extortionate threat was particularly pointed, because it boxed Mr. Magleby in. A "voluntary departure" notation on a Form U-5 ordinarily has no negative connotation to "the Street".  Investment professionals routinely change jobs.  But a negatively marked Form U-5 can be crippling to the effort to obtain future employment.

83.    Swimmer's (and the others identified in ¶81, *supra*) extortionate threat constituted a guarantee that Mr. Magleby could not leave with his reputation – built up over twenty years – intact. If he resigned voluntarily, he would be negatively marked.  And if he were terminated, he would be negatively marked.

84.    The extortion was a violation of FINRA's overarching mandate that brokerage firms observe just and equitable principles of trade.

85.    So, to repeat, Swimmer, McCree and others all knew that any such fabricated negative "marks" on Mr. Magleby's Form U-5 would interfere with Mr. Magleby's ability to secure employment elsewhere. Indeed, CFG's own original offer letter (ostensibly on behalf of CBNA for Mr. Magleby to work at what would ultimately become CCM) was contingent on Mr. Magleby's background check, which included review of his Form U-5. So, with that figurative, but knowing and powerful, gun to his head, Mr. Magleby accepted the restrictions.

86.    Mr. Magleby's last purported personal trading "violation" was November 19, 2020, and the restrictions were imposed for one year, set to expire on November 19, 2021. Mr. Magleby observed the restrictions and did no trading of individual stocks in

---

[14] Formally titled "Uniform Termination Notice for Securities Industry Registration."

his individual account for that time. However, with around a week of so left on the restriction period, Corporate Respondents, acting through and aided by the Individual Respondents, in concert and in bad faith, fabricated a "violation" – the one used to "justify" his termination – on November 11, 2021.

87.    Nevertheless Mr. Magleby was also erroneously cited for a supposed violation in March 2021 for trading in his own 401(k) account, which CCM later acknowledged was a "misunderstanding." Despite CCM's acknowledgement, Mr. Magleby was prevented from subsequently trading individual stocks in his own 401(k) account.

88.    CCM, in order to deprive Mr. Magleby of millions of dollars, if not more, and to benefit Citizens and the various entities named in this FASOC, terminated him without notice on December 14, 2021.

89.    The significance of terminating Mr. Magleby less than two weeks before Christmas goes beyond the mere Dickensian. High producing financial professionals count on year-end bonus income, which often constitutes up to 90% of their annual compensation.

90.    At CCM, bonus entitlements were calculated in December, for payment in February of the following year.

91.    By terminating Mr. Magleby when they did, Corporate Respondents effectively assured that he would be deprived of his well-earned bonus.  Ironically, on November 16, 2021, Swimmer had told Mr. Magleby that senior management was "really happy" with Mr. Magleby's performance, that the bonus pool was looking good and that Mr. Magleby's bonus was looking like it would come in at over $2,000,000.00 (two million dollars). But by terminating him four weeks later, Mr. Magleby's bonus entitlement would

be returned to the bonus pool and redistributed to the benefit of others at Mr. Magleby's expense.

92.     Then, crossing the border into "Outrageous," Citizens falsely asserted that Mr. Magleby "intentionally" tried to mislead Citizens Bank. (*See* ¶ 97, *infra*.)

**OTHER RELEVANT EVENTS**

93.     Tragically, the day before he was terminated, Mr. Magleby's son was hospitalized after a failed suicide attempt, placed in intensive care, and placed on a wait list for a liver transplant.

94.     Despite his son's hospitalization, and oblivious to the intent to terminate him, Mr. Magleby went to the office on December 14, 2021, only to be confronted by guards wearing body armor. The locks had been changed and Mr. Magleby was informed he was no longer welcome.

95.     Citizens' rough treatment of Mr. Magleby was inflicted on Mr. Magleby, despite him having generated an aggregated $138,700,000.00 (one hundred thirty-eight million seven hundred thousand dollars) production during his employment with Citizens.

96.     Corporate Respondents prevented Mr. Magleby from retrieving or even accessing his personal papers. CCM unlawfully retained some of his personal property for several days. And, to this day, nobody from Citizens has returned Mr. Magleby's all-important personal contacts list or calendar, among other things, intentionally converting his property, to the detriment of Mr. Magleby. A broker's livelihood is inextricably tied to his or her contact list.

97.     Mr. Magleby spoke with Gary Aswad (as head of risk management, an authorized agent of Citizens). Mr. Aswad told Mr. Magleby directly and unequivocally

that Mr. Magleby was being terminated for "intentionally trying to mislead Citizens Bank." In other words, Citizens was not terminating him for "no reason" but rather for a false reason.  No description was ever provided as to just how Mr. Magleby could possibly have misled CBNA.

98.    Mr. Magleby is unaware of any document generated by him that could have possibly misled CBNA, the 13th largest retail bank in the United States.

99.    Mr. Magleby never misled CBNA or any Corporate Respondent, any Individual Respondent or anyone else.

100.    Mr. Magleby pressed for answers and was directed to CCM's lawyer, who refused to provide Mr. Magleby with any information as to how Mr. Magleby misled anyone in the Citizens universe.

101.    On that same date, December 14, 2021, CCM sent Mr. Magleby a proposed termination agreement, which, in exchange for paying Mr. Magleby several million dollars (*see*, n.15, *infra*) that he was entitled to, required Mr. Magleby to be silent about his treatment at Citizens, and sought to press a non-competition requirement (unenforceable in either Nevada or California) among other requirements that Mr. Magleby felt were oppressive, if not unlawful.

102.    In an effort to come to an amicable departure, and preserve his reputation, Mr. Magleby retained counsel to negotiate the terms of a separation, but those negotiations proved fruitless. This was particularly frustrating as it appeared an agreement had been reached, but then Citizens moved the goalposts, seeking to apply Delaware law to prevent Mr. Magleby from working in Nevada. Mr. Magleby remonstrated against signing an agreement that was effectively violative of the laws of the state in which he

lived and worked.

## THE FALSE FORM U-5

103.    While those negotiations were ongoing, CCM nevertheless initially filed a false Form U-5, in violation of FINRA rules, containing the otherwise desirable designation that Mr. Magleby, despite being locked out, being met with guards, and having his personal property converted, "voluntarily resigned." He would have earlier voluntarily resigned, but for the extortion describe in ¶¶ 80-86.

104.    Form U-5 provides space to designate four categories for termination: (i) Voluntary (ii) Permitted to Resign (iii) Discharged and (iv) Other.  With the exception of "Voluntary" the other three choices require an explanation.

105.    CCM falsely placed a "Voluntary" designation on the original Form U-5 it filed, while in the midst of negotiations, hoping that Mr. Magleby would accept a few million dollars,[15] representing only a fraction of his entitlement, and would agree to burdensome (and unbeknownst to him, unenforceable) post-employment restrictions. Hence, the designation "Voluntary," otherwise desirable, was not only false but a manipulation, a fraudulent gambit to press Mr. Magleby to accept dimes on the dollar of his entitlement.

106.    Once the negotiations failed, however, CCM retaliated and filed an amended Form U-5 stating that Mr. Magleby was "Discharged," the most negative designation.

107.    CCM was then required to provide two explanations, one for the reason for termination and the other for the reason for amending the originally filed Form U-5.

---

[15]  Specifically, $900,000.00 in cash and $1,800,000.00, at then market prices, in CFG free trading stock, for a total package of $2,700,000.00.

108.    CCM wrote that the reason for termination was "Failure to follow internal policies as it pertains to personal trading activities. No customer/client impact." This notation – implying an intentional act of wrongdoing on Mr. Magleby's part - was in rather stark contrast to compliance officer Ragucci's notations. (*See,* ¶ 73, *supra.*)

109.    And, by way of explanation for *amending* the reason for termination from "Voluntary" to "Discharged," CCM wrote: "Upon review of the circumstances attendant to Mr. Magleby's termination, the Firm determined that the Reason for Termination is more accurately classified as "'Discharged.'"

110.    In other words, CCM falsely stated that supposedly overlooked "circumstances" caused the amendment, when the "circumstances" were actively in play during the negotiations. The only new fact was that Corporate Respondents refused to negotiate in good faith.

111.    This "Discharged" designation, coupled with a "failure to follow policies" notation has prevented Mr. Magleby from obtaining subsequent employment, a consequence foreseeable by Corporate Respondents, and for which Corporate Respondents should be held jointly and severally liable.

112.    CCM needed to replace Mr. Magleby in order to finalize / monetize several billion dollars in commitments developed and obtained by Mr. Magleby for the benefit of Citizens. CCM did so by elevating Chris Lynch, Mr. Magleby's subordinate, trained by Mr. Magleby, at a significantly lower compensation level than CCM had been paying Mr. Magleby.

113.    The evidence will handily show that CCM, acting through and aided by Swimmer and McCree, and others, trumped up a host of violations against Mr. Magleby over

insignificant and immaterial "errors" that had no effect on Citizens, no effect on customers and no effect on CCM's ability to pass FINRA audits, all in a bad faith, rule-violative, effort to deprive Mr. Magleby of millions of dollars in earned compensation.

114.    CCM has threatened to "enforce" a non-competition clause in the original CFG offer letter, which, upon information and belief, is unenforceable in the State of Nevada, where Mr. Magleby currently resides, or in California. *See, e.g., Reeves v. Hanlon*, 17 Cal. Rptr.3d 289, 295 (Cal. Sup. Ct. 2004). (*See* ¶ 102, *supra*.)

115.    In summary, Corporate Respondents acting through and aided by Individual Respondents, engaged in an intentional course of conduct, in violation of securities industry standards, not to mention the common law duty of good faith and fair dealing, to benefit themselves financially at Mr. Magleby's expense, in substantial sums which cannot be precisely calculated at this time, but which will be detailed for the Panel during the evidentiary hearings. The sums are significant.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Against CFG[16], CBNA and CCM)

116.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 115 of this Statement of Claim as if fully set forth in this paragraph.

117.    As detailed above, Mr. Magleby and Citizens were in a contractual relationship, which required Mr. Magleby to perform certain tasks and responsibilities. Not only did Claimant perform under his contract, but he was, upon information and belief, Corporate Respondents' largest producer (*see,* ¶¶ 55, 56, 59, 76, and n.10, *supra*).  In other words, Mr. Magleby's performance was outstanding, and that performance inured to the

---

[16]  See n.2, *infra*.

benefit of all Respondents.

118.    To state a breach of contract claim, under Nevada or California law, a plaintiff must allege four elements: (1) formation of a contract; (2) performance or excuse of performance by the plaintiff; (3) material breach of contract by the defendant; and (4) damages." *Laguerre v. Nev. Sys. Of Higher Educ.*, 837 F.Supp.2d 1176, 1180 (D. Nev. 2011), *cited with approval by Trice v. Liberty Mut. Ins. Co.,* 2021 Nev. App. Unpub. LEXIS 26, *5 (Jan. 22, 2021) *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (Cal. Sup. Ct. 2011).

119.    Notwithstanding that Mr. Magleby performed his obligations under the contract propounded by parent company CFG exceedingly well, as alleged above, Corporate Respondents collectively failed to meet their obligations, failed to remit promised, earned bonuses, failed to pay promised raises, and fabricated false assertions against him, among other breaches. In Corporate Respondents' many collective failures, they, depending on their particular nexus to the contract and contractual obligations and duties, either directly breached the contract or induced the breach of the contract, to the benefit of all Corporate Respondents (and Individual Respondents) and to Mr. Magleby's substantial economic detriment and damage, as detailed above.

120.    As a direct result of the breach, Claimant was economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**Breach of Duty of Good Faith and Fair Dealing**
**(Against CFG[17], CBNA and CCM)**

121.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 120 of this FASOC as if fully set forth in this paragraph.

122.    It is well established that contracts contain implied covenants of good faith and fair dealing. The laws of each of California and Nevada recognize the covenant.

123.    "It is well settled in Nevada that 'every contract imposes upon the contracting parties a duty of good faith and fair dealing." *State, University and Community College System v. Sutton*, 120 Nev. 972, 989, 103 P.3d 8, 19 (2004).

124.    "[W]hen one party performs a contract in a manner that is unfaithful to the purposes of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith." *Hilton Hotels Corp v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 808 P2d 919, 923 (1991).

125.    "In *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883], we stated, "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654 (Cal. Sup. Ct. 1988).

126.    As noted in the foregoing jurisprudence, as well as in the relevant cases cited in the Ruling, the covenant generally means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

---

[17]  See n.2, *infra*.

127.    The Corporate Respondents, acting through and aided by the Individual Respondents and other employees and agents, in engaging in nefarious, bad faith tactics, to squeeze Mr. Magleby out and deprive him of his earned remuneration, of the fruits of his work, thereby breached their collective duties of good faith and fair dealing. FINRA deems this breach a violation of "just and equitable principles of trade."

128.    As a direct result of the breach of Corporate Respondents' duty of good faith and fair dealing, Claimant was economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against CFG[18], CBNA and CCM)**

129.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 128 of this FASOC as if fully set forth in this paragraph.

130.    Citizens retained bonus monies and related funds earned by and due to Claimant, without the consent and authorization of Claimant.

131.    Corporate Respondents, acting through and aided by the Individual Respondents, thereby obtained money at Mr. Magleby's expense which they should not otherwise have been entitled to, and accordingly they enriched themselves at Claimant's expense and to Claimant's financial detriment.

132.    In that way, Corporate Respondents were unjustly enriched.

133.    As a direct result of Corporate Respondents' unjust enrichment, Claimant was economically harmed in an amount to be determined at the hearing of this matter.

---

[18]  See n.2, *infra.*

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### Conversion
### (Against CCM)

134.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 133 of this FASOC as if fully set forth in this paragraph.

135.    Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights", *Vigilant Insurance Co. of America v. Housing Authority of the City of El Paso*, 87 N.Y.2d 36, 637 N.Y.S.2d 342 (1995) [citations omitted].

136.    In California, conversion has three elements: ownership or right to possession of property, wrongful disposition of the property right and damages. *Tyrone Pacific Int'l, Inc. v. MV Eurychili,* 658 F.2d 664, 666 (9th Cir.1981). Nevada is the same.

137.    In "California, conversion is a "strict liability tort." *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 144 [271 Cal.Rptr. 146, 793 P.2d 479] (*Moore*); *id.* at p. 144, fn. 38 ["`"conversion rests neither in the knowledge nor the intent of the defendant"'"]; accord, *Poggi v. Scott* (1914) 167 Cal. 372, 375 [139 P. 815]". *Voris v. Lampert*, 7 Cal. 5th 1131, 1150 (Sup. Ct. Cal. 2019).  Conversion is a strict liability tort in Nevada, as well. *Wynn Las Vegas, LLC v. Tofani,* No. 69936 (Nev. Court of Appeals Dec. 14, 2017).

138.    Here, even though Claimant had an ownership interest, an immediate superior right of possession to items of personal property, including his all-important contact list, Respondent CCM nevertheless exercised "unauthorized interference with plaintiff's ownership or possession of such property." *Republic of Liberia v. Bickford*, 787 F. Supp. 397, 402 (S.D.N.Y. 1992). (*See* ¶ 97, *supra*.)

139.   In that way, Respondent CMM unlawfully converted Claimant's property.

140.    As a direct result of CMM's conversion, Claimant was economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A FIFTH CLAIM FOR RELIEF**
**Defamation**
**(Against CFG[19] and CCM)**

141.   Claimant repeats and realleges the allegations set forth in paragraphs 1 – 140 of this FASOC as if fully set forth in this paragraph.

142.   The details underlying the defamation with respect to the Form U-5 are set forth at ¶¶ 104 – 115, *supra*.

143.   CCM, for itself and as agent of CFG, aided by the Individual Respondents, filed, or caused to be filed, a false Form U-5 against Mr. Magleby.

144.   CCM, for itself and as agent of CFG, aided by the Individual Respondents, then filed a false, defamatory Amended Form U-5 against Mr. Magleby.

145.   Corporate Respondents and Individual Respondents knew that the statements in both the Form U-5 and the Amended Form U-5 were false when made, or else they recklessly disregarded the truth, in violation of Mr. Magleby's right to an honest termination notice.

146.   The defamatory falsehoods went directly to Mr. Magleby's "trade or business", and were made with actual malice[20] and thus constituted defamation *per se*.

147.   The defamatory falsehoods have marred Mr. Magleby's otherwise unblemished reputation and operated to prevent Mr. Magleby, despite his long history of success in

---

[19]   See n.2, *infra*.
[20]   "Actual malice" is used here in both its legal sense and its vernacular sense.

the industry, from obtaining subsequent employment, despite efforts to do so, to his significant economic harm.

148.    The harm caused to Mr. Magleby is ongoing.

149.    An honest, non-defamatory notation on the Form U-5 would have been "Other" with an explanation that Citizens decided it did not want to pay Mr. Magleby, and thus elected to sever their relationship by exercising their "at-will" option.

150.    As a direct result of Corporate Respondents' defamation of Claimant, Claimant was (and continues to be) economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A SIXTH CLAIM FOR RELIEF**
**Intentional Interference With Contractual Relations**
**(Against CFG[21], CBNA, CCM, Swimmer and McCree)**

151.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 150 of this FASOC as if fully set forth in this paragraph.

152.    There are two prongs to this claim for relief. The first relates to interference with the future continuation of existing contractual relations between Mr. Magleby and his book of clients. The second prong relates to interference by Swimmer and McCree, each of whom is an agent of the Corporate Respondents, with an at will employment agreement between Mr. Magleby and Citizens.

153.    In general, the following elements comprise a claim for tortious interference with contractual relations: (i) a prospective contractual relationship between a plaintiff and a third party (ii) knowledge by a defendant of the prospective relationship (iii) intent to harm the plaintiff by preventing the relationship (iv) the absence of privilege or

---

[21]  See n.2, *infra*.

justification by the defendant, and (v) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987), cited by *Wichinsky v. Mosa,* 109 Nev. 84, 87-88 (1993). *But see, Korea Supply Co. v. Lockheed Martin Corp.*, 63 P. 3d 937 (2003 Cal. Sup. Ct) (same, but no need to plead intent).

154.    Importantly, a third party's "interference with an at-will contract is actionable interference with the contractual relationship" ***because the contractual relationship is at the will of the parties, not at the will of outsiders***. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, supra, 50 Cal.3d 1118, 1127, 270 Cal.Rptr. 1, 791 P.2d 587; *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39, 172 P.2d 867.) And, more specifically, such tort may be based on interference with an at-will employment relationship. (*E.g., Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 448, 26 Cal.Rptr.2d 305 [tort of interference with contractual relations may be based on an at-will employment contract]; *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598, 86 Cal.Rptr. 52 ["the fact that the Bank was privileged to discharge plaintiff at any time does not necessarily privilege a third party unjustifiably to induce the termination"].) *Reeves v. Hanlon*, 95 P. 3d 513 (2004 Cal. Sup. Ct.).

155.    As detailed above, Mr. Magleby had established quite a respectable book of business – so substantial that it enabled him to generate, during the time of his employment, over $138 million dollars in gross revenue.

156.    Interactions with clients in the securities industry are contractual in nature, particularly at the level at which Mr. Magleby's business operates.

157.    By (a) failing to return Mr. Magleby's contact list to him and (b) fabricating a thin narrative to justify termination, a narrative which admitted to no customer harm, no firm harm and no violation of laws and regulations governing the securities industry, Corporate Respondents and Individual Respondents collectively, knowingly, and intentionally prevented or obstructed Mr. Magleby from entering into profitable agreements with his own client base.

158.    Further, by engaging in the specific machinations detailed in the body of this FASOC, including the allegations in ¶¶ 41, 46, 51, 58, 61, 64, 66, 67, and 75-80, to identify a few instances, the Individual Respondents named here tortiously interfered with Mr. Magleby's at-will employment agreement.

159.    As a direct result of the intentional interference with Mr. Magleby's various contractual relations he was (and continues to be) economically harmed in an amount to be determined at the hearing of this matter.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
### Intentional Interference With Prospective Economic Advantage
### (Against CFG[22], CBNA, CCM, Swimmer and McCree)

160.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 159 of this Statement of Claim as if fully set forth in this paragraph.

161.    The tort of intentional interference with prospective economic advantage is comprised of the following elements: (i) a prospective contractual relationship between the plaintiff and a third party (ii) knowledge by the defendant of the prospective relationship (iii) intent to harm the plaintiff by preventing the relationship (iv) the absence of privilege or justification by the defendant and (v) actual harm to the plaintiff

---

[22]  See n.2, *infra.*

as a result of the defendant's conduct. *Leavitt, supra; Wichinskyh, supra. Reeves v. Hanlon*, 95 P. 3d 513 (2004 Cal. Sup. Ct.).

162.    For the reasons detailed in the Sixth Claim for Relief, which are incorporated as if fully set forth in this paragraph, and throughout this FASOC, Mr. Magleby has stated a *prima facie* claim for tortious interference with prospective economic advantage.

163.    As a direct result of the intentional interference with Mr. Magleby's prospective economic advantage Mr. Magleby was (and continues to be) economically harmed in an amount to be determined at the hearing of this matter.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### Conspiracy to Interfere With Contract and
### Current and Prospective Business Relationships
### (Against CFG[23], CBNA, CCM, Swimmer and McCree)

164.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 163 of this FASOC as if fully set forth in this paragraph.

165.    An actionable civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Hilton Hotels v. Butch Lewis Productions,* 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993) (citing *Sutherland v. Gross,* 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989)).

166.    As detailed throughout this FASOC, the Corporate Respondents and Individual Respondents acted in concert to unlawfully – through the breaches and torts alleged herein – deprive Mr. Magleby of his earned compensation, and in the process of severing him from Citizens, interfered with his existing contract, future contracts, and existing business relationships.

---

[23]  See n.2, *infra.*

167.    In short, the Corporate Respondents and Individual Respondents collectively and individually, have intentionally conspired to, and did inflict economic and reputational harm on Mr. Magleby by interfering with his contracts and obstructing his business and economic opportunities, in bad faith, as detailed throughout this FASOC.

168.    Corporate Respondents and Individual Respondents had no legitimate justification for their malfeasance toward Claimant, and in fact it can easily be seen that their purpose was to harm Mr. Magleby by benefiting themselves at his expense.

169.    As a direct result of Respondents' collective, patently tortious, conduct toward Mr. Magleby, he was economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A NINTH CLAIM FOR RELIEF**
**Common Law Fraud**
**(Against CCM, Swimmer and McCree)**

170.    Claimant repeats and realleges the allegations set forth in paragraphs 1 – 169 of this FASOC as if fully set forth in this paragraph.

171.    As particularized above, at the times and places specified, Swimmer and McCree, acting in their capacity as agents of Citizens, knowingly misrepresented Mr. Magleby's remuneration entitlement to him. (*See* ¶¶ 45, 46, 53-60, *supra*.)

172.    Mr. Magleby justifiably relied on Swimmer's and McCree's false representations, which were intended to, and did, incentivize him to continue to outperform, in the reasonable expectation that his superior performance would generate the promised pay raises and bonus payments dangled in front of him.

173.    Instead, CMM and the Individual Respondents, timed the termination of Mr. Magleby to inflict maximum harm on him and substantial benefit to themselves, as

detailed above, but specifically to deprive him of his bonus and to have those monies flow back into a bonus pool to the benefit of Corporate Respondents and Individual Respondents at Mr. Magleby's expense.

174.   As a direct result of the foregoing fraudulent conduct toward Mr. Magleby, he was economically harmed in an amount to be determined at the hearing of this matter.

**AS AND FOR A TENTH CLAIM FOR RELIEF**
**Aiding and Abetting**
**(Against Swimmer and McCree)**

175.   Claimant repeats and realleges the allegations set forth in paragraphs 1 – 174 of this FASOC as if fully set forth in this paragraph.

176.   The Individual Respondents knowingly aided and abetted the torts detailed in this FASOC as detailed throughout.

177.   In *Casey v. U.S. Bank National Assn.,* 127 Cal. App.4th 1138, 26 Cal.Rptr.3d 401, 405 (2005), the court acknowledged that "California has adopted the common law rule" that "[l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... *knows* the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act." (emphasis added) (quoting *Fiol v. Doellstedt,* 50 Cal.App.4th 1318, 58 Cal.Rptr.2d 308, 312 (1996)); *see also River Colony Estates Gen. P'ship v. Bayview Financial Trading Group, Inc.,* 287 F.Supp.2d 1213, 1225 (S.D.Cal.2003) ("A party can be liable for aiding and abetting an intentional tort if ... an individual is aware that the other's conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other to so act."). *See also, Dow Chemical Co. v. Mahlum*, 970 P. 2d 98 (Sup. Ct. Nev. 1998).

178.    The Individual Respondents, at all times, knowingly and substantially acted on behalf of the Corporate Respondents, aiding the Corporate Respondents' intentional deprivation of Mr. Magleby's just entitlements, to his substantial and ongoing detriment, as particularized throughout this FASOC.

179.    As a direct result of Individual Respondents aiding and abetting of Corporate Respondents' torts, Mr. Magleby, was economically harmed in an amount to be determined at the hearing of this matter.

## **REQUEST FOR EXPUNGMENT**

Claimant respectfully requests that the Panel hold the appropriate hearing pursuant to **FINRA Rule 12805 (or any other applicable rule)**, issue an order directing CRD to expunge the false statements in Mr. Magleby's Form U-5, and, if reportable, from any reports in which it appears, order that the Form U-5 be re-amended to state that Mr. Magleby was wrongfully terminated, and grant such other and further relief to Mr. Magleby that it deems just and proper.

**WHEREFORE**, the Claimant seeks:

(a) An Award of compensatory and consequential money damages in an amount to be determined at the hearing, plus pre- and post- award interest at the appropriate statutory rate; and

(b) An Award of exemplary damages to punish the willful, malicious, and contumacious disregard of Mr. Magleby's rights to fair compensation, and to deter its repetition, in an amount determined by the Panel to be just and proper, as well as sufficient to satisfy the policy purposes of exemplary or

punitive damage awards in general; and

(c) An Award directing expungement pursuant to the Request for Expungement,

*supra;* and

(d) An Award directing that all costs, fees, and expenses of this Arbitration be

imposed against Respondents; and

(e) An Award of such other and further relief as the Panel deems just and proper.

Dated:        Kings County, New York
              April 12, 2023

                                        Respectfully submitted,

                              BY:    *Lawrence R. Gelber*

                                     Lawrence R. Gelber
                                           Attorney for Claimant
                                     The Vanderbilt Plaza
                                     34 Plaza Street – Suite 1107
                                     Brooklyn, New York 11238
                                     T:     718 638 2383
                                     F:     718 857 9339

# Exhibit 5

# Exhibit 5

DocuSign Envelope ID: B6DA263C-3E9F-4CE9-B8C2-7E4320A59AF8

Hon. Amy Hogue (Ret.)
SIGNATURE RESOLUTION, LLC
633 W. 5th Street, Suite 1000
Los Angeles, CA 90071
(213) 622-1002

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| CURTIS C. MAGLEBY,<br><br>                    Claimant,<br><br>vs.<br><br>CITIZENS BANK, N.A., CITIZENS FINANCIAL GROUP, INCL, CITIZENS CAPITAL MARKETS INC., THEORDORE C. SWIMMER, AND DONALD H. McCREE<br><br>                    Respondent | Case No.:01-22-0003-9196<br><br>ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS |

## I.     Introduction

Claimant Curtis Magleby is a highly skilled investment banker who worked as a Managing Director for Citizens Bank N.A. and/or Citizens Financial Group Inc.  Those entities, together with Citizens Capital Markets Inc., are collectively referred to as "Citizens" in this Order.

Magleby worked for Citizens from approximately May 2015 until Citizens terminated his employment in December 2021.  In this arbitration proceeding, Magleby complains that Citizens' breached promises to tie his award incentive compensation as a set percentage of revenue generated; disciplined him and ultimately terminated his employment in bad faith for technical and non-material violations of Citizens Personal

Security Transactions Policy ("PST Policy"); and defamed him by filing a FINRA Form U5 filing indicating he was terminated for violating the PST Policy.

For that alleged conduct and other conduct identified in the (Corrected) First Amended Statement of Claims ("FASOC"), Magleby seeks an award of damages against Citizens for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unjust enrichment, (4) conversion,  (5) defamation, (6) intentional interference with contractual relations, (7) intentional interference with prospective advantage, (8) conspiracy to commit the interference claims, and (9) common law fraud (10) and aiding and abetting.   The FASOC names Swimmer and McCree as individual respondents in causes of action (7) through (10).

Respondents have moved for summary judgment on all claims.  Based on counsels' oral argument, the briefs supporting and opposing the motion, and the evidence presented as sworn statements, deposition testimony and writings, the Arbitrator GRANTS the motion as to all claims.

## II.        Standard of Proof for Summary Adjudication

Nevada has adopted a standard analogous to the standard in Federal Rule of Civil Procedure 56:

> Summary judgment is appropriate under NRCP 56 when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that are properly before the court demonstrate that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  The substantive law controls which factual disputes are material and will preclude summary judgment; other factual disputes are irrelevant.  A factual dispute is genuine when the evidence is such that a rational trier of fact could return a verdict for the nonmoving party.

*Wood v. Safeway, Inc.* (2005) 121 Nev. 724, 731, 121 P.3d 1026, 1031.  It is well established in Nevada, that to raise a triable issue of fact, the non-moving party must present "a*dmissible* evidence," as "he or she 'is not entitled to build a case on the gossamer

2

threads of whimsy, speculation and conjecture.' " (*Posadas v. City of Reno,* 109 Nev. 448, 452, 851 P.2d 438, 441–42 (1993); emphasis added.)

California's Code of Civil Procedure section 437c is more demanding because it requires the moving party to introduce admissible evidence sufficient to make a *prima facie* showing on each cause of action in order to shift the burden of proof to the non-moving party to introduce evidence raising triable issues of fact. Like Nevada, California requires the non-moving party to introduce *admissible* evidence. (Cal. Code Civil Proc. 437c, subd. (d).) Under Nevada and California law, all reasonable and non-speculative inferences must be drawn in favor of the non-moving party. (See, *e.g.*, *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1537. ("all inferences reasonably deducible from the evidence".) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

Respondents are entitled to summary judgment under either standard either because his claims fail as a matter of law or because he has failed to present admissible or reliable evidence raising triable issues of fact.

### III. The Defamation Claim Fails as a Matter of Law because Citizens' Statements in the Form U5 Are Absolutely Privileged

Under both Nevada and California law, Citizens' statements in the Form U5, (including its statement that Magleby was terminated for "[f]ailure to follow internal policies as it pertains to personal trading activities") are absolutely privileged against any action for damages. (*Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521; *Cucinotta v. Deloitte & Touche, LLP* (2013) 129 Nev. 322, 326.)

Claimant's reliance on *Tilkey* for the proposition that Citizens' Form U5 statements are not privileged is not persuasive. *Tilkey* did not vitiate the absolute privilege for statements made in a Form U5. It merely held that statements unrelated to FINRA's mission fall outside the protection of the absolute privilege. Reviewing a verdict in favor

of plaintiff based on his employer's U5 report that he was terminated for "engaging in threatening behavior and/or acts of physical harm or violence," *Tilkey* reasoned as follows:

> To the extent the Form U5 provides information related to FINRA's enforcement of its rules, the statements are protected. However, the scope of FINRA's authority is not unlimited. Section 7 of the Form U5 includes a list of disclosure questions for full terminations that asks if the terminated employee was the subject of a governmental investigation; was under internal review for fraud, wrongful taking of property, or violated investment related laws, regulations, or industry standards relating to compliance; was convicted of or pleaded guilty to a felony; or was convicted of or pleaded guilty to a misdemeanor that related to investments, fraud, false statements, bribery, perjury, forgery, counterfeiting, extortion, or wrongful taking of property. These questions make clear that FINRA seeks termination information that allows it to assess whether the employee's conduct lacked compliance with regulatory requirements in the securities arena. The explanation required in section 3 of the form helps FINRA determine whether and in what ways an employee may have engaged in unethical behavior or otherwise violated FINRA rules. Thus, the absolute privilege extends to communications required by FINRA, i.e., fraud-and securities-related information and other information covered by its rules.

(*Tilkey* at 546; see also, *Arges v. LPL Fin., LLP,* 2020 WL 6883156, at *1 (Cal. Ct. App. Nov. 24, 2020.)

There is no dispute FINRA required Citizens to disclose whether Magleby "voluntarily resign[ed] from your firm, or . . . was discharged from your firm after allegations were made that accused the individual of (a) violating investment-related statutes, regulations, rules or industry standards of conduct." (Gelber Decl., Exh. ZA.) Citizens' disclosures in that regard were absolutely privileged because they "allowd[ed] FINRA to assess whether the employee's conduct lacked compliance with regulatory requirements in the securities arena" and to "determine whether or in what ways an employee may have enbibed in unethical behavior." (*Tilkey* at 546.) Consistent with *Tilkey*, Citizens' communications were absolutely privileged as "communications required by FINRA [i.e.,] securities-related information." (*Id.*)   Respondents therefore are entitled

4

1    to judgment on the defamation claim (and any other claim) based on statements made in

2    the U5 filings.

3

4    **IV.    Citizens Is Entitled to Judgment on the Breach of Contract and Breach of
        Implied Covenant Claims**

5

6        **A.  The Offer Letter Agreement Extinguished and Superseded All
            Written or Verbal Promises that Preceded It**

7

8        Magleby seeks damages based on Citizens' alleged breach of promises to pay his

9    incentive awards according to set percentages.  Magleby proposed this structure while he

10   was being recruited in January 2015:

11           As for [compensation], I am just laying out thoughts.  If you think they are

12           unreasonable or crazy I am happy to modify but you asked me to go first so I am

             giving it a shot.  For the base [compensation] package we discussed I assume you

13           expect a minimum amount of revenue, and I am going to guess that's in the $5

14           million range.

15           Using that assumption, I would [like] to propose the following.  Anything above

16           that number would be a percentage. 20% of leveraged finance revenue and 30% of

17           merger revenue would be my share.  No magic to those numbers but I think they

18           are reasonable.

19   (Melnick Decl. Exh. 6, CB0000013.)  Swimmer replied to the proposal as follows:

20           I think there is something to work with, but there will have to be a formula.  This

21           bank is not paying out 2 million bonuses.  I would like to put it in place for the first

             year and hopefully after that [we'll] not have to worry about it . . ..

22   (*Id.*)  Magleby avers that later on in the recruitment process, Swimmer told him "our

23   agreement, which I understood to mean the formula, had been approved [by Swimmer's

24   superior]."  (Gelber Decl. Exh. 8, ¶ 9.)

25       In mid-March 2015, Magleby accepted the offer of employment presented in

26   Citizens' February 15, 2015 letter (the "Offer Letter Agreement").  (Melnick Decl., Exh.

27   8.)  While employed with Citizens he was bound by the terms of that agreement which

28   made him an at-will employee for a term of unspecified duration in exchange for "an

                                        5

annualized base salary of $300,000," and "[eligibility] to participate in the Company's discretionary award program as amended from time to time." (*Id.*)

Under the Offer Letter Agreement, Magleby agreed to vest the Company with broad discretion over the *form* of any incentive award ("cash, equity-based instruments or in any other form"); the *amount* of any award (depending "on a mix of factors, including, but not limited to individual and Company performance" including factors unrelated to his performance such as "external economic considerations"); and the *timing* of any awards (the Company retained discretion to "[defer] them in full or in part"). (*Id.*). He also gave Citizens the unilateral and unrestricted right to modify the award program "from time to time." Importantly, Magleby agreed that the Offer Letter Agreement "fully superseded any and all prior verbal or written communications regarding [the] terms and conditions [of his employment]." (*Id.*)

Having agreed that, going forward, Citizens would have complete discretion over the form, amount, timing, and obligation to pay incentive awards and that the Offer Letter Agreement extinguished all promises made beforehand, Magleby has no legal basis for enforcing alleged pre-Offer Letter Agreement promises.

## B.  The Offer Letter Agreement Cannot Be Reasonably Interpreted as a Promise to Pay Claimant a Set Percentage of Revenue Generated

Because the Offer Letter Agreement's integration clause does not go so far as to preclude the admission of prior promises into evidence, the Arbitrator admits and considers the evidence of pre-contract communications for the limited purpose of determining whether the Offer Letter Agreement is reasonably susceptible of the interpretation Magleby advances. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1342, 1352.)

The Arbitrator finds that the alleged agreement to pay according to a set formula is inconsistent with the Offer Letter Agreement because it contradicts the broad discretionary language allowing Citizens to tie his compensation to a variety of factors, including factors unrelated to his individual productivity. Because the Offer Letter Agreement is not reasonably susceptible of the interpretation advanced by Magleby, parol evidence advancing that interpretation is ultimately inadmissible. Without admissible evidence,

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

Magleby's contract and implied covenant claims based on pre-Offer Letter Agreement promises necessarily fail.

### C.  Magleby Cannot Enforce Subsequent Promises to Pay According to the Formula

Magleby claims that, after he commenced his employment, Citizens kept on promising to pay him according to his proposed formula.  He also avers that when he asked Swimmer about the integration clause in the Offer Letter Agreement, Swimmer told him that "since we were having these conversations after the Offer Letter Date . . . and [he] expected we would have multiple conversations about compensation every year,  [the] clause in the offer letter was meaningless."  (Gelber Decl., Exh. H, ¶ 12.)

However, by accepting the Offer Letter Agreement, Magleby relinquished any right to enforce post-agreement *verbal* promises about compensation, agreeing that:

> No verbal promises may be made by any officer or employee of the Company as to eligibility for or the guarantee of any receipt of any discretionary and/or performance-related awards in association with the Discretionary Award Program or any other types of incentive payments or awards.

This disclaimer is consistent with the integration clause and underscores the parties' intentions to prevent any enforceable modification based on subsequent verbal promises. Magleby's contract and implied covenant claims based on such promises accordingly fail.

### D.  Magleby Has Failed to Introduce Evidence Raising Triable Issues of Fact on his Contention that Citizens' Progressive Discipline and Decision to Terminate his Employment Were a Dishonest Pretext Motivated by a Desire to Cheat Him Out of Award Compensation

To establish "bad faith, " i.e., that Citizense breached the implied covenant of good faith and fair dealing, Magleby must introduce evidence of dishonesty.  "[A]n employer's honest though mistaken belief that legitimate business reasons provided good cause for discharge will negate the claim it acted in bad faith to deprive the employee of the benefits of the contract." (*Wilkerson v. Wells Fargo Bank* (1989) 212 Cal.App.3d 1217, 1231; see also, California Civil Jury Instructions (CACI) 325: "Good faith means honesty of purpose

7

without any intention to mislead or to take unfair advantage of another" and "being faithful to one's duty or obligation.")

### 1. Citizens Has Made a *Prima Facie* Showing of Good Faith

Citizens has introduced evidence sufficient to make a *prima facie* showing it was not dishonest and did not deal with Magleby unfairly or in bad faith during the pendency of his employment.   That evidence demonstrates, *inter alia,* it treated Magleby fairly relative to other Citizens' employees by making him one of its top twenty (and sometimes top ten) earners by paying him millions of dollars in incentive awards on top of an annual base salary of $300,000. (SUMF and CSUMF ¶¶ 14, 18, 22, 24–29, 31-33.)   It also demonstrates that Citizens followed its usual procedures in determining his compensation. (SUMF and CSUMF ¶¶ 15-17.)

### 2. There Is No Dispute Magleby Violated the Strict Letter of the PST Policy

As a condition of his employment under the Offer Letter Agreement, Magleby agreed to be bound by Citizens' policies including a PST Policy that required compliance with "the spirit and the strict letter of its provisions," and specified that failure to do so "may result in the imposition of serious sanctions which may include . . . suspension of personal securities transaction privileges [and] termination of employment." (SUMF ¶ 38.) As a managing director with access to "Material Non-Public Information," Magleby was required to pre-clear (obtain approval for) all personal trades of equities, bonds and options. (SUMF ¶ 37.)   Citizens' Control Room was responsible for monitoring Magleby's pre-clearances, alerting him to failures to pre-clear the exact trades he made, and reporting violations to higher management.

Citizens has introduced evidence it addressed his repeated PST Policy violations by embarking on a modulated course of progressive discipline spanning 15 months (from September 2019 until his termination on December 14, 2021). (SUMF ¶¶ 38; 39-47.) According to Magleby, the discipline and termination for violations of the PST Policy were a pretext for Respondents' scheme to usurp his book of business and take his year 2021 incentive compensation for themselves.  Although Magleby's CSUMF takes issue

with non-material facts in Respondents' SUMF, it does not dispute the following basic facts:

(i) In September 2019, Magleby obtained clearance for a "buy" when the intended transaction was a "sell." (CSUMF ¶ 40.) Citizens responded to this by issuing a Verbal Warning (First Violation). (SUMF, CSUMF ¶ 40.)

(ii) In June 2020, he obtained pre-clearance for the *purchase* of Zoom shares from the Control Room but failed to obtain approval to *sell* them. (CSUMF ¶ 41.) This resulted in a written warning "Second Violation" of the PST Policy. (SUMF, CSUMF ¶ 41.)

(iii) In July 2020, he purchased and sold various option contracts and purchased 25 shares of Cloudshare without pre-clearance. (SUMF, CSUMF ¶ 42.) This elicited a Final Written Warning for his Third Violation of the PST Policy as well as counseling from Swimmer who warned him that "another violation could lead to termination." (SUMF, CSUMF ¶¶ 42, 43.)

(iv) In November 2020, he sold an uncovered *call* option contract after obtaining approval to sell a *put* option contract. (SUMF, CSUMF ¶ 44.) This elicited a Fifth Violation of the PST Policy, a Second Final Written Warning, a restriction on taking any new positions in equities, and reductions in his performance rating and discretionary award for year 2020. (SUMF, CSUMF ¶¶ 45-47.)

(v) On November 12, 2021, he assumed ownership of 20 shares of AMEH as reflected in a November 11, 2021, entry in his Fidelity account documenting the purchase. (SUMF, CSUMF ¶ 51.) This transaction violated the terms of his Second Final Written Warning and led to the termination of his employment.

### 3. There Is No Evidentiary Basis for Magleby's Contention that Citizens' Acted in Bad Faith because It Knew the PTA System Was Responsible for the Mistakes Underlying his Violations

Magleby contends that Citizens' system for tracking his trades (the "PTA system") made erroneous entries and that the Control Room accused him of trade violations knowing that the PTA system was prone to errors. That contention is not supported by reliable or admissible evidence.

DocuSign Envelope ID: B6DA268C-3E95-4C5B-B8C3-F64220A50AF8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For example, Magleby cites David Anjoorian's comment, in a March 28, 2017, email, that the PTA system "is not an overly robust system." (Magleby Decl. ¶ 32; Gelber Decl. Exh. Q.) Anjoorian's comment does not demonstrate or support a reasonable inference that any of Magleby's violations arose out of errors made by the PTA system or that Anjoorian knew the system made errors. In his email, Anjoorian explained that an *options* trade was "red flagged" because Magleby only obtained approval for an *equity* trade. Anjoorian then provided a detailed explanation on the correct way to report options trades, inviting Magleby to call the Control Room if he had any questions. (*Id*.) Anjoorian's comment that the system was not "overly robust" was in reference to its required use of the yahoo symbol for options trades. The correspondence accordingly fails to support a reasonable inference that the system made or was prone to errors. Anjoorian's email also provides no inference he was acting in bad faith. To the contrary, it shows that Anjoorian gave Magleby the benefit of the doubt, electing to "document the option trade as a coaching moment and close it out, no violation." (*Id.*)

Magleby's contention "[t]he control room errors were near constant" is also not supported by reliable or admissible evidence. (Magleby Decl., ¶ 34.). Anjoorian's 2019 email (Exhibit S to the Gelber Declaration) recounts that someone at Fidelity told him Fidelity had broken and rebooked one of Magleby's red-flagged transactions. The email provides no evidence or reasonable inference of "control room errors."

Magleby's citation to Anjoorian's September 2021 correspondence further undermines Magleby's claim the PTA system made errors. (Magleby Decl., ¶35, Gelber Decl. Exh. T.) Responding to a September 19, 2019, internal inquiry whether "there is any possible way [Magleby's violation] was the result of a system error," Anjoorian said, "We believe it's highly unlikely there was a system error. We don't have any have prior examples or complaints from employees who said they entered a buy and the system changed it to a sell or vice versa. Every preclearance request generates an email confirmation that goes directly back to the employee [and the control room]." (Gelber Decl., Exh. T). This uncontradicted evidence belies the allegation the system made errors or that Anjoorian thought it did.

Magleby contends that "[m]ultiple people in compliance did not understand how the approval system operated or the errors it had built into it." (Magleby Decl., ¶ 36.) The

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

referenced internal correspondence does not evidence or support a reasonable inference the system "had errors built into it." (Gelber Decl., Exh. U.) It is also unsupported by evidence. Even if it was, employees' "failure to understand" would not tend to prove or support a reasonable inference the system was responsible for errors in connection with Magleby's trades.

Magleby's assertion he was "not the only person calling the control room out for its clear errors" is also not borne out by the referenced documentation. (Magleby Decl. ¶ 40; Gelber Decl. Exh. X.). In the email, the Director of Employment Relations notes that Citizens had "just terminated another colleague for a PST violation" commenting that, "by the way," the colleague "is causing a stir [by] call[ing] the HSRC about a dozen times already." There is no indication the "stir" occurred prior to the employee's termination or had anything to do with errors by the Control Room. The email also undermines Magleby's contention Citizens "singled him out" for PST Policy violations.

### 4.   There Is No Evidence the Control Room Acted in Bad Faith

For his June 2020 violation (the Zoom transaction), Magleby asserts that he "was told by the business line that he was to receive an oral warning," speculating that it was "presumably because they knew I was correct." (Magleby Decl., ¶ 37; Gelber Decl., Exh. V.) He further asserts that the "Control Room showed their exasperation," speculating that its employees "presumably ramped up their retaliation against me." (*Id.*)

The referenced documentation contains no evidence and fails to support a reasonable inference Citizens was acting in bad faith because it "presumably knew [Magleby] was correct" or that the Control Room "ramped up retaliation against [him]." While Anjoorian expressed exasperation that Citizens only gave a verbal warning while Magleby was under a Final Written Warning, it belies any inference of bad faith or "retaliation." To the contrary, it documents Citizens' continued efforts to retain him as an employee notwithstanding repeat violations. (*Id.*) The same is true for the email correspondence in Exhibit W to the Magleby Declaration. (Magleby Decl., Exh. W.)

Magleby's testimony that "even when the control room confirmed a trade was not a violation, the inquiry nevertheless accrued against me to make it appear as if I was an habitual violator" when "I was not" is not supported by the documentation. (Magleby

11

DocuSign Envelope ID: B6DA268C-3E95-4EEB-B8C3-F64228A50AF8

Decl. ¶ 42, Gelber Decl., Exh. Y.).   In a November 2020 email to Magleby, Anjoorian noted that a trade "was flagged for a preclearance violation" because shares were purchased in Magleby's "-284" account after Magleby obtained approval to purchase them in the "-869" account.  Instead of castigating or retaliating against Magleby for another violation, Anjoorian suggested two workarounds (having Fidelity either break the trade or journal it in the -869 account).  Magleby was grateful for these suggestions ("My Apologies" and "Thank you for the options") and promised to have Fidelity move the trade to the proper account.   After receiving confirmation Fidelity made the switch, Anjoorian assured Magleby he would "close it out" with "no violation, you are all set. thanks."   This correspondence provides no inkling of bad faith.  To the contrary, it documents Anjoorian's good faith effort to avert a violation during a time when Magleby was at risk of termination under the Final Written Warning for a Third Violation of the PST Policy.

Magleby's statement that, after the November 20, 2020, violation he "repeatedly attempted to get information about it, including the conditions I was being subjected to" but "instead of a response, my inquiry was sent to the legal department" is also unsupported by evidence.  (Magleby Decl. ¶ 43; Gelber Decl. Exh. Z.).   There is no evidence Citizens withheld any information about his restrictions.  To the contrary, Citizens sent him a Memorandum that same day detailing his restrictions under the Final Written Warning. (Melnick Decl., Exh. 39.)

**5.  Magleby's Contention Citizens Acted in Bad Faith Because the Preclearance Violations Were "Technical and Not Material" Fails as a Matter of Law and Fails to Raise Triable Issues of Fact**

Magleby's claim that Citizens breached its duty of good faith by strictly enforcing the PST Policy fails because the Offer Letter Agreement and the PST Policy gave Citizens the express right to do so.  Under the Offer Letter Agreement, Magleby agreed to be bound by Citizens' PST Policy which required him "ensure his preclearance requests and execution of trades [were] within the correct account number, security, and number of shares."  (Melnick Decl., Exh. 31 at CB000353.)  He further agreed that a failure to comply with "the spirit *and the strict letter* of its provisions," would subject him to "serious sanctions" including termination of employment." (SUMF ¶ 38; emphasis added.)

12

It is well established that courts may not enforce implied contracts that vary the express terms of an agreement.  (E.g., *Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal. App. 4th 1383, 1390.)  Magleby's effort to characterize Citizens' enforcement of the strict letter of the PST Policy as a breach of the implied covenant of good faith and fair dealing fails because it would require enforcement of an implied covenant to enforce the spirit but not the strict letter of the Policy.  The PST Policy plainly requires enforcement of both.

It also fails because the strict enforcement language of PST gave Magleby a reasonable expectation he would be disciplined or terminated for "technical" violations.  The appellate court in *First American Title Insurance Company v. Spanish Inn, Inc.* (2015) 239 Cal.App.4th 598, 604, explained this principle.

> [A]lthough it has been said the implied covenant finds 'particular application in situations where one party is invested with a discretionary power affecting the rights of another' [citations], if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.' " (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1120–1121, 76 Cal.Rptr.3d 585; *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808, 48 Cal.Rptr.2d 747 (*Waits*) ["courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement."].)

Citizens had the express contractual right and discretion to enforce the "strict letter" of the PST Policy.  Because an implied covenant cannot contradict an express provision in a contract, Magleby cannot assert an implied covenant of good faith and fair dealing vitiating the express provisions of the PST Policy incorporated into the Offer Letter Agreement.

**6.    Magleby's Contention Citizens Engaged in Bad Faith by Threatening to Disclose Magleby's Disciplinary History on a Form U5 Is Not Supported by Reliable or Admissible Evidence**

As noted in section III above, Citizens' disclosures of information in FINRA's Form U5s are absolutely privileged against liability under any theory, including breach of contract and alleged bad faith.  Magleby's contention Citizens' conduct in connection with intended U5 disclosures was in bad faith is not supported by admissible or reliable evidence.

Magleby testified that when his 2020 incentive compensation was reduced for violations of the PST Policy, McCree told him, "We're not going to fire you.  We want to keep you on.  But we're going to reduce your bonus by 60 percent . . . [a]nd if you quit, we're going to mark your U5 that you were terminated."   (Opposition at 25-26.)  In his Declaration, Magleby explains that a negative mark on the U5 would make it "virtually impossible for me to obtain employment at a marquis firm suitable to an investment banker at my level of production."   (Magleby Decl., ¶¶ 46-48.)  In response to McCree's "threat," Magleby says he redoubled his efforts in 2021 and generated $37.5 million in revenue for that year.  (*Id*.)

McCree was not asked about his alleged statement in his deposition.  Instead, he was asked whether he was "ever aware of communications that either Ted Swimmer or Gary Aswad or Bridget McAvo [had with Magleby] . . . about consequences to his resignation if he resigned after he was paid his bonus." McCree replied that he "was not." Asked whether he would be surprised to learn they told Magleby that "if he resigned after [Citizens paid] his bonus, they would negatively mark his Form U5," McCree said, "I don't know anything about that." (McCree deposition at 156-157, Gelber Decl., Exh. G.)  As additional evidence of supposed "extortion," Magleby cites the November 2021 email correspondence authored by Sara O'Gara, SVP Head of Risk - Human Resources, addressing performance evaluation reports.  O'Gara told a colleague that Citizens "had reduced [Magleby's] performance rating and placed him on a Final Written Warning" noting that if he resigned, "his disciplinary history would need to be marked on U5/U4 accreditation."  (Gelber Decl., Exh. M.)

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

DocuSign Envelope ID: B6DA262C-3E95-4C5B-B8C3-F64220A50AF8

O'Gara's statements were not directed to Magleby.  There is accordingly no evidence anyone other than McCree told Magleby that Citizens intended to report negative information on the U5 form if he resigned.  To create a triable issue of fact, Claimant must introduce admissible evidence (a) McCree falsely represented that Citizens was required to make negative disclosures on the U5 if he resigned; (b) that he did so to pressure Magleby to stay employed and generate revenue in 2021; and (c) that his motivation was to later terminate Magleby's employment in order to deprive him of 2021 award compensation.  Magley has failed to present evidence supporting (a), (b), or (c).

There is no evidence the gist of McCree's statement about the disclosure was false, i.e., that that Citizens was not required make disclose his disciplinary history if Magleby resigned.  The language of the U5s is consistent with McCree's understanding.  In the U5s, Citizens was obligated to "provide timely, complete and accurate information" in response to question 7F which asks whether "the individual voluntarily *resign[ed] from your firm*, or the individual was discharged from your firm *after allegations were made that accused the individual of (a) violating investment-related* statutes, regulations, *rules* or *industry standards of conduct*."  (Gelber Decl., Exhs. O, ZA.)  The PST Policy is a set of investment-related rules designed, among other things, to deter insider trading or any appearance of insider trading.  Under the language in question 7F, Citizens was arguably required to disclose.  O'Gara's email correspondence documents Citizens' understanding it was obligated to disclose the negative disciplinary activity even if Magleby resigned.  There is no evidence McCree or Citizens had a contrary understanding or that they were mistaken about their understanding.

There is also no evidence McCree's purpose in making the alleged statement was pressure Magleby to remain employed and no evidence his motivation was to terminate Magleby after he generated 2021 revenue. The timing of Magleby's termination was dictated by the timing of the AMEH transaction which happened to occur in November 2021.  There is no evidence it was timed as a "set up."  The resulting deprivation of Magleby's award compensation was not a discretionary decision made by McCree or Swimmer.  Under Citizens' standing policies, only current employees are entitled to award compensation.  There is also no evidence Respondents knew Magleby was not responsible for the AMEH trade.  Magleby's failure to provide names and details substantiating his

DocuSign Envelope ID: B6DA262C-3E95-4C5B-B8C3-F64220A50AF8

1    increasingly detailed representations about inheriting the shares from his uncle, and his

2    apparent misrepresentations about his dealings with Fidelity in connection with the trade

3    cast doubt on his claim he was not responsible for it. (SUMF ¶¶ 56-59.)

4

5        **7.  Citizens' Alleged Post-Termination Conduct Does Not Raise Triable Issues of Fact**

6

7        Magleby points to the failed post-termination severance negotiations as evidence of

8    Citizens' bad faith.  Because the negotiations occurred after his employment agreement

9    ended, they cannot form the basis for any breach of that agreement.

10       Even if the agreement had remained in place, the severance negotiations would

11   provide no basis for relief.  It is well established that a party has no obligation to negotiate

12   in good faith unless it is under an agreement to do so.  (See, *e.g.*, 1 Witkin, Summary of

13   California Law 11th § 826.)  Any claim of bad faith in connection with post-termination

14   negotiations therefore fails as a matter of law.

15       Magleby's allegations of bad faith based on the severance negotiations also fail for

16   lack of evidentiary support.  At the culmination of the negotiations, Citizens offered to pay

17   $750,000 in severance and to allow him to retain his unvested RSUs.  (CSUMF ¶ 62.)  Its

18   proposed separation agreement included a the following non-compete provision:

19       "You agree that that for a period of twelve (12) months after your employment with

20       Citizens ends, you shall not, directly or indirectly, for any person or entity other

21       than the Company, accept business, solicit or assist in soliciting for business any

22       referral source or customer of Citizens, nor will you induce or encourage any such

23       referral source or customer to discontinue or diminish his, her or its relationship or

24       prospective relationship with Citizens, or divert business away from Citizens;

25       provided, however, that general solicitation through advertisement to the general

26       public, without individualized contact and that does not mention Citizens, shall not

27       constitute solicitation for purposes of this provision."

(Melnick Decl, Exh. 54.)

       Magleby argues this provision is unlawful under Nevada law and that Citizens'

insistence on it amounted to "extortion."  (Magleby Decl., ¶¶ 88–91.)  His attorney, Jordan

16

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

Becker, opines that such clauses are unlawful unless they "(a) [are] supported by valuable consideration; (b) [do] not impose any restraint greater than required to protect the employer for whose benefit the restraint was imposed; and (c) [do] not impose any undue hardship on the employee, among other things, as well as offering the employee certain litigation rights and benefits." (Becker Decl. ¶9; Gelber Decl., Exh. E.)   Magleby has failed to offer evidence the proposed restrictions (which was part of a proposal to pay $750,000 plus vesting of RSUs) were not supported by valuable consideration, imposed a restraint greater than required to protect Citizens, or imposed any undue hardship.

There is also no evidence Citizens requested it in bad faith.  Magleby was already bound by a substantially similar restriction.  In the Offer Letter Agreement, he promised that "for 365 days following the termination of employment for any reason, [he would] not directly or indirectly . . . solicit . . . or attempt to persuade in any manner . . . any client or customer . . . ."  He also expressly agreed the restriction was "reasonable."   (Melnick Decl. Exh. 8.)  Thus, even if the post-termination negotiations could be actionable as a breach of contract or breach of the implied covenant of good faith and fair dealing, Magleby has failed to raise a triable issue of fact as to Citizens' alleged bad faith in asking him to reaffirm it.

## V.    Claims for Alleged Breaches of the OIPs Cannot Be Pursued in this Proceeding

As part of his annual compensation, Magleby received restricted share units (RSUs). In connection with each annual award, he signed (electronically) a Restricted Stock Unit Award Agreement ("OIP") under Citizens Omnibus Incentive Program.   (E.g., Gelber Decl. Exh. B.)  At the time of his termination, Magleby had thousands of RSUs that had not yet vested.   Magleby argues Citizens breached the OIPs by requiring him to forfeit the unvested shares even though his termination was not for "cause" as defined in the OIPs.[1]

---

[1] In argument on the motion, Magleby's counsel complained that in pre-litigation correspondence, he requested copies of all agreements between Citizens and Magleby but never received copies of the OIPs. According to Magleby's counsel, the litigation would have been framed differently had he seen copies of the OIPs.  The Arbitrator disregards these contentions.  The pre-litigation correspondence is not in evidence.

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

DocuSign Envelope ID: B6DA268C-3E95-4E5B-B8C3-F64228A50AF8

As explained below, there are several problems with this argument: (1) Claimant's FASOC does not identify or allege the breach of any OIP; (2) it is not reasonable to interpret the Offer Letter Agreement and the OIPs as a single integrated agreement; and (3) because Magleby failed to invoke the OIPs' dispute resolution clauses, the AAA did not take jurisdiction over claims arising out of the OIPs.

### A.  Claimant Failed to Plead any Claim for Breach of the OIPs

The FASOC does not allege a breach of any OIP, or the breach of any contract based on his forfeiture of unvested RSUs.  To the contrary, it focuses entirely on Citizens' alleged failure to pay him cash compensation.  Paragraph 119, for example, alleges "[n]otwithstanding that Mr. Magleby performed his obligations under the contract propounded by parent company CFG exceedingly well . . . Corporate Respondents collectively failed to meet their obligations, failed to remit promised, **earned bonuses**, failed to pay **promised raises**, and fabricated false assertions against him . . . ."  (Emphasis added.).  Paragraph 130 similarly asserts that "Citizens retained **bonus monies and related funds** earned by and due to Claimant, without the consent and authorization of Claimant."  (Emphasis added.).

Claimant's Demand for Arbitration likewise makes no mention of the OIPs or his forfeiture of RSUs.  It only attaches a copy of the Mutual Agreement and the Offer Letter

---

There is also nothing the Arbitrator can do about dealings that occurred before the arbitration was commenced. Counsel also complained that Respondents failed to produce the OIPs in discovery notwithstanding requests for information about compensation, including compensation in the form of securities. Respondent's counsel denied any "concealment" of the OIPs, pointing out that Magleby had possession of, and produced a copy of at least one OIP.  He further argued that, because Magleby signed them on an annual basis, he knew or should have known about them. Respondent's counsel denied withholding production of the OIPs in discovery, citing correspondence between counsel indicating that Claimant raised the issue but failed to pursue it.  From the Arbitrator's standpoint, the key question is whether  Magleby had what he needed to oppose Respondents' motion for summary judgment.  The extensive evidence and argument presented in opposition to the motion demonstrate that Magleby had the facts necessary to oppose the motion.  The Arbitrator accordingly finds no basis for denying or continuing the hearing on the motion. See e.g., Cal. Civ. Proc. Section 437c(h) allowing the continuance of a motion for summary judgment upon a showing "that facts essential to justify opposition may exist but cannot, for reasons stated, be presented."

18

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

Agreement.  The Arbitrator therefore finds that any claim for breach of the OIPs was not pled and is not at issue in this arbitration.

### B. **For Purposes of Dispute Resolution, the Offer Letter Agreement Is Separate and Distinct from the OIP**

Claimant urges the Arbitrator to address his claim for breach of the OIP by treating the Offer Letter Agreement and the OIP as a single, integrated agreement.  The language of the agreements does not allow the arbitrator to do so.

Addressing compensation in the form of RSUs, the Offer Letter Agreement states that "[a]ny equity-based instruments granted to you as part of your award **will be governed by the applicable . . . award agreement**" and provides that, "[i]n the event of any conflict between information contained in this document and the plan or award agreement provisions, **the terms of the plan and award agreement will govern**." (Melnick Decl., Exh. 8.)  (Emphasis added.).    The Mutual Agreement meanwhile excludes from its dispute resolution provisions, claims "[the Parties] have agreed to arbitrate through a separate agreement." (Mutual Agreement, paragraph 3.)   Thus, the language of the agreements plainly requires the Arbitrator to interpret them as separate and distinct contracts.

The contrasting procedures for dispute resolution underscore the parties' intentions to keep them separate.  (Melnick Decl., Exhs. 8, 24.)  For example, the Mutual Agreement allows an employee to go straight to arbitration while the OIP requires a two-step process (nonbinding mediation before binding arbitration).  (Melnick Decl., Exh. 24, paragraph 13(k).)  The Mutual Agreement requires Citizens to pay all arbitration fees other than the filing fee, while the OIPs empower the arbitrator to assign responsibility for those fees to either party.  Dispute resolution under the Mutual Agreement is governed by the AAA Employment Rules while the OIPs specify the AAA Commercial Rules.  The Mutual Agreement sets a location for the arbitration hearing that is favorable to the claimant (within 50 miles of his Primary Work Location) while the OIPs give the Company sole discretion to determine where the hearing will take place.  (Compare Exh. B to Demand for Arbitration, paragraphs 1 and 2 with Melnick Decl., Exh. 24).

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

Magleby's argument the Arbitrator should address the alleged breach of OIPs because the Offer Letter Agreement and the OIPs are a single, integrated agreement is inconsistent with the language of those agreements.

### C.   **Magleby's Claim for Breach of the OIPs Is Not Before the Arbitrator**

As noted above, Magleby's Demand for Arbitration in this proceeding specifically invoked the dispute resolution procedures in the Mutual Agreement.  (Demand for Arbitration, Exh. B., paragraphs 2 and 3.)   The AAA's  jurisdiction in this contractual arbitration is therefore limited to claims covered by the Mutual Agreement.  The Mutual Agreement expressly excludes claims arising in connection other agreements.  The OIPs are separate agreements dictating a separate and distinct dispute resolution process.  The AAA and the Arbitrator accordingly have no jurisdiction to adjudicate claims arising out of the OIPs in this proceeding.

### VII.   **For the Reasons Presented in Its Motion, Citizens Is Entitled to Judgment on Magleby's Remaining Causes of Action**

The Arbitrator agrees with Citizens that Magleby's claim for unjust enrichment is not actionable where, as in this case, the parties' express written contracts govern his employment relationship with Citizens.  (Motion, at 22-23.).  Also, having failed to introduce evidence of bad faith, Magleby has necessarily failed to prove that any alleged enrichment was unjust.

Magleby has also failed to introduce admissible or reliable evidence raising issues of fact on his conversion claim.  The undisputed evidence is that the allegedly converted calendar and contract lists belonged to Citizens.  (Melnick Decl. Exh. 29.)

His intentional interference claims (including the claim for conspiracy) also fail for lack of evidence and fail as a matter of law as to Swimmer and McCree.  (Motion at 24-25.)  As employees of Citizens acting within the scope of their employment, Swimmer and McCree cannot be personally liable for interfering with Magleby's employment agreement with Citizens.  (*Id.*)

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

DocuSign Envelope ID: B6DA268C-3E9F-4C5B-B8C3-F64220A50AF8

Magleby's fraud claim fails because he cannot prove the element of reasonable reliance.  His acceptance of the Offer Letter Agreement memorialized his consent to relinquish any reliance on alleged prior promises. He also agreed that future verbal promises could not form the basis for any modification to that agreement.  (Melnick Decl, Exh. 8.).  With this contractual language in place, Magleby could not have reasonably relied on side agreements involving compensation.

**VIII.   The Arbitrator Grants Summary Judgment on All Claims**

For the reasons provided in this Order, the Arbitrator GRANTS Respondents' motion in full and summarily adjudicates all claims in favor of Respondents and against Magleby.   The evidentiary hearings set for June 24, 2024, through June 2, 2024, are off calendar.

Dated this 14th day of June, 2024.

DocuSigned by:

*Hon. Amy D. Hogue (Ret)*

F0C039E7623A423...

Hon. Amy Hogue (Ret.)
Arbitrator

ARBITRATION AWARD GRANTING SUMMARY JUDGMENT IN FAVOR OF RESPONDENTS

# Exhibit 6

# Exhibit 6

# MUSHKIN & COPPEDGE

| | | |
|---|---|---|
| **Michael R. Mushkin, Esq.** | **6070 South Eastern Avenue** | **Telephone** 702.454.3333 |
| **L. Joe Coppedge, Esq.** | **Suite 270** | **Facsimile** 702.386.4979 |
| **Mark C. Hafer, Esq.\*** | **Las Vegas, Nevada 89119** | |
| *\*of counsel* | | |

October 23, 2024

Via Certified First-Class Mail,
First-Class Mail, and Electronic Mail

| | |
|---|---|
| Andrew J. Melnick | Gaurav K. Talwar |
| c/o Davis Wright Tremaine LLP | c/o Davis Wright Tremaine LLP |
| 1251 Avenue of the Americas, 21st Fl. | 1251 Avenue of the Americas, 21st Fl. |
| New York, NY 10020-1104 | New York, NY 10020-1104 |
| AndrewMelnick@dwt.com | Gtalwar@dwt.com |

      Re:    Curtis C. Magleby v. Citizens Bank, N.A.
              Restricted Share Units Award Agreement

Dear Counsel,

     Please accept this letter as demand for arbitration pursuant to 13(k) of the Restricted Stock Units Award Agreement between the parties, a copy of which is attached hereto for your ease of reference.

     After you have had the opportunity to review this letter and attachment, I would appreciate a speedy response. If you have any questions or concerns, please do not hesitate to contact the undersigned.

                           Sincerely,

                           Michael R. Mushkin, Esq.

MRM:cml
cc: I. Fogel

**CITIZENS FINANCIAL GROUP, INC.**
**2014 OMNIBUS INCENTIVE PLAN**

**Restricted Stock Unit Award Agreement**
**Terms and Conditions (Annual Grants)**

Name of Participant: CURTIS CONRAD MAGLEBY

Number of Restricted Stock Units:  13,378

Date of Grant: 03/01/2019

Unless defined in this award agreement (this "**Award Agreement**"), capitalized terms shall have the meanings assigned to them in the Citizens Financial Group, Inc. 2014 Omnibus Incentive Plan (the "**Plan**").  In the event of a conflict among the provisions of the Plan and this Award Agreement, the provisions of the Plan shall prevail.

Section 1.     *Grant of RSU Award.*  Citizens Financial Group, Inc. (together with its Subsidiaries, the "**Company**") has granted to the Participant (the "**Participant**") an award (the "**Award**") of the number of restricted share units ("**RSUs**") specified in the Participant's electronic account, effective on the "**Grant Date**" specified in the Participant's electronic account. The Award is subject to the terms and conditions of the Plan and this Award Agreement. The Award is granted under the Plan, the provisions of which are incorporated herein by reference and made a part of this Award Agreement.

Section 2.     *Issuance of RSUs.*  Each RSU shall represent the right to receive one Share upon the vesting of such RSU, as determined in accordance with and subject to the terms of this Award Agreement and the Plan.

Section 3.     *Rights as a Shareholder; Dividend Equivalents.*

(a)     The Participant shall have no voting rights or any other rights as a shareholder of the Company with respect to the RSUs unless and until the Participant becomes the record owner of the Shares underlying such RSUs.

(b)     If a dividend is declared on Shares during the period commencing on the Grant Date (including such date) and ending on the date on which the Shares underlying RSUs are distributed to the Participant pursuant to Section 6, the Participant shall be credited with dividend equivalents in the form and in an amount equal to the dividend that the Participant would have received had the Shares underlying the RSUs been distributed to the Participant as of the time at which such dividend is paid. Dividend equivalents will be subject to the same vesting and forfeiture restrictions as the RSUs to which they are attributable and will be paid on the same date that the RSUs to which they are attributable are settled in accordance with Section 6.

Section 4.     *Restrictions on Transferability.*  The RSUs granted hereunder shall not be assigned, sold, exchanged, pledged, hypothecated, transferred, alienated or otherwise disposed of or hedged, in any manner (including through the use of any cash-settled instrument), whether voluntarily or involuntarily, and whether by operation of law or otherwise, other than by will or by the laws of descent and distribution, by the Participant.  Any sale, exchange, transfer, assignment, pledge, hypothecation, or other disposition in violation of the provisions of this Section 4 shall be null and void and any RSU which is hedged in any manner shall immediately be forfeited.  All of the terms and conditions of the Plan and this Award Agreement shall be binding upon any permitted successors and assigns.

Section 5.     *Vesting; Change of Control; Vesting and Forfeiture Upon a Termination of Employment.*

1

(a)     *Vesting.*  The Award will be subject to the vesting schedule specified in the Participant's electronic account.

(b)     *Change of Control.*  If the Participant is terminated by the Company without Cause, or the Participant resigns from employment with the Company with Good Reason, within 12 months after a Change of Control (a "**Change of Control Termination**"), all unvested RSUs shall fully vest on the Participant's termination date and shall be distributed to the Participant pursuant to Section 6.

(c)     *Vesting and Forfeiture Upon Termination of Employment.*

i.      *Termination Without Cause.*  If the Participant is terminated by the Company without Cause (other than a Change of Control Termination), the Participant's RSUs shall continue to vest in accordance with Section 5(a) as though the Participant was still employed by the Company on each applicable vesting date, *provided, however,* that the Participant does not engage in any Detrimental Activity during the Participant's post-employment vesting period.

ii.      *Retirement; Disability.*  If the Participant's employment is terminated due to Retirement or Disability, the Participant's RSUs shall continue to vest in accordance with Section 5(a) as though the Participant was still employed by the Company on each applicable vesting date, *provided, however,* that the Participant (A) does not engage in any Detrimental Activity and (B) does not become employed by any company in the financial services industry, in each case, during the Participant's post-employment vesting period.

iii.      *Death.*  If the Participant is terminated due to death, the Participant's RSUs shall fully vest on the Participant's date of death and shall be distributed to the Participant's Beneficiary pursuant to Section 6.

iv.      *Forfeiture.*  If the Participant is terminated by the Company with Cause or the Participant resigns for any reason (other than a Change of Control Termination), any unvested RSUs shall be forfeited in their entirety on the Participant's termination date without any payment to the Participant. In addition, if (A) the Participant's employment is terminated by the Company without Cause (other than a Change of Control Termination) and the Participant engages in any Detrimental Activity during the Participant's post-employment vesting period, or (B) the Participant's employment is terminated due to Retirement or Disability and the Participant either (I) engages in any Detrimental Activity, or (II) becomes employed by any company in the financial services industry, in either case, during the Participant's post-employment vesting period, any unvested RSUs shall be forfeited in their entirety on the date that the Participant engages in such Detrimental Activity or becomes employed by any company in the financial services industry, as applicable, without any payment to the Participant.

Section 6.     *Distribution on Vesting.*  Subject to the provisions of this Award Agreement, upon the vesting of any of the RSUs, the Company shall deliver to the Participant (or the Participant's Beneficiary, in the event of the Participant's death prior to distribution), as soon as reasonably practicable after the vesting date (or the Participant's termination date, as applicable), one Share for each RSU, provided that such delivery of Shares shall be made no later than the end of the calendar year in which they vest or, if later, by the 15th day of the third calendar month after the vesting date provided that the Participant shall not be permitted, directly or indirectly, to designate the taxable year of the payment.  Upon such delivery, such Shares shall be fully assignable, saleable and transferable by the Participant, provided that any such assignment, sale, transfer or other alienation with respect to such Shares shall be in accordance with applicable securities laws.

Section 7.     *Notice Prior to the Participant's Voluntary Separation from Employment.* In partial consideration for the Participant's eligibility for and receipt of any award granted under the

Plan, the Participant agrees to provide the Company with prior notice of the Participant's voluntary separation from employment, regardless of the reason for such separation. Such notice shall be no less than the greater of (a) the notice period applicable to the Participant's employee level as specified in the Company's Separation from Employment Policy as it exists at the time the Participant provides such notice or (b) the period specified in any other written agreement between the Participant and the Company.

Section 8.    *Restrictive Covenants.*

(a)    *Non-Solicitation of Employees.*  In addition to the Participant's obligations detailed in this Agreement, the Participant agrees and reaffirms that, at any time during the Participant's employment and for twelve (12) months following the date the Participant ceases to be employed by the Company for any reason, or if longer, during the remaining vesting period (the "Restricted Period"), the Participant shall not, directly or indirectly, whether for the Participant's own account or for any person or entity other than the Company or any Company Affiliate hire, employ, solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by the Company or any Company Affiliate during the Restricted Period, nor shall the Participant directly or indirectly induce any such employee to terminate his or her employment or accept employment with anyone other than a Company Affiliate, or otherwise interfere with the relationship between the Company and/or any Company Affiliate and any of their employees during the Restricted Period. Anything to the contrary notwithstanding, the Company agrees that the Participant shall not be deemed in violation of this Section 8(a) if an entity with which the Participant is associated hires or engages any employee of the Company or a Company Affiliate, if the Participant was not, directly or indirectly, involved in hiring or identifying such person as a potential recruit or assisting in the recruitment of such employee.

(b)    *Non-Solicitation of, and Non-Interference with, Customers and Prospective Clients.*  The Participant agrees that during the Participant's employment and during the Restricted Period, the Participant shall not, directly or indirectly, for any person or entity other than the Company or any Company Affiliate, solicit, assist in soliciting for or accept business from any customer of the Company or any Company Affiliate, nor will the Participant induce or encourage any such customer to discontinue or diminish his, her or its relationship or prospective relationship with the Company or any Company Affiliate, or divert business away from the Company or any Company Affiliate; provided, however, that general solicitation through advertisement shall not constitute solicitation for purposes of this provision. Anything to the contrary notwithstanding, the Company agrees that the Participant shall not be deemed in violation of this Section 8(b) if an entity with which the Participant is associated accepts business from a customer or client of the Company or a Company Affiliate, if the Participant was not, directly or indirectly, involved in soliciting or identifying such customer or client as a potential customer or client of the competing entity.

(c)    *Representations.*  The Participant agrees that all of the foregoing restrictions are reasonable and necessary to protect the Company's and/or any Company Affiliate's business and their Confidential Information and that the Participant's eligibility for and receipt of any award under the Plan, are independently and together good and valuable consideration to compensate him or her for agreeing to all restrictions contained in this Agreement. The Participant also acknowledges, represents and warrants that the Participant's knowledge, skills and abilities are sufficient to permit the Participant to earn a satisfactory livelihood without violating these provisions. Further, the Participant agrees that the Participant shall not, following the termination of the Participant's employment with the Company, represent or hold the Participant out as being in any way connected with the business of the Company or any Company Affiliate.

(d)    *Blue Pencil.*  It is expressly understood and agreed that although the Participant and the Company consider the restrictions contained in this section to be reasonable, if a final judicial determination is made by an arbitrator or a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against the Participant, the provisions of this Agreement shall not be rendered void but shall be

deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if an arbitrator or a court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

Section 9.     *Tax Liability; Withholding Requirements.*  The Participant shall be solely responsible for any applicable taxes (including, without limitation, income and excise taxes) and penalties, and any interest that accrues thereon, that the Participant incurs in connection with the receipt, vesting or settlement of any RSU granted hereunder. The Company shall be authorized to withhold from the Award the amount (in cash or Shares, or any combination thereof) of applicable withholding taxes due in respect of the Award, its settlement or any payment or transfer under the Award and to take such other action (including providing for elective payment of such amounts in cash or other property by the Participant) as may be necessary in the opinion of the Company to satisfy all obligations for the payment of such taxes; provided, however, that no Shares shall be withheld with a value exceeding the maximum statutory tax rates in the applicable tax jurisdictions.

Section 10.     *Recoupment/Clawback.*  The Participant hereby acknowledges and agrees that in order to comply with applicable law (including, without limitation, the Dodd-Frank Wall Street Reform and Consumer Protection Act), regulatory authority, and policies of the Company, the Committee retains the right at all times to decrease or terminate all awards and payments under the Plan, and any and all amounts payable under the Plan, or paid under the Plan, shall be subject to clawback, forfeiture, and reduction to the extent determined necessary to comply with applicable law, regulatory authority, and/or policies of the Company, including as a result of risk-related events.

Section 11.     *No Right to Continued Employment.*  Neither the Plan nor this Award Agreement shall confer upon the Participant any right to continue to be employed by the Company and the receipt of the Award does not confer any rights on the Participant other than those expressly set forth in this Award Agreement or the Plan.

Section 12.     *Section 409A of the Code.*  This Award Agreement is intended to comply with the requirements of Section 409A of the Code and the regulations thereunder, and the provisions of this Award Agreement shall be interpreted in a manner that satisfies the requirements of Section 409A of the Code, and this Award Agreement shall be operated accordingly. If any provision of this Award Agreement or any term or condition of the RSUs would otherwise conflict with this intent, the provision, term or condition shall be interpreted and deemed amended so as to avoid this conflict. Notwithstanding anything else in this Award Agreement, if the Board considers a Participant to be a "specified employee" under Section 409A of the Code at the time of such Participant's "separation from service" (as defined in Section 409A of the Code), and the amount hereunder is "deferred compensation" subject to Section 409A of the Code any distribution that otherwise would be made to such Participant with respect to RSUs as a result of such separation from service shall not be made until the date that is six months after such separation from service, except to the extent that earlier distribution would not result in such Participant's incurring interest or additional tax under Section 409A of the Code. If the Award includes a "series of installment payments" (within the meaning of Section 1.409A-2(b)(2)(iii) of the Treasury Regulations), the Participants' right to the series of installment payments shall be treated as a right to a series of separate payments and not as a right to a single payment. Notwithstanding the foregoing, the tax treatment of the benefits provided under this Award Agreement is not warranted or guaranteed, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Participant on account of non-compliance with Section 409A of the Code.

Section 13.     *Miscellaneous.*

(a)     *Definitions*.  For purposes of this Award Agreement:

i.     "**Cause**" means:

(1)     any conviction (including a plea of guilty or of nolo contendere or entry into a pre-trial diversion program) of the Participant for the commission of a felony or any conviction of any criminal offense within the scope of Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. § 1829;

(2)     the Participant commits an act of gross misconduct, fraud, embezzlement, theft or material dishonesty in connection with the Participant's duties or in the course of the Participant's employment with the Company or any of its affiliates;

(3)     failure on the part of the Participant to perform his or her employment duties in any material respect, which is not cured to the reasonable satisfaction of the Company within 30 days after the Participant receives written notice of such failure; or

(4)     the Participant engages in Detrimental Activity.

ii.     "**Company Affiliate**" means the Company's parents, subsidiaries, affiliates or their respective successors (collectively, the "Company Affiliates" and each a "Company Affiliate").

iii.     "**Detrimental Activity**" includes the following:

(1)     The Participant's disclosure to any unauthorized person, firm, or corporation or use or attempt to use for his or her own advantage or to the advantage of any other person, firm or corporation, any confidential information relating to the business affairs or trade secrets of the Company or any of its affiliates, howsoever obtained or provided, during the course of, or as a result of, his or her employment (the "**Confidential Information**").  Confidential Information includes, but is not limited to, information relating to employees, customers and suppliers (former, actual and potential), Company contracts, pricing structures, financial and marketing details, business plans, any technical data, designs, formulae, product lines, intellectual property, research activities and any information which may be deemed to be commercially or price sensitive in nature, whether printed, typed, handwritten, videotaped, transmitted or transcribed on data files or on any other type of media, including but not limited to electronic and digital media, whether or not labeled as "confidential";

(2)     The Participant violates the obligations set forth in Section 8(a) or 8(b) of this Award Agreement.

(3)     Making any false or disparaging comments about the Company or any of its subsidiaries, affiliates, employees, officers, or directors; or

(4)     Engaging in any activity which in the opinion of the Company is not consistent with providing an orderly handover of the Participant's responsibilities.

The Participant agrees that the foregoing restrictions are reasonable and necessary to protect the Company's business and that the grant of this Award, along with the benefits and attributes of the Participant's employment by the Company, is good and valuable consideration to compensate the Participant for agreeing to these restrictions.

iv.     "**Disability**" means the Participant is entitled to, and has begun to receive, long-term disability benefits under the long-term disability plan of the Company in which the Participant participates.

5

v.    "**Good Reason**" means any of the following changes, as compared to the Participant's terms of employment prior to a Change of Control:

(1)    a material diminution in the Participant's authority, duties, or responsibilities;

(2)    a material diminution in the Participant's base salary other than a general reduction in base salary that affects all similarly situated employees; or

(3)    a relocation of the Participant's principal place of employment by more than 50 miles from his or her current principal place of employment, unless the new principal place of employment is closer to the Participant's home address.

Provided, however, that the Participant must give written notice to the Company within 30 days of the initial existence of any of the foregoing changes, the Company shall have 30 days upon receipt of such notice to remedy the condition so as to eliminate the Good Reason, and if not remedied, the Participant's employment must terminate no later than 60 days following the expiration of such cure period.  Notwithstanding the foregoing, the Participant's continued employment shall not constitute a waiver of the Participant's rights with respect to any circumstance constituting Good Reason under this Award Agreement.

vi.    "**Retirement**" means the Participant's age plus years of service (in each case, including completed months) equals or exceeds 65, with a minimum of at least five years of service with the Company.

(b)    *Notices.*  All notices, requests and other communications under this Award Agreement shall be in writing and shall be delivered in person (by courier or otherwise), mailed by certified or registered mail, return receipt requested, or sent by facsimile transmission or by e-mail or any other form of electronic transmission or delivery approved by the Committee, as follows:

if to the Company, to:

Citizens Financial Group, Inc.
600 Washington Blvd.
Stamford, CT 06901
Attention: Corporate Secretary

if to the Participant, to the address that the Participant most recently provided to the Company,

or to such other address, facsimile number, e-mail address or such other form of electronic transmission or delivery as such party may hereafter specify for the purpose by notice to the other parties hereto.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed received on the next succeeding business day in the place of receipt.  Notwithstanding anything to the contrary contained in this Award Agreement or in the Plan, the Company may, in its sole discretion, deliver and, by acceptance of this grant, the Participant hereby explicitly and unambiguously consents and agrees to the receipt and delivery of, any notices permitted or required hereunder, documents related to any Awards granted under the Plan and/or any other information (including, without limitation, information required to be delivered to the Participant pursuant to applicable securities laws) regarding the Company and the Subsidiaries or the Plan by electronic means, including but not limited to through the Participant's electronic account, through another on-line or electronic account system established and maintained by the Company or another third party designated by the Company or via the Company website.  Such consent shall remain in effect throughout the Participant's term of employment or service with the

6

Company and thereafter until withdrawn in writing by the Participant.  The Participant acknowledges that the Participant may receive from the Company a paper copy of any notices or documents delivered electronically at no cost to the Participant by contacting the Company by telephone or in writing.

(c)    *Entire Agreement*.  This Award Agreement and the Plan (including the terms specified in the Participant's electronic account, as noted in Section 1 and Section 5 above) constitute the entire agreement and understanding between the parties in respect of the subject matter hereof and supersede all prior and contemporaneous arrangements, agreements and understandings, both oral and written, whether in term sheets, presentations or otherwise, between the parties with respect to the subject matter hereof.

(d)    *Severability*.  If any provision of this Award Agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, or would disqualify the Plan or this Award Agreement under any law deemed applicable by the Board, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Board, materially altering the intent of this Award Agreement, such provision shall be stricken as to such jurisdiction, and the remainder of this Award Agreement shall remain in full force and effect.

(e)    *Amendment; Waiver*.  No amendment or modification of any provision of this Award Agreement that has a material adverse effect on the Participant shall be effective unless signed in writing by or on behalf of the Company and the Participant, *provided* that the Company may amend or modify this Award Agreement without the Participant's consent in accordance with the provisions of the Plan or as otherwise set forth in this Award Agreement.  No waiver of any breach or condition of this Award Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.  Any amendment or modification of or to any provision of this Award Agreement, or any waiver of any provision of this Award Agreement, shall be effective only in the specific instance and for the specific purpose for which made or given.

(f)    *Assignment*.  Neither this Award Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by the Participant.

(g)    *Successors and Assigns; No Third-Party Beneficiaries*.  This Award Agreement shall inure to the benefit of and be binding upon the Company and the Participant and their respective heirs, successors, legal representatives and permitted assigns.  Nothing in this Award Agreement, express or implied, is intended to confer on any Person other than the Company and the Participant, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Award Agreement.

(h)    *Governing Law; Waiver of Jury Trial.* This Award Agreement shall be governed by the laws of the State of Delaware, without application of the conflicts of law principles thereof.  By acknowledging this Award Agreement electronically or signing it manually, as applicable, the Participant waives any right that the Participant may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Award Agreement or the Plan.

(i)    *Discretionary Nature.* The grant of the RSUs does not create any contractual right or other right in the Participant to receive any RSUs or other Awards in the future. Future grants of Awards, if any, shall be at the sole discretion of the Company.

(j)    *Participant Undertaking; Acceptance*.  The Participant agrees to take whatever additional action and execute whatever additional documents the Company may deem necessary or advisable to carry out or give effect to any of the obligations or restrictions imposed on either the Participant or the RSUs pursuant to this Award Agreement. The Participant acknowledges

7

receipt of a copy of the Plan and this Award Agreement and understands that material definitions and provisions concerning the RSUs and the Participant's rights and obligations with respect thereto are set forth in the Plan. The Participant has read carefully, and understands, the provisions of this Award Agreement and the Plan.

(k)     *Dispute Resolution.* Except as provided in the last sentence of this paragraph to the fullest extent permitted by law, the Company and the Participant agree to waive their rights to seek remedies in court, including but not limited to rights to a trial by jury.  The Company and each Participant agree that any dispute between or among them and/or their affiliates arising out of, relating to or in connection with this Plan shall be resolved in accordance with a confidential two-step dispute resolution procedure involving: (a) Step One: non-binding mediation, and (b) Step Two: binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, et. seq., or state law, whichever is applicable.  Any such mediation or arbitration hereunder shall be under the auspices of the American Arbitration Association ("**AAA**") pursuant to its then current AAA Commercial Arbitration Rules. No arbitration shall be initiated or take place with respect to a given dispute if the parties have successfully achieved a mutually agreed to resolution of the dispute as a result of the Step One mediation.  The mediation session(s) and, if necessary, the arbitration hearing shall be held in the city/location selected by the Company in its sole discretion.  The arbitration (if the dispute is not resolved by mediation) shall be conducted by a single AAA arbitrator, selected by the Company in its sole discretion.  Any award rendered by the arbitrator, including with respect to responsibility for AAA charges (including the costs of the mediator and arbitrator), shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction.  In the unlikely event the AAA refuses to accept jurisdiction over a dispute, the Company and each Participant agree to submit to JAMS mediation (formerly known as Judicial Arbitration and Mediation Services) and arbitration applying the JAMS equivalent of the AAA Commercial Arbitration Rules.  If AAA and JAMS refuse to accept jurisdiction, the parties may litigate in a court of competent jurisdiction.

(l)     *Captions.*  Captions provided herein are for convenience only and shall not affect the scope, meaning, intent or interpretation of the provisions of this Award Agreement.

(m)     *Nature of Payments.*  Any and all grants or deliveries related to the RSUs hereunder shall constitute special incentive payments to the Participant and shall not be taken into account in computing the amount of salary or compensation of the Participant for the purpose of determining any retirement, death or other benefits under (i) any retirement, bonus, life insurance or other employee benefit plan of the Company, or (ii) any agreement between the Company and the Participant, except as such plan or agreement shall otherwise expressly provide.

(n)     *Data Privacy.*  The Participant understands that the Company and its affiliates and hold certain personal information about the Participant, including but not limited to the Participant's name, home address and telephone number, birthdate, social insurance number or other identification number, compensation, details of all Awards or any other entitlement to Shares for the purpose of administering the Plan (the "Data").  As a condition of receipt of this Award, the Participant explicitly consents to the collection, use, transfer and retention, in electronic or other form, of the Data by and among, as applicable, the Company, its affiliates and any third parties assisting the Company in administration of the Plan (including but not limited to any broker or other third party with whom the Participate may elect to deposit Shares), in each case, for the purpose of administering the Participant's participation in the Plan.

Acceptance Date: 03/22/2019

Electronic Signature: Signed Electronically

J8Y5P5K5

03/22/2019 09:57 AM U.S. Eastern Standard Time

ACCEPTED